Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA,
                    Plaintiff,

V.                                Criminal Action No. 04-10194-RCL

DAVID JORDAN and
ANTHONY BUCCI,                    March 27, 2006
                    Defendants.   Boston, Massachusetts
_____

TRANSCRIPT OF TESTIMONY OF CARLOS ALBERT RUIZ, DAY 2

JURY TRIAL DAY 6

BEFORE THE HONORABLE REGINALD C. LINDSAY

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

ONE COURTHOUSE WAY

BOSTON, MA  02210

DEBRA M. JOYCE, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA  02210
617-737-4410

```
 1    APPEARANCES:
 2    FOR THE GOVERNMENT:
 3    JOHN T. McNEIL, ESQ.
      S. THEODORE MERRITT, ESQ.
 4    Assistant United States Attorney
      Office of the United States Attorney
 5    John J. Moakley U.S. Courthouse
      1 Courthouse Way, Suite 9200
 6    Boston, MA  02210
      617-748-3100
 7
 8    FOR THE DEFENDANT DAVID JORDAN:
 9    THOMAS DRECHSLER, ESQ.
      Finneran, Byrne & Drechsler
10    Suite 201
      50 Redfield Street
11    Boston, MA  02122
      617-265-3900
12
      MARIA A. LUISE, ESQ.
13    Balliro & Mondano
      99 Summer Street
14    Suite 1800
      Boston, MA  02110
15    781-737-8442
16
      FOR THE DEFENDANT ANTHONY BUCCI:
17
      MICHAEL F. NATOLA, ESQ.
18    63 Atlantic Avenue
      Suite 2B
19    Boston, MA  02110
      617-367-1199
20
      ANTHONY J. ROSSI, ESQ.
21    ROSSI & BLAISDELL, P.A.
      516 Broadway
22    Everett, MA  02149
      617-387-5502
23
24
25
```

1db11721-5076-4e92-b471-52ca304c4ec2

1                P R O C E E D I N G S

2            (The following proceedings were held in open court

3     before the Honorable Reginald C. Lindsay, United States

4     District Judge, United States District Court, District of

5     Massachusetts, at the John J. Moakley United States Courthouse,

6     1 Courthouse Way, Boston, Massachusetts, on March 27, 2006.

7            The defendants, David Jordan and Anthony Bucci, are

8     present with counsel.  The Assistant United States Attorneys

9     are present.)

10               *   *   *   *   *   *   *

11           CARLOS ALBERT RUIZ, having been previously duly

12    sworn by the Clerk, was further examined and testified as

13    follows:

14               CONTINUED DIRECT EXAMINATION

15    BY MR. McNEIL:

16    Q.  All right.  Mr. Ruiz, when we broke on Friday, you had just

17    listened to a call on December 22, '03.  Do you recall that?

18    A.  Yes.

19    Q.  All right.  Picking up after that call where an order of

20    three kilos was made by Jon Minotti -- first of all, what do

21    the kilos refer to?  Kilos of what?

22    A.  Cocaine.

23    Q.  And did you get three kilos?

24    A.  Yes.

25    Q.  And did you get it from one of the suppliers in this

1db11721-5076-4e92-b471-52ca304c4ec2

Page 4

1    organization?

2    A.  Yes.

3    Q.  And how was it packaged?

4    A.  It was packaged in individuals, wrapped up in white tape.

5    Q.  And was it real cocaine?

6    A.  I've been working with this organization for the past three

7    years.

8    Q.  And after that did you get further calls from Jon Minotti?

9    A.  Yes.

10              MR. MERRITT:  May I approach the witness, your

11   Honor?

12              THE COURT:  Yes.

13              MR. MERRITT:  I'm going to place Exhibit -- well,

14   ask the jury to get their transcripts out, but I'm going to

15   play a tape which has already been admitted, Exhibit 3 A, which

16   is a call on December 23, 2003 at 7:12.

17              THE COURT:  This will be in tab three?

18              MR. MERRITT:  Yes, tab 3.

19              (Played CD.)

20   BY MR. MERRITT:

21   Q.  Now, Mr. Ruiz, on the first page of that transcript you're

22   told by Jon Minotti that he'll have everything with him, you

23   know.  Do you see that?

24   A.  On the front page?

25   Q.  Yeah.

Page 5

1    A.   What was the question again?

2    Q.   Reference there by Mr. Minotti that says he'll have

3    everything with him, you know.

4    A.   Money.

5    Q.   Okay.   And then he says, "You've met the guy twice."

6             To what is he referring?

7    A.   To Gino.

8    Q.   So where was the meeting supposed to take place the next

9    morning?

10   A.   Jon's house.

11   Q.   And you had been there?

12   A.   Yes.

13   Q.   And do you recall where it was located?

14   A.   In Stoneham in a cul-de-sac.

15   Q.   And about what time are you supposed to be there?

16   A.   10:00.

17   Q.   Now, that next morning, December 24th, did you get a call

18   from Jon Minotti?

19   A.   Yes.

20   Q.   Again, now, I'm going to play what's been admitted as

21   Exhibit 4 A, your Honor.

22             THE COURT:   Okay.

23             That will be at tab 4.

24             (Played CD.)

25   BY MR. MERRITT:

1db11721-5076-4e92-b471-52ca304c4ec2

Page 6

1   Q.  Now, Mr. Ruiz, this call was at 9:00; is that right?

2   A.  Yes.

3   Q.  Now, the voices you heard before you picked up, that's not

4   something you heard that day; is that right?

5   A.  Yes.  I hadn't heard it.

6   Q.  You hadn't heard those voices?

7   A.  No.

8   Q.  Now, did you go to Jon Minotti's house around 10:00?

9   A.  Yes.

10  Q.  And what were you driving?

11  A.  A Park Avenue, red.

12  Q.  What color?

13  A.  A red Park Avenue.

14  Q.  And did you have the three kilos of cocaine with you?

15  A.  Yes, I have.

16  Q.  And where were they located?

17  A.  They were in a secret compartment on the driver's -- the

18  front passenger side on the bottom.

19  Q.  Okay.  Now, you say a secret compartment.

20  A.  Yes.

21  Q.  Did you have that placed in there?

22  A.  Yes.

23  Q.  And how did it operate?

24  A.  Electronically, you push a couple of buttons and it will

25  open.

1db11721-5076-4e92-b471-52ca304c4ec2

1  Q.  Now, when you got to Jon Minotti's house, where did you go?

2  A.  I went into the garage.

3  Q.  Where did you park?

4  A.  In the garage, door's in front.

5  Q.  Were you in the driveway or were you in the garage?

6  A.  Yeah, in the driveway.  In the driveway.

7  Q.  And you said you went into the house through the garage?

8  A.  Yes.

9  Q.  All right.  What happened when you went into the house?

10  A.  I went in empty at first, I seen him.  He wanted to see a

11  kilo, so I went back into the car, opened up the compartment,

12  and took out a kilo and went in, put it in the black bag, and I

13  took it into his house.

14  Q.  What kind of black bag was this?

15  A.  A shopping bag, regular black bag.

16  Q.  So you brought one kilo into his house?

17  A.  Yeah, and I showed it to him.

18  Q.  All right.

19  A.  I opened it up, and I showed it to him.

20  Q.  Did Mr. Minotti do anything with it?

21  A.  No, he just seen it.

22  Q.  All right.  Did you have any further conversation with Jon

23  Minotti in the house about the transaction?

24  A.  Yes.  He told me that it wasn't going to happen here, we

25  had to meet Gino at work.

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 2  3/27/06

1db11721-5076-4e92-b471-52ca304c4ec2

Page 8

1  Q.  Okay.  And did he say where you had to go?

2  A.  No, not at that time.

3  Q.  All right.  So what did you do next?

4  A.  I went back, put the kilo in.  When he was coming towards

5  the car, he told me we have to go meet him at the hospital.

6  Q.  All right.  Did he say which hospital or did you know which

7  hospital he meant?

8  A.  No.

9  Q.  All right.  And did he say why you had to go to the

10  hospital?

11  A.  Because that's where Gino works at.

12  Q.  All right.  And so did Mr. Minotti get in the car with you?

13  A.  Yes.

14  Q.  And what did you do?

15  A.  We were going towards that direction, to the hospital, but

16  he forgot his phone, so we turned around and he grabbed the

17  phone and --

18  Q.  When you say you turned around, where did you go when you

19  turned around?

20  A.  We turned around back to his house, Jon's house.

21  Q.  And what did he do when he get there?

22  A.  He forgot the phone, cell phone, so he went to pick up the

23  cell phone.

24  Q.  Then did he come out of the house?

25  A.  Yes.

1   Q.  At that point was he on the cell phone?

2   A.  Yeah, he was on the cell phone.

3   Q.  And did he hand the phone to you at any time?

4   A.  Yes.

5   Q.  And did you speak to someone on the phone?

6   A.  I spoke to Gino.

7   Q.  And what was that conversation?

8   A.  I made -- I told him if everything was okay, you know, if

9   everything was all set for me to go over there, if he had the

10  money, you know, he said yeah.

11  Q.  All right.  After you had this conversation with Minotti's

12  cell phone did he get in the car with you?

13  A.  Yes.

14  Q.  And where did you head?

15  A.  Went towards the hospital.

16  Q.  And about -- do you recall how long it took you to get

17  there?

18  A.  About 10, 15 minutes.

19  Q.  And did Jon Minotti do anything while you were driving to

20  the hospital?

21  A.  Yes.  He went to the back passenger, and I opened up the

22  secret compartment.  He grabbed the three kilos, put them in a

23  shopping bag, the black shopping bag; and he told me which way

24  to go towards the hospital.

25  Q.  All right.  Had you ever been to this particular hospital

1db11721-5076-4e92-b471-52ca304c4ec2

Page 10

1  before?

2  A.  No.

3  Q.  And when you got to the hospital, did he give you any

4  instructions?

5  A.  Yeah, where to park.

6  Q.  All right.  Do you remember what general vicinity you

7  parked?

8  A.  I parked towards the rail -- actually, he told me to go

9  next to Gino's car.

10  Q.  Did you see a car there?

11  A.  Yeah.

12  Q.  Did you recognize the car?

13  A.  Yes.

14  Q.  What kind of car was it?

15  A.  It was a black Mercedes.

16  Q.  All right.  And how was that car parked?

17  A.  It was towards the back of the -- it was against the rail.

18  He was facing out.

19  Q.  All right.  And how did you park your car?

20  A.  I faced in towards the rail.

21  Q.  So the driver doors were next to each other?

22  A.  Yes, the driver doors were next to each other.

23  Q.  All right.  And after you parked there -- was anyone in the

24  car when you parked there?

25  A.  No.

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 2   3/27/06

Page 11

1    Q.   What's the next thing you saw happen?

2    A.   I seen Gino coming in, coming up the parking -- toward the

3    cars.

4    Q.   All right.  What did he do?

5    A.   He was dressed in blue clothes, like scrubs, working

6    clothes, black leather jacket.  He was walking towards his

7    car.  He got in his car and turned it on, and lit up a

8    cigarette, rolled up the windows.  One window was down, too.

9    Q.   Okay.  Did Jon Minotti do anything at that point?

10   A.   He got out, was walking towards the front of the car,

11   and -- he was going to give him -- supposedly three kilos to

12   Gino.

13   Q.   What did he have --

14               MR. NATOLA:  Objection.  Objection.

15               THE COURT:  Overruled.

16   BY MR. MERRITT:

17   Q.   Did he have the three kilos with him?

18   A.   He had the three kilos with him.

19   Q.   And where did he have them?

20   A.   He had them tucked into his jacket.

21   Q.   And he got out of the car to do what?

22   A.   To go give him the three kilos.

23   Q.   Did you see where he walked?

24   A.   He was walking towards the front of the car.

25   Q.   Then what happened?

Page 12

1   A.  Then I felt an impact from behind on my car, and --

2   Q.  Did you see where Jon Minotti went?

3   A.  He jumped over the rail.

4   Q.  Where did he go?

5   A.  Down the woods.

6   Q.  All right.  Now, you said you felt an impact?

7   A.  Yes.

8   Q.  What was the next thing you realized happening at that

9   point?

10  A.  The impact?

11  Q.  Yeah.

12  A.  I had a police officer come out with his gun pointing at my

13  head, and he said, "Malden police."

14  Q.  Was he in uniform or in plain clothes?

15  A.  In plain clothes.

16  Q.  And was your window up or down?

17  A.  Down.

18  Q.  And how was he holding the gun?  Could you show the jury?

19  A.  Yes, he was going like that.

20  Q.  Did you get a look at the gun?

21  A.  Yes.

22  Q.  Can you describe what it looked like?

23  A.  It was a silver revolver.

24  Q.  What do you mean by a revolver?

25  A.  A small handgun.  You could see the chambers and the

1db11721-5076-4e92-b471-52ca304c4ec2

Page 13

1   barrel.

2   Q.  So you're making a circular motion?

3   A.  Yes.

4   Q.  Could you see the color of it?

5   A.  Silver.

6   Q.  Did it look metal to you?

7   A.  Yes.

8   Q.  Did it look real?

9   A.  Yes.

10  Q.  Did he give you any instructions?

11  A.  Yes.

12  Q.  What?

13  A.  Turn off the car.  I turned it off.  After that they told

14  me to step out of the vehicle.

15  Q.  Did you get out?

16  A.  Yes.

17  Q.  What did you do then?

18  A.  He told Gino the same thing, too.  Gino had his -- his car

19  on, so he turned it off, and turned off and he came out, Gino

20  come out.  He frisked us both.

21  Q.  Okay.  When you say "frisk," what do you mean?

22  A.  Pat us down.

23  Q.  Did you have anything on you?

24  A.  No.

25  Q.  Did Gino have anything on him?  Do you remember?

Page 14

1   A.   He had -- when he was touching him, frisking him, he had

2   something in his pocket.   Gino said it was --

3              MR. NATOLA:   Objection.

4   A.   He asked --

5              THE COURT:   Just a minute.

6              Overruled.

7   A.   He asked -- told him it was money for Christmas presents.

8   Q.   Okay.   You didn't see --

9   A.   I didn't see it.   That's what Gino said.

10  Q.   All right.   Now, after the officer frisked you, frisked

11  Gino did he ask you any questions about the passenger in the

12  car?

13  A.   Yes.

14  Q.   What did he ask you?

15  A.   He asked who was that person that ran?

16  Q.   And what did you tell him?

17  A.   I told him that was Steve.

18  Q.   Steve?

19  A.   Yeah.

20  Q.   Did you make that up?

21  A.   Yes.

22  Q.   Did you tell him anything else about Steve?

23  A.   He asked why he ran.   I told him he had a warrant for his

24  arrest.

25  Q.   You said he had a warrant?

1db11721-5076-4e92-b471-52ca304c4ec2

Page 15

1   A.  Yes.

2   Q.  And when you told the officer that this Steve person had a

3   warrant, did he do anything?

4   A.  No.

5   Q.  Did he ask you for anything?

6   A.  Yes, he asked me for my license.

7   Q.  And did you give it to him?

8   A.  Yes.

9   Q.  And what did he do -- what did you hear happen next?

10  A.  He called it in.  He called dispatch, gave them my name.

11  And I heard dispatch come back with my address, Carlos Ruiz, my

12  address for my house, 106 Bartholomew Street.

13  Q.  Did the officer ask Gino for any identification?

14  A.  No.

15  Q.  Did he call in any name for -- besides yours?

16  A.  No.

17            MR. MERRITT:  May I approach, your Honor?

18            THE COURT:  Yes.

19            Your Honor, at this time I'd like to offer a

20  stipulation and an exhibit as 21 A.  And, if I might, the

21  exhibit has been marked as Exhibit 40, which I think we'd like

22  to offer into evidence as well.

23            THE COURT:  The stipulation?

24            MR. MERRITT:  Yes.

25            THE COURT:  Okay.  May I just take a look at the

Page 16

1    stipulation?

2              (Pause.)

3              THE COURT:  All right.  Ladies and gentlemen,

4    Mr. Merritt -- are you going to read the stipulation as well?

5              MR. MERRITT:  Yes, your Honor.

6              THE COURT:  Mr. Merritt is going to read a

7    stipulation.  And it's a stipulation among the United States,

8    Mr. Jordan, and Mr. Bucci.  And when the parties stipulate to

9    the existence of a fact, there's no need, ladies and gentlemen,

10   for any other evidence as to that fact.  You may take this as

11   evidence, and you may consider this as having been established,

12   the fact in this stipulation as having been established by this

13   stipulation.

14             MR. MERRITT:  Thank you, your Honor.

15             The stipulation reads follows:  That the United

16   States of America and the defendants, David Jordan, Anthony

17   Bucci, stipulate to the following fact:  The compact disc

18   admitted as Exhibit 21 A -- which I offer at this time as well,

19   your Honor --

20             THE COURT:  21 A is received into evidence.

21             (Exhibit 21 received into evidence.)

22             MR. MERRITT:  -- contains a recorded communication

23   between Malden Police Detective David Jordan and the Malden

24   police dispatcher on December 24, 2003 at approximately

25   10:00 a.m.  This is the only radio communication between the

1db11721-5076-4e92-b471-52ca304c4ec2

Page 17

1    Malden police dispatcher and Detective David Jordan on December

2    24, 2003 between the hours of 8:30 a.m. and 12:30 p.m.

3              And now if we could turn to tab 21.

4              (Played CD.)

5    BY MR. MERRITT:

6    Q.  Now, Mr. Ruiz, that's your address at the time?

7    A.  Yes.

8    Q.  Now, did the officer search your car?

9    A.  Yes.

10   Q.  And did he find anything in there?

11   A.  No.

12   Q.  Did he search Gino's car?

13   A.  No.

14   Q.  Did the officer arrest you?

15   A.  No.

16   Q.  Did he say anything to you?

17   A.  After --

18   Q.  Yes.

19   A.  -- everything was over, yeah.

20   Q.  What did he say?

21   A.  He said, "It's your lucky day.  I'm going to let you go.

22   You have a merry Christmas."

23   Q.  Did he make any reference to drugs, do you recall?

24   A.  Yes.

25   Q.  What did he say?

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 2  3/27/06

Page 18

1    A.  He said you're well-known in Lynn for drug dealing.

2    Q.  Now, after he told you it's your lucky day and a merry

3    Christmas, did he tell you to do anything?

4    A.  I left.  We left.

5    Q.  Now, you -- you left?

6    A.  Yes.

7    Q.  Okay.  And did you get in your car?

8    A.  Yes.

9    Q.  Did you see where Gino went?

10   A.  No.

11   Q.  And did you make any calls shortly after you left the

12   Malden parking lot?

13   A.  Yes.

14   Q.  Who was one of the first people you called?

15   A.  Jon's house, Jon.

16              MR. MERRITT:  May I approach, your Honor.

17              THE COURT:  Yes.

18   BY MR. MERRITT:

19   Q.  Let me show you what's been marked for identification as

20   Government Exhibit 5 A, identified as a call at 11:00 on

21   December 24th.

22              Have you listened to that before?

23   A.  Yes.

24   Q.  And have you also read the transcript?

25   A.  Yes.

1db11721-5076-4e92-b471-52ca304c4ec2

Page 19

1    Q.  And is it an accurate representation of the call you made

2    to Jon Minotti?

3    A.  Yes.

4             MR. MERRITT:  Your Honor, I move in Exhibit 5 A at

5    this time.

6             THE COURT:  Any objection?

7             MR. DRECHSLER:  No.

8             THE COURT:  5 A is admitted.

9             (Exhibit 5 A received into evidence.)

10            MR. MERRITT:  Turn to tab 5, your Honor, in the

11   transcript books.

12            (Played CD.)

13   BY MR. MERRITT:

14   Q.  Now, Mr. Ruiz, after you left that parking lot what did you

15   think had just happened to you?

16            MR. DRECHSLER:  Objection.

17            Objection.

18            THE COURT:  Sustained.

19   BY MR. MERRITT:

20   Q.  Well, Mr. Ruiz, what was your state of mind at that point?

21            MR. DRECHSLER:  Objection.

22            MR. NATOLA:  Objection.

23            THE COURT:  Sustained.

24            MR. MERRITT:  May we approach, your Honor?

25            THE COURT:  Yes.

1db11721-5076-4e92-b471-52ca304c4ec2

Page 20

1    (At sidebar on the record.)

2        MR. MERRITT:  I'm trying to lay the foundation for

3    an excited utterance, which I think has already been discussed,

4    both pretrial and in our trial brief.  I expect the witness to

5    say that he was angry, he was agitated, he was upset, and he

6    thought that he just been ripped off.  And the next call is to

7    his wife, which is actually in Spanish, but he has that tone;

8    and I think it well fits within the excited utterance

9    exception.  He's still under the influence of a startling

10   event, and he has no reason to prevaricate at that point,

11   speaking to his wife.  And it is, I think, a classic excited

12   utterance.

13       THE COURT:  But I've already ruled on the excited

14   utterance.

15       MR. MERRITT:  So I don't know why they objected,

16   but they did.

17       THE COURT:  I guess you were -- you asked him about

18   his state of mind.  And which I guess you would have had to do

19   to establish the excited utterance, but I've already ruled on

20   it.  So if you're planning on playing the tape, I've already

21   ruled that you can play that tape.

22       MR. MERRITT:  Okay.

23       THE COURT:  All right.

24       MR. DRECHSLER:  My concern was it was going to

25   beyond that in his answer and say something else.  I don't have

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 2  3/27/06

Page 21

1    a problem of you playing the tape.  You made a ruling.  I don't

2    want to be viewed as waiving my objection, I still press my

3    objection.

4            MR. MERRITT:  I guess I'm a little confused only

5    because then the record doesn't necessarily reflect the

6    foundation that otherwise would support the admission of an

7    excited utterance.

8            MR. NATOLA:  Doesn't need it.  You've already made

9    a ruling, your Honor.

10           MR. DRECHSLER:  I just don't want to waive my

11   objection.

12           THE COURT:  Let me say this.  We had the discussion

13   about excited utterance, because this is one of the tapes that

14   had originally been objected to.  And I ruled that it was an

15   excited utterance and the tape could be played, this part of

16   the tape could be played.

17           I assume that, as I recall this tape, Mr. Ruiz says

18   on the tape that he thinks he's been robbed.

19           MR. MERRITT:  Yes, your Honor.

20           THE COURT:  So the ruling I made had to do with the

21   state of mind, that's what he was thinking, he said that.  I'm

22   allowing the statement, which was a reflection of his state of

23   mind in any event.  So I don't think we need to do it again.

24           MR. MERRITT:  Okay.

25           MR. NATOLA:  And note my renewed objection.

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 2  3/27/06

1db11721-5076-4e92-b471-52ca304c4ec2

Page 22

1          THE COURT:  Yes, I understand that you object.  I

2    understand it's still there.

3          MR. DRECHSLER:  Thank you.  Mine as well.

4          THE COURT:  Okay.

5          (End of discussion at sidebar.)

6          THE COURT:  I'm sorry, can I just see you all again

7    at the sidebar?

8          (At sidebar on the record.)

9          THE COURT:  This tape is in Spanish; is that right?

10          MR. MERRITT:  Yes, your Honor.

11          THE COURT:  So how are you going to do this?

12          MR. MERRITT:  Well, I think he can authenticate the

13    transcript as being an accurate translation and play the tape.

14          THE COURT:  Okay.  You're going to play it in

15    Spanish?

16          MR. MERRITT:  Yes.

17          MR. DRECHSLER:  Judge, that presents a different

18    problem, because he is going to be the interpreter,

19    effectively, and he's not a sworn interpreter.  He is far from

20    being neutral or unbias in this case, and that's one of the

21    reasons that I objected originally.  I understand the Court's

22    ruling, but I -- I have a real problem with Mr. Ruiz, a witness

23    who has entered into an agreement with the government, being

24    the translator here.

25          I mean, if the government represents that they've

1db11721-5076-4e92-b471-52ca304c4ec2

Page 23

1    had -- it's one thing if the government has translated the tape

2    using a control -- you know, a certified translator or

3    something, but I have a real problem with Mr. Ruiz being the

4    translator.

5            THE COURT:  But he can say that this is what I

6    said.  Just as any other witness can say that's what I said.

7            MR. DRECHSLER:  I understand that he can say that

8    the tape is accurate, but can he -- you mean he's going to

9    translate -- I mean -- let me put it to you this way, Judge.

10   If he's going to say that what's on -- I don't know who

11   prepared the translation, I'm assuming it wasn't Mr. Ruiz, I'm

12   assuming it was some person from the government.

13           THE COURT:  Yes.

14           MR. DRECHSLER:  Unless I'm incorrect about that,

15   I'm assuming it was someone who was qualified to translate it.

16   I don't have a problem with that.  I just don't want this

17   witness translating it to the jury or having him say it's

18   something different or, you know, giving his own translation.

19   That's my concern.

20           THE COURT:  But he is now translating his own

21   remark, his own statement.  So what he's saying -- what I would

22   take him to be saying is this is what I said.  This in English

23   is what I said in Spanish, either by translating it or

24   listening to the tape and saying this is what he said.  So he

25   is doing that.  But he's doing nothing more than any other

1db11721-5076-4e92-b471-52ca304c4ec2

Page 24

1    witness who's saying this is what I said.

2              MR. DRECHSLER:  I guess my only concern is if he

3    says that the transcript is not 100 percent accurate in some

4    way, or the wording is different, I have a concern about him

5    being the person who says that.

6              MR. NATOLA:  It's not quite as simple as the Court

7    has outlined for the very simple reason is the jury doesn't

8    know -- the jury doesn't know what is being said on the tape,

9    so they can't compare it to what he says.

10             THE COURT:  I understand.

11             MR. NATOLA:  Okay.

12             THE COURT:  I understand, that's inherent in the

13   foreign language.

14             MR. MERRITT:  Exactly.  And they've had the

15   transcript for months.  If they don't think it's an accurate

16   transcript translated into Spanish, they certainly had an

17   opportunity to.

18             THE COURT:  So tell me what you're going to do.

19   You're going to play the tape in Spanish.

20             MR. MERRITT:  Yes.

21             THE COURT:  And then he is going to say this is

22   what I said?

23             MR. MERRITT:  Yes, in English.

24             THE COURT:  Okay.

25             (End of discussion at sidebar.)

Page 25

1    BY MR. MERRITT:

2    Q.  Now, Mr. Ruiz, I'm placing before you what's been marked

3    for identification as Government Exhibit 6 A, which is a call

4    labeled a call Ruiz to Irene, December 24, 11:16 a.m.  Have you

5    listened to this tape before?

6    A.  Yes.

7    Q.  And what language is it in?

8    A.  Spanish.

9    Q.  Now, what's also been placed before you is for

10   identification Government Exhibit 6 B.  That is an English

11   translation of this call?

12   A.  Yes.

13   Q.  Is it an accurate translation?

14   A.  Yes.

15           MR. MERRITT:  Your Honor, I move in Government

16   Exhibit 6 A.

17           THE COURT:  Counsel, beside the objection you made,

18   is there any other objection.

19           MR. DRECHSLER:  Not beyond what's been made.

20           THE COURT:  All right.  It's admitted.

21           (Exhibit 6 A received into evidence.)

22           MR. MERRITT:  Turn to tab 6.

23           THE COURT:  Yes.  Ladies and gentlemen, this tape

24   as you heard is going to be in Spanish.  So you're going to

25   hear the Spanish.

Page 26

1          (Played CD.)

2    BY MR. MERRITT:

3    Q.  Now, Mr. Ruiz, on the transcript in the first page at least

4    the translation says that you say, "He hit me from the back of

5    the car."  And who are you referring to?

6    A.  To the police.

7    Q.  When you say "hit," what do you mean by hit?

8    A.  He struck -- he hit me --

9    Q.  With his car?

10   A.  Yeah, with his car.

11   Q.  All right.  And then you say, "I don't know if Jon knew

12   because I think that he was in it with the other asshole."

13   A.  Yeah.

14   Q.  And who are you referring to there?

15           MR. DRECHSLER:  Objection.

16           THE COURT:  Excuse me.  Overruled.

17   A.  To Gino.

18   Q.  And when you say he was in it with the other, who are you

19   referring to?

20   A.  The cop.

21           MR. DRECHSLER:  Objection, move to strike.

22           THE COURT:  Overruled.

23   BY MR. MERRITT:

24   Q.  Now, did you pick up your wife after that?

25   A.  Yes.

1db11721-5076-4e92-b471-52ca304c4ec2

Page 27

1   Q.  And did you pick anyone else up?

2   A.  My brother-in-law.

3   Q.  What's his name?

4   A.  Armando Lovos.

5   Q.  All right.  And did you go somewhere with Mr. Lovos?

6   A.  Yes.

7   Q.  Where did you go?

8   A.  To Jon's house.

9   Q.  Did you go in the same vehicle?

10  A.  No.

11  Q.  What car did you go in?

12  A.  I went in a 2003 Toyota 4Runner.

13  Q.  So you switched cars?

14  A.  Yes.

15  Q.  When you went to Jon Minotti's house, did you see him

16  there?

17  A.  Yes.

18  Q.  Did you speak to him?

19  A.  Yes.

20  Q.  What did you say to him?

21  A.  I asked him where are the three kilos at?

22  Q.  What did he say happened?

23  A.  He said he left them -- he said he seen the blue light, he

24  ran, and he hid them in the forest.

25  Q.  Now, what -- when you say "the forest," what did you mean

1db11721-5076-4e92-b471-52ca304c4ec2

Page 28

1    by that?

2    A.   Down the hospital.

3    Q.   There was some wooded area?

4    A.   Yes, a wooded area.

5    Q.   And did you ask him or tell him what you were going to do

6    about it?

7    A.   I told him to let's go look for the stuff, the three kilos.

8    Q.   And what did he say?

9    A.   He said no, that he had company over.  And I went by myself

10   with my brother-in-law.

11   Q.   Did you tell Jon Minotti you were going to do that?

12   A.   Yes.

13   Q.   So did you go back over to the hospital area?

14   A.   Yes.

15   Q.   And you were driving a truck now, a 4Runner?

16   A.   Yes.

17   Q.   What happened when you got to that area?

18   A.   I parked up on the other -- down the hill, there's like a

19   street.  I was parked there.  I told my brother-in-law to look

20   around the area, which he was looking around the forest area.

21   Q.   Did he do that?

22   A.   Yes.

23   Q.   All right.  And what's the next thing that happened?

24   A.   He said --

25               MR. NATOLA:  Objection.

Page 29

1          MR. DRECHSLER:  Objection.

2          THE COURT:  The next thing -- the question is

3     what's the next thing that happened?

4          MR. NATOLA:  No, the next thing the brother-in-law

5     said to him.

6          THE COURT:  Oh, the question is what happened

7     next.

8     A.  My brother-in-law was already looking for the stuff.

9     Q.  Okay.

10    A.  I told him to get down.  He was looking around the forest

11    for it.

12    Q.  And did something happen after that?

13    A.  Yes.

14    Q.  What?

15    A.  He seen the same police officer.

16    Q.  And where was -- I'm sorry, where was he?

17    A.  He was on top of the hill.

18    Q.  When you say "the same police officer," same meaning what?

19    A.  The same guy that struck me the first time.

20    Q.  All right.  And did this police officer have any then

21    interaction with you and your brother-in-law?

22    A.  No.  My brother in law came down from the hill running.

23    Q.  Yeah.

24    A.  He got in the truck.  We were leaving -- we were leaving,

25    and I met up with him again coming down to -- we met up with

1    each other.

2    Q.  The police officer?

3    A.  Yeah.

4    Q.  All right.  Did he have a conversation with you?

5    A.  Yes.

6    Q.  Okay.  Were you in your truck?

7    A.  Yes.

8    Q.  And where was he?

9    A.  He was in his car.  He got out.

10   Q.  He got out of his car?

11   A.  Yes.

12   Q.  And what was the conversation?

13   A.  He's like "you changed cars, you're smart, huh?  You think

14   you're smart you think you can change cars?"  He asked what was

15   I doing there?  I go "my friend dropped his wallet.  I'm

16   looking for it."  He said, "No, you're not, you're looking for

17   the drugs."  I said, "No, I'm looking for his wallet, for

18   Steve's wallet, he dropped it."  From there he asked my

19   brother-in-law for his license, for his ID.  He gave it to him,

20   and after that he just looked at it and gave it back.

21   Q.  So your brother-in-law, Mr. Lovos gave him some

22   identification, you think?

23   A.  Yes.

24   Q.  Did the police officer do anything with that information?

25   A.  No.

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 2   3/27/06

Page 31

1    Q.  Didn't radio it in?

2    A.  Nope.

3    Q.  And what happened then after you -- after that?

4    A.  He let us go.

5    Q.  And you left?

6    A.  Yes.

7    Q.  Were you angry at this point?

8              MR. NATOLA:  Objection.

9              MR. DRECHSLER:  Objection.

10             THE COURT:  Sustained.

11   BY MR. MERRITT:

12   Q.  All right.  Did you make any other calls?

13   A.  Yes.

14   Q.  Do you recall who else you called?

15   A.  I called Jon, and I called the guy who gave me the three

16   kilos.

17   Q.  Do you know -- do you recall calling a Tommy?

18   A.  Yes.

19   Q.  And who was Tommy?

20   A.  Tommy was a friend of ours.  He's the one that introduced

21   me to Jon.

22   Q.  And what was your purpose in calling this Tommy?

23   A.  To go to Jon's house -- to go to Jon's house.

24             MR. MERRITT:  May I approach, your Honor?

25             THE COURT:  Yes.

1db11721-5076-4e92-b471-52ca304c4ec2

Page 32

1   BY MR. MERRITT:

2   Q.  Let me hand you what's been marked for identification as

3   Government Exhibit 7 A, which is entitled a call Tommy to Ruiz

4   December 24, 2003, 1:45.  Have you listened to this recording?

5   A.  Yes.

6   Q.  And is that a fair and accurate recording of the

7   conversation you had with Tommy?

8   A.  Yes.

9   Q.  Now, this says he called you.  Did you reach out to him

10  first?

11  A.  Yes.

12          MR. MERRITT:  Your Honor, I move in Government

13  Exhibit 7 A.

14          THE COURT:  Any objection?

15          7 A is admitted.

16          (Exhibit 7 A received into evidence.)

17  BY MR. MERRITT:

18  Q.  I hand you a transcript marked 7 B.  You've also looked at

19  the transcript?

20  A.  Yes.

21  Q.  And is that a fair and accurate transcript of the call?

22  A.  Yes.

23          MR. MERRITT:  If I might now play Government

24  Exhibit 7 A, your Honor.

25          THE COURT:  Yes.

1db11721-5076-4e92-b471-52ca304c4ec2

Page 33

1            (Played CD.)

2   BY MR. MERRITT:

3   Q.  Now, Mr. Ruiz, you wanted to threaten Jon Minotti?

4   A.  Yes.

5   Q.  Did you intend to shoot him?

6   A.  No.

7                MR. NATOLA:  Objection.

8                THE COURT:  Overruled.

9                MR. DRECHSLER:  Objection.

10               THE COURT:  Overruled.

11  BY MR. MERRITT:

12  Q.  Now, you actually then called Jon Minotti; is that right?

13  A.  Yes.

14  Q.  And did you have a conversation with him?

15  A.  Yes.

16               MR. MERRITT:  May I approach, your Honor?

17               THE COURT:  Yes.

18  BY MR. MERRITT:

19  Q.  Showing you what's been marked as Government Exhibit 8 A

20  for identification, which is excerpts of the call between Ruiz

21  and Minotti at 2:04 p.m. on December 24th, have you listened to

22  this tape?

23  A.  Yes.

24  Q.  And are those excerpts accurate reproductions of those

25  parts of the conversation with Minotti?

1db11721-5076-4e92-b471-52ca304c4ec2

Page 34

1    A.   Yes.

2              MR. MERRITT:  Your Honor, I move in Exhibit 8 A.

3              THE COURT:  Any objection?

4              MR. DRECHSLER:  Objection.  May we approach on

5    this, Judge.

6              THE COURT:  Yes.

7              (At sidebar on the record.)

8              MR. NATOLA:  Do you mind if I lean on your bench,

9    your Honor?

10             THE COURT:  Go right ahead.

11             MR. NATOLA:  I'm lazy.

12             THE COURT:  You're not going to do anything more

13   than lean, right?

14             MR. NATOLA:  No.  I don't want to invade your

15   space.

16             THE COURT:  That's all right.

17             Yes.

18             MR. DRECHSLER:  Your Honor, the government is now

19   seeking to offer excerpted portions of this conversation.  This

20   conversation -- I realize that we filed a motion in limine --

21   we had a discussion about this earlier and you ruled, but we're

22   now at that point in the trial, and I think things are in a

23   different posture.

24             This stands in an entirely different footing from

25   the conversations of my client.  There the government was

1db11721-5076-4e92-b471-52ca304c4ec2

Page 35

1  arguing that they were inadmissible because, you know, it was

2  statements -- they weren't statements being offered by a party

3  opponent, there was -- under 106 the conversations were

4  complete as they were and so on.

5          This is different, Judge.  This is a witness with

6  whom the government has entered into a cooperation agreement.

7  And I don't see any reason why at this point, where this

8  witness' cooperation agreement has been placed into evidence

9  and the jury knows that he is testifying -- he's been sentenced

10 and he's looking at resentencing, actually, in about a month,

11 and his credibility is at stake in a number of issues which are

12 material to both myself and Mr. Natola's client, that the jury

13 shouldn't hear this whole tape.

14         What the government has excised out are some very

15 unpleasant parts of this conversation, swear words, ethnic

16 slurs, more threats.  This is a witness with whom the

17 government has entered an agreement with.  And, Judge, I don't

18 see any reason why this witness should be protected and have

19 part of his conversation sanitized so that he looks a little

20 better on the stand than he would if the jury heard that entire

21 conversation.

22         You know, it escapes me the logic that they should

23 be able to put in part of the conversation and effectively

24 dress this guy up in front of the jury, whose credibility is at

25 stake and who is a witness who's entered into an agreement with

1db11721-5076-4e92-b471-52ca304c4ec2

Page 36

1    the government.  I just don't see how that should be allowed

2    here.

3              MR. NATOLA:  There's one more aspect to it, your

4    Honor, and it's this -- and I intend to bring this out on

5    cross-examination, unless, of course, you prevent me from doing

6    so -- Mr. Ruiz is part -- the deal that he made with the

7    government in his plea agreement, which is in evidence,

8    received the benefit of the safety valve guideline 5C1.2.  One

9    part, as the Court knows, of the guideline is that the Court

10   has to find in order for the defendant to be eligible for

11   consideration under the guideline that there is no violence or

12   credible threat of violence.

13             Now, two things:  First of all, there's plenty of

14   talk in this conversation about threats of violence.

15             Secondly, and more importantly, your Honor, in the

16   offense conduct that was prepared by the government for

17   Mr. Ruiz's presentence report, given to Judge Saris upon which

18   she made her determinations in this case, there was no mention

19   of any threats that Ruiz made to anybody.  And I am going to

20   explore that, your Honor, on cross-examination to show that he

21   got well more than anybody -- than the government wants the

22   jury to believe that he got.

23             He shouldn't have gotten the safety valve because

24   of that, and by the government deliberately leaving that out,

25   not telling probation about it, not telling Judge Saris about

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 2  3/27/06

Page 37

1    it, he got far more than he was entitled to.

2           MR. MERRITT:  Can I respond to any of this?

3           THE COURT:  Yes, I'm going to let you respond.

4           As to the completion question, I'm going to

5    overrule the objection.  But I might as well deal with the

6    question that Mr. Natola raises, which is a different question.

7           MR. DRECHSLER:  I join in that as well.

8           THE COURT:  Okay.

9           MR. MERRITT:  Well --

10          MR. NATOLA:  I join in Mr. Drechsler's objection.

11          MR. MERRITT:  I understand the court is not

12   permitting them to use other excerpts at this point based on,

13   for instance --

14          THE COURT:  In lieu of 106.

15          MR. MERRITT:  Putting in inflammatory use,

16   derogatory racial term, which I think there is no reason to.

17          As to this, they can explore with Mr. Ruiz what his

18   understanding was with respect to this safety valve thing, and

19   that's fine; but the kind of cross-examination that they're

20   suggesting is they want to cross-examine the government about

21   it.  And if want to find a witness that they can find.  They

22   can't just bring up all this stuff and say to Mr. Ruiz once he

23   said the government didn't promise him anything having to do

24   with this, they're not impeaching Mr. Ruiz, they're

25   impeaching -- I guess they want to impeach the government.

1db11721-5076-4e92-b471-52ca304c4ec2

Page 38

1        THE COURT:  Well, I think I understand Mr. Natola's

2    proposition to be that Mr. Ruiz got favorable treatment that

3    included a safety valve treatment -- he was facing a mandatory

4    sentence, he got favorable treatment because the government did

5    not mention these threats of violence, and they want to explore

6    that.  It seems appropriate for them to do that.

7        MR. MERRITT:  I understand.  They've already just

8    heard a tape where he says I'm going to F'ing shoot somebody.

9    The stuff that we're admitting now says you're going to have a

10   problem.  I'm not objecting to that.

11       They haven't shown the Court anything specific that

12   they want to ask about this tape this is already in evidence.

13       THE COURT:  But as you -- over their objection let

14   you ask the witness and him answer that he didn't intend to

15   shoot anybody, and they're entitled to explore that intention.

16       I haven't looked at this carefully about --

17       MR. MERRITT:  That's what I'm asking, whether

18   there's anything in there that would further that kind of

19   cross-examination.

20       THE COURT:  I don't know if it's in the tape,

21   whether it's in this tape or in some other --

22       MR. DRECHSLER:  It's on the transcript, Judge.  And

23   I will say that guideline 5C1.2, it says credible threats.

24       Now, it's easy for the government to convince the

25   jury that these threats weren't credible when they're only

1db11721-5076-4e92-b471-52ca304c4ec2

Page 39

1    repeated at the government's option only twice.  On this tape

2    there are more threats, and the intensity of them is relevant

3    to the issue of whether or not he got more of a break than he

4    should have under 5C1.2.

5              First of all, Judge, on the unmarked transcript,

6    which I don't know if the Court --

7              THE COURT:  I have it.  This is it.

8              MR. DRECHSLER:  If you look at the second page of

9    my -- and I'd ask that this be marked for identification as

10   well so that the record is clear --

11             THE COURT:  Haven't we marked this for

12   identification?

13             MR. DRECHSLER:  I don't know if we have.  I know

14   the ones on my client we did, but I don't know if it's been

15   marked for identification, but I asked that it be marked for

16   identification so the record is clear.

17             MR. MERRITT:  May I just interrupt, your Honor,

18   logistically?

19             If the Court has already ruled on a 106 basis that

20   this is not coming in now, perhaps we could save the jury

21   some time if we preserve this part for cross-examination.

22             THE COURT:  Why don't we do this, when the jury

23   goes out for break, take this up.

24             MR. DRECHSLER:  On cross, sure.

25             (End of discussion at sidebar.)

Page 40

1          (Discussion off the record.)

2          THE COURT:  All right.  Let's -- we're going to

3     take a short recess.  Keep an open mind and don't discuss the

4     case.

5          (Jury left the courtroom.)

6          THE COURT:  Let's excuse Mr. Ruiz for a couple of

7     minutes.

8          (Witness left the courtroom.)

9          THE COURT:  One of the jurors needed to -- one or

10    two of them needed to go out.

11          This is a good time to take up the matter we were

12    taking up at the sidebar.

13          Mr. Natola, Mr. Drechsler, you wanted me to look at

14    page 2?

15          MR. DRECHSLER:  Starting on page 2, Judge.  I can

16    go through the portions that we -- first, right at the top,

17    Judge, the second reference by Mr. Ruiz.  "Tomorrow morning

18    you're going to contact your friend, I'm going to go tomorrow

19    morning with all my fucking friends and you're going to have

20    fucking problems."

21          I don't how that can be interpreted as anything

22    other than a threat.

23          And Minotti says to -- before you start with

24    that -- and Ruiz says, "No, I'm telling you this right now."

25    And Minotti:  "I did not do a fucking thing.  I would never do

Page 41

1    that to you.  Are you out of your fucking mind?"

2           I should also add when Mr. Minotti takes the stand,

3    he obviously by either the government or the defendant's

4    version of the case stole the cocaine from Mr. Ruiz.  So

5    there's no question these statements, again, adversely reflect

6    on his credibility as well because he's actually lying here

7    when he says, "I did not do a fucking thing.  I would never do

8    that to you."  That's precisely what the government says that

9    he did.

10          And then he says -- if you go down at the bottom,

11   Jon Minotti, the second to the last entry says, "Let me just

12   tell you something before you say anything like that, okay?"

13   And Ruiz says, "No, fuck that shit, Dawg."  And then on the top

14   Jon says, "Huh?"  And then there is ethnic and racial slur.

15          I, for the record, don't agree that people who --

16   that the jury can't negatively reflect on Mr. Ruiz's

17   credibility from the fact that he thinks and uses language like

18   that.  I think a jury can use that to affect his credibility.

19   They may feel, and I would agree with them, that people who

20   think and use language like that are less credible.

21          And so I think it should come in for that purpose

22   on cross anyway.

23          And then the next excerpt, again, Mr. Minotti is

24   denying the complicity in this, which the government has

25   already indicated that in fact was his.

1db11721-5076-4e92-b471-52ca304c4ec2

Page 42

1          At the top of the next page Mr. Minotti says

2   that -- he's telling him that they'll be around there all night

3   long, meaning the cops, and they'll still be there.

4              Now, on direct examination --

5              THE COURT:  Where is this?

6              MR. DRECHSLER:  The top of page 4, Judge, I'm

7   sorry.  Mr. Minotti says, "Let me just tell you something.  I

8   know how they think.  They don't fucking -- when something like

9   this goes down, they'll be around there all night long.  I bet

10  if you went back there again today, they'll still be there."

11             I believe it's fair inference he's referring to the

12  police.

13             The government doesn't -- the jury doesn't hear

14  that.  They don't realize that this witness told a different

15  story on the stand today.

16             He said today the reason Mr. Minotti told him not

17  to -- he wasn't going to go back to the hospital with him was

18  because he had company.  This contradicts that, because here

19  Mr. Minotti is saying that the reason he's -- and, therefore,

20  contradicts the witness.  Because Mr. Minotti is saying to him

21  the reason not to go back there is because the cops are there.

22             Then, your Honor, on this same page, you see one,

23  two, three, four, five -- sixth entry from the bottom, Mr. Ruiz

24  says, "Yeah, but why?  If I don't have my shit tomorrow, I'm

25  going to go to your house tomorrow morning or you're going to

Page 43

1    show me."

2           Again, a threat.  Minotti says, "Stop telling me

3    you're going to my house, because that's fucking fucked up."

4           And Minotti at the bottom says, "Don't start

5    talking stupid like that."

6           So, clearly, Minotti interprets it as a threat.

7           At the top of the next page, that portion of the

8    conversation continues in the excerpted piece.  And I think it

9    puts it all in context as to what they're talking about.

10           On page 6 Minotti again in the excerpted part says,

11    "What?  What are you out of -- you think I would do that to

12    you?  Seriously, think about it?  You really think that of

13    me?"  And Ruiz goes, Oh, I don't know that."  "Who would

14    possibly do this how many times?"

15           "I don't even know what to believe no more, you

16    know what?  You know that, because I would do anything for

17    you.  You've been good to me.  I'm not going to do that to

18    you.  You've got to be fucking kidding me right now."

19           And then Ruiz says, "I'm just telling you this shit

20    better be here by tomorrow."

21           The rest of that page and the next excerpted part

22    at the top of the next page, again, page 7, Mr. Ruiz says, "If

23    he doesn't have my shit, tomorrow, I'm going to tell you this

24    right now, Jon, if he don't have my shit tomorrow, I swear to

25    God, there's going to be fucking problems, man."

Page 44

1        Again, another threat.  The intensity of the threat

2   level rises.  And interspersed in here is Mr. Minotti lying,

3   which by everyone's view of this Mr. Minotti is saying I

4   didn't -- I would never do that to you, man, when the

5   government's case is that Mr. Minotti did steal the cocaine.

6   We may dispute the rest of it, but that's clear.

7        And, again, Mr. Minotti continues to deny his

8   complicity in the theft of the cocaine.  And Mr. Ruiz keeps

9   telling him that, again, at the bottom of page 7, "If I don't

10  get my shit tomorrow, there's going to be fucking problems.

11  I'm telling you this right now."

12        So that's the fourth or fifth threat.

13        Now, the government, it is true, has put in some of

14  the threats, but the intensity level of the threats is enhanced

15  by all of those entries.

16        If you go to page 9, there are more excerpts.  And,

17  again, Mr. Minotti pretends that he doesn't know anything about

18  the theft of the cocaine, which the government agrees is

19  false.  And he continues to deny that at the bottom of page 9

20  and page 10.

21        And, again, Minotti lies on the tape.  Says --

22  talking about what did the with the cocaine on page 10 he

23  says -- Ruiz says to him, "Well, supposedly you know where the

24  shit is at."

25        Minotti said, "I just told you at the bottom of the

1db11721-5076-4e92-b471-52ca304c4ec2

Page 45

1    hill, I just pushed it into the leaves and ran, Dude."

2            So, again, here's Mr. Minotti telling what the

3    government in its opening and in their case says is an absolute

4    lie.  Their case is that Mr. Minotti, in fact, took the cocaine

5    to Mr. Muolo's house and that there, he, Mr. Bucci, and

6    Mr. Muolo split the -- or he delivered the cocaine to Mr. Bucci

7    at Mr. Muolo's house.

8            So by the government's version of the case that's a

9    lie by Mr. Minotti to Mr. Ruiz.

10            I just don't see how you can parse out on

11    cross-examination in fairness to the defendants the level of

12    threats that are going on, the intensity of them, as well as

13    the lies being told to Mr. Ruiz by Mr. Minotti's -- by anyone's

14    version of the case.

15            It just seems to me if not on direct -- I

16    understand the Court's ruling under 106 -- that on cross we

17    should be able to delve into those issues.

18            THE COURT:  Mr. Natola, do you want to add anything

19    before Mr. Merritt --

20            MR. NATOLA:  No, your Honor, not on that issue, no.

21            MR. MERRITT:  Your Honor, I appreciate

22    Mr. Drechsler's candor in explaining why he wants those

23    excerpts in the case.

24            When Jon Minotti lies, which may or may not happen,

25    he can cross Jon Minotti about that, he's made a prior

1db11721-5076-4e92-b471-52ca304c4ec2

Page 46

1    inconsistent statement.

2              But it's clear what he's doing here, he just wants

3    to somehow do this to dirty up Mr. Minotti in a way that's

4    confusing and not within the rules of evidence.

5              His point that if you make the same threat six

6    times more than twice, I don't believe that that, your Honor,

7    is enough to otherwise make that admissible.

8              But if the Court thinks that somehow there's some

9    credibility issue raised by that, then at the most he should be

10   able to cross-examine Mr. Ruiz and say, now, didn't you say,

11   you know, you're going to have an F'ing problem six times?

12             Putting in what Minotti says at this point is not

13   based on the cross-examination of Ruiz.  It's something that

14   may happen, may not happen when Mr. Minotti takes the stand.

15             THE COURT:  All right.  My ruling is this, that to

16   the extent there are threats, and there are threats throughout

17   this, the evidence may come in.  In other words, you may

18   inquire, and the defendants may inquire as to what Mr. Ruiz

19   said to Mr. Minotti.  And I'm going to leave out Minotti's

20   comments unless there is a point in which Minotti -- that puts

21   a threat in context.

22             But by and large, most of this can be done by

23   inquiring about Mr. Ruiz -- what Mr. Ruiz said to Mr. Minotti

24   by way of threat.  And I'm putting that in for this -- I'm

25   allowing that to go in for this reason and this reason alone:

1db11721-5076-4e92-b471-52ca304c4ec2

Page 47

1    Because Mr. Natola has raised the question that this --

2    evidence of these threats goes to the question of the magnitude

3    of any inducement given to Mr. Ruiz.

4            So to the extent that Mr. Ruiz has -- his

5    statements can be interpreted as threats, his statements may be

6    used.

7            Is there anything else?

8            MR. DRECHSLER:  No, your Honor.

9            THE COURT:  We might as well bring the jury back.

10           MR. DRECHSLER:  Are we going to take a break at

11   11:00?

12           THE COURT:  Do you want to take it now?

13           (Discussion off the record.)

14           THE COURT:  We'll take it now.

15           (Recess taken.)

16           THE COURT:  Mr. Merritt.

17           MR. MERRITT:  Thank you, your Honor.  I believe we

18   moved in Exhibit 8 A, your Honor.

19           THE COURT:  Yes.

20           (Exhibit 8 A received into evidence.)

21           MR. MERRITT:  I intend to play that at this point,

22   if I might, your Honor, and ask the jurors to turn to number 8

23   in their transcript book.

24           (Played CD.)

25   BY MR. MERRITT:

1   Q.   Now, Mr. Ruiz, when you had this conversation with

2   Mr. Minotti, you had already been back to the hospital; is that

3   right?

4   A.   Yes.

5   Q.   And when you say on the first page of the transcript "Your

6   F'ing friend went to go visit me again, that cop," what were

7   you referring to?

8   A.   To the police officer that we had the first time, he hit me

9   from the back.

10   Q.   When you say "visit me" --

11   A.   The Malden cop.

12   Q.   Back at the hospital?

13   A.   Yes.

14   Q.   And later in that transcript -- excuse me, I guess it's on

15   the -- on that same page, you're threatening him, you're

16   telling him you're going to have an F'ing problem.  Is that

17   what you're doing, threatening him?

18   A.   Yes.

19   Q.   And on the second page -- do you have the second page?

20   A.   Yes.

21   Q.   Where it says, "I already told Tommy to get me his F'ing

22   address," who are you referring to?

23   A.   To Gino.

24   Q.   And if I could draw your attention to the third page in the

25   middle where you say, "If that F'ing idiot -- how the hell he

Page 49

1   knows that I was up there," who are you referring to?

2   A.   To the Malden cop.

3   Q.   And then you say, "He didn't even have -- this time he

4   didn't have no F'ing gun or else I would have F'ing kicked

5   him," what are you referring to?

6   A.   The first time he pointed the gun on me.

7   Q.   When you say, "This time he didn't have no F'ing gun," what

8   are you referring to?

9   A.   The time right now.  What was that?

10  Q.   I'm sorry.

11  A.   Can you ask the question again?

12  Q.   Can you read the transcript?

13         Now, you say, "He didn't even have -- this time he

14  didn't have no F'ing gun, or else I would have F'ing kicked

15  him."

16  A.   He didn't have it pointed at me, the gun.

17  Q.   And which time are you referring to?

18  A.   The first -- the second time he didn't have the gun pointed

19  at me, the first time he did.

20  Q.   All right.  And then you say, "He had his F'ing gun on me

21  or else I would have F'ing popped him in the nose."  What are

22  you referring to there?

23  A.   The first time, he if he didn't have the gun on me, I would

24  have hit him.

25  Q.   Now, on the same day, the same afternoon, as you've just

1db11721-5076-4e92-b471-52ca304c4ec2

Page 50

1   testified, you were trying to get Gino's number?

2   A.  Correct.

3   Q.  And you asked Jon Minotti for it?

4   A.  Yes.

5   Q.  And you asked Tommy for it?

6   A.  Yes.

7   Q.  Did you later that day get any calls from someone

8   identifying himself as Gino?

9   A.  Yes.

10  Q.  And did you believe that person to be Gino?

11  A.  Yes.

12          MR. NATOLA:  Objection.  I withdraw the objection.

13          THE COURT:  Okay.  All right.

14  BY MR. MERRITT:

15  Q.  Did you believe that person to be Gino?

16  A.  Yes.

17  Q.  And what was it -- was it anything about the call that made

18  you believe it was Gino?

19  A.  He was telling me -- he was going with the same story, you

20  know.  He introduced him as Gino and then he knew what

21  happened, so I figured it was Gino.

22          MR. MERRITT:  May I approach, your Honor?

23          THE COURT:  Yes.

24  BY MR. MERRITT:

25  Q.  Let me put before you what's marked for identification

Page 51

1    Exhibit 9 A entitled Gino, in quotes, to Ruiz December 24,

2    2003, 3:37 p.m., and 10 A, Gino to Ruiz December 24th,

3    5:09 p.m.

4             Have you listened to those tape recordings?

5    A.  Yes.

6    Q.  Are those fair and accurate reproductions of the

7    conversation you had with this person identifying himself as

8    Gino?

9    A.  Yes.

10            MR. MERRITT:  Your Honor, I move in exhibits 9 A

11   and 10 A, your Honor.

12            THE COURT:  Any objection?

13            MR. NATOLA:  No, your Honor.

14            THE COURT:  I'm sorry.

15            MR. NATOLA:  No, your Honor.

16            THE COURT:  They are admitted, 9 A and 10 A.

17            (Exhibits 9 A and 10 A received into evidence.)

18   BY MR. MERRITT:

19   Q.  And if I show you a transcript marked 9 B, is that a fair

20   and accurate transcript of the conversation?

21   A.  Yes.

22            MR. MERRITT:  If I could ask the jury, your Honor,

23   to turn to tab 9.

24            THE COURT:  All right.

25            (Played CD.)

1db11721-5076-4e92-b471-52ca304c4ec2

Page 52

1    BY MR. MERRITT:

2    Q.  Referring to the first page of the transcript where you

3    say, "To me that was a setup, Gino, you tried to set me, Man,"

4    what did you mean by that?

5    A.  Tried to set me up to steal the drugs, three kilos.

6    Q.  And then he has -- at the bottom of the page he's talking

7    about "They caught me and pulled me over a second time with

8    cruisers, and they go through my trunk."  And then you say,

9    "Well, when I went over, he pulled me over."

10                What did you understand him to be telling you?

11   A.  He got searched, too.

12   Q.  Do you know if that was true?

13                MR. NATOLA:  I'm sorry, I missed the question and

14   the answer, your Honor.

15                THE COURT:  Ms. Joyce will read that back, the

16   question and the answer back.

17                (Record read.)

18                MR. NATOLA:  Objection.

19                THE COURT:  Too late.  And what was the answer?

20                MR. NATOLA:  I move to strike it, your Honor.

21                THE COURT:  Overruled.

22   BY MR. MERRITT:

23   Q.  And on the third page, midway down you're talking about --

24   above that -- about the cop, "He would have run after Jon."

25   And then in the middle of the page you said, "At least he would

Page 53

1    have called for backup."  What did you mean by that?

2              MR. DRECHSLER:  Objection.

3              THE COURT:  He may explain what he meant.

4    BY MR. MERRITT:

5    Q.  What did you mean by "backup"?

6    A.  Backup, when I told the cop that he had a warrant for his

7    arrest, he never called it.

8    Q.  Okay.  When you're telling Minotti at least he would have

9    called for backup, what did you mean by the term "backup"?

10             MR. DRECHSLER:  Objection.

11             THE COURT:  Overruled.

12   A.  He came by himself.

13   Q.  And on the fourth page where -- about a third of the way

14   down Gino says, "I didn't even have something in my hands yet,

15   Buddy, so how did I have something to do with it?"  You said,

16   "Yeah, but it had to be one -- something don't smell right."

17             When he said "something in my hands," what did that

18   mean?

19   A.  The three kilos.

20   Q.  And the bottom of the page where Gino says, "Secondly, I

21   don't really like talking on the phone like this," what does

22   that mean to you?

23   A.  Stop talking, the conversation.

24   Q.  Now, you got another call from Gino later that day?

25   A.  Yes.

1db11721-5076-4e92-b471-52ca304c4ec2

Page 54

1    MR. MERRITT:  At this time, your Honor, I'd like to

2  play Exhibit 10 A, which I believe has been admitted.

3    THE COURT:  Yes, you may.

4    MR. MERRITT:  If the jurors can turn to tab 10.

5    (Played CD.)

6  BY MR. MERRITT:

7  Q.  Now, Mr. Ruiz, where this Gino is saying, "Or there's F'ing

8  cops all over the place," what was he talking about?

9  A.  The hospital forest.

10  Q.  And this was at 5:09 p.m.?

11  A.  Yes.

12  Q.  All right.  Now, turning your attention to the day after

13  Christmas, December 26th, did you go back to Jon Minotti's

14  house?

15  A.  Yes.

16  Q.  And with whom did you go?

17  A.  With five friends.

18  Q.  And what was your purpose in going there?

19  A.  Threatening him.

20  Q.  And why did you have so many friends with you?

21  A.  To look good.

22  Q.  Were any of them armed?

23  A.  No.

24  Q.  Did you see Jon Minotti when you got to his house?

25  A.  Yes.

1db11721-5076-4e92-b471-52ca304c4ec2

Page 55

1    Q.   Where was he?

2    A.   In the driveway.

3    Q.   Was he with anybody?

4    A.   Malden cop.

5    Q.   Which one?

6         MR. DRECHSLER:  Objection.

7    A.   This one.

8         MR. DRECHSLER:  May I approach, Judge?

9         THE COURT:  Okay.

10        (At sidebar on the record.)

11        MR. DRECHSLER:  Your Honor, I've never been advised

12   that this witness was going to attempt to make an in-court

13   identification of my client.  In fact, the discovery reports

14   that I've received told me two things, the interviews of this

15   witness by the special agents one, was that he said he never

16   saw my guy.  And, two, he was shown --

17        THE COURT:  The police report tell you that?

18        MR. DRECHSLER:  It's right in the, it's marked for

19   identification.

20        Secondly, he said the agent showed this witness an

21   array of photographs, including my client, and he was unable to

22   make an identification of my client.

23        Now, if I had known this witness was going to

24   attempt to come in and make an in-court identification under

25   these highly suggestive circumstances, I would have moved to

Page 56

1    suppress that.  I was led to believe by the discovery that he

2    could not identify the person.  In fact, he was shown a photo

3    array and couldn't identify anybody.

4              It's pretty suggestive here, Judge, he's sitting

5    next to us, he's on trial.  I think it's pretty obvious who the

6    government suspects the defendant is.  And I object to it.

7              MR. McNEIL:  I'm not sure what he's objecting to,

8    your Honor.

9              MR. DRECHSLER:  An in-court identification of my

10   client.

11             MR. MERRITT:  I haven't sought one --

12             THE COURT:  Your client -- Mr. Ruiz pointed in

13   Mr. Jordan's direction.  I don't know if you intended --

14             MR. MERRITT:  No, I didn't.

15             THE COURT:  -- intended to have him identify him.

16             MR. MERRITT:  No, I didn't.

17             THE COURT:  He did point in that direction.

18             MR. MERRITT:  If he did, that's fodder for

19   identification.  But this is not an in-court identification

20   procedure.  And I'm not sure what Mr. Drechsler is talking

21   about.  He said he never saw his guy in his entire testimony.

22             THE COURT:  He said --

23             MR. MERRITT:  He did not pick him out of a photo

24   spread.

25             MR. DRECHSLER:  At one point in the narrative I was

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 2   3/27/06

1db11721-5076-4e92-b471-52ca304c4ec2

Page 57

1  given said he never saw him.  I took that to mean he never saw

2  his face.  I'll show it to you and have it marked.

3          THE COURT:  He testified here of two encounters.

4          MR. DRECHSLER:  He never said he saw his face.  In

5  the first one he said there was a gun pointed at him, and he

6  said the guy told him to do this and that and he never saw his

7  face.  I'm just telling you what the report says, that he never

8  saw him.

9          THE COURT:  Well, the jury can take it that he said

10 I saw him, pointed a gun at my face, after I came back and the

11 same person came up to him again.  I don't --

12         MR. MERRITT:  Your Honor, I don't believe there's

13 any requirement -- not that that I planted this -- that an

14 in-court identification procedure be noticed to the defendant.

15 There's no requirement of that whatsoever.

16         And if he himself recognizes him, then that's

17 fine.  I'm not eliciting it.  If they want to cross-examine

18 about his gestures, they can do that.

19         THE COURT:  Okay.  Overruled.

20         (End of discussion at sidebar.)

21 BY MR. MERRITT:

22 Q.  All right.  Mr. Ruiz, when you went back to Jon Minotti's

23 house on December 26th with your friends --

24 A.  Yes.

25 Q.  -- you were saying that you saw Mr. Minotti outside?

Page 58

1   A.  Yes.

2   Q.  And was he with anybody?

3   A.  A Malden cop.

4   Q.  And was this the same guy you had seen in the hospital?

5   A.  Yes.

6   Q.  And what were they doing?

7   A.  Talking.

8   Q.  And what did you observe them do next?

9   A.  They -- well, the Malden cop got in the pickup truck, in

10  the black pickup truck, he got in, and Jon went into his house.

11  Q.  Did you see where the Malden cop went?

12  A.  He backed up to the cul-de-sac.

13  Q.  And did you see him do anything as he went by you?

14  A.  As he went -- as he was leaving he covered his face.

15  Q.  And after he left did you talk to Jon Minotti?

16  A.  Yes.

17  Q.  Before he went inside?

18  A.  Yes.

19  Q.  What did you say and what did he say?

20  A.  He said that was DEA.  And he went -- he went inside, he

21  never came out.

22  Q.  Now, did any police officers show up shortly after that?

23  A.  Yes.

24  Q.  Do you know what town they were from?

25  A.  Stoneham.

1  Q.  And what happened when they arrived on the scene there?

2  A.  They told us that they had a disturbance call.

3  Q.  Okay.  And can you describe what happened?

4  A.  Then one officer went -- they asked what are we doing

5  here.  I said, "I came to talk to my friend."  And then he goes

6  "Did you talk to him?"  I said "No, I'm going to go up to his

7  house."  He goes "Hold on."

8           We stayed there, my friends, and one officer went

9  to go -- I guess went to Jon's house, and one officer stayed

10 with us.

11 Q.  All right.  And when the officer that stayed with you, did

12 he do anything?

13 A.  Yes, he asked us questions, what were we doing, if we had

14 any weapons, and he write down all our information.

15 Q.  At some point did the other officer come outside after

16 being inside the house?

17 A.  Yes.

18 Q.  And what happened then?

19 A.  He told us, the group, that this guy is scared, he's very

20 scared, and he's like he knows -- he told them that we came to

21 pick up some money for -- drug money.

22 Q.  And what did you say?

23 A.  I go, "Yeah, it's for drugs.  He owes me money for drugs."

24 Q.  What did the officer do?

25 A.  Nothing.  He just -- he just told us to get out, that he

Page 60

1    doesn't want to talk to us, and they escorted us out.

2    Q.  And did you leave?

3    A.  Yes.

4    Q.  Did you ever go back to Jon Minotti's after that?

5    A.  No.

6    Q.  But did you continue to try to get your cocaine or your

7    money?

8    A.  Yes.

9    Q.  How did you do that?

10   A.  I called a couple of times.

11   Q.  Called whom?

12   A.  Jon.

13   Q.  And did you threaten him?

14   A.  Yes.

15   Q.  At some point did Jon Minotti make arrangements to give you

16   some money?

17   A.  Yes.

18   Q.  And how did he make the arrangements?

19   A.  I met up with him in Square One Mall.

20   Q.  And do you remember when approximately that was in relation

21   to Christmas?

22   A.  A couple of days.

23   Q.  And did you meet with Jon Minotti at the Square One Mall?

24   A.  Yes.

25   Q.  And was he with anybody?

Page 61

1   A.  No.

2   Q.  And did he give you anything?

3   A.  Yes, he gave me $23,000 in cash in a brown bag.

4   Q.  And after that did you have any further contact with either

5   Jon Minotti or the man you knew as Gino?

6   A.  No.

7   Q.  Did you have any calls or anything?  Do you remember?

8   A.  Calls for -- him calling me?

9   Q.  Either way, calls.

10  A.  Yeah.

11  Q.  Did you continue to try to collect either more money or

12  drugs?

13  A.  Yeah.

14  Q.  And did you get any?

15  A.  No.

16  Q.  Now, were you arrested in early January 2004?

17  A.  Yes.

18  Q.  And where were you arrested?

19  A.  In New Hampshire, my house.

20  Q.  You were arrested where?

21  A.  In Massachusetts, but it was for a charge in New Hampshire.

22  Q.  All right.  And when -- after you were arrested did you

23  know of the location of any firearms in New Hampshire?

24  A.  Yes.

25  Q.  Where?

Page 62

1    A.   In my trailer.

2    Q.   And were those surrendered to the police?

3    A.   Yes.

4    Q.   Whose firearm was it?

5    A.   My friend's.

6    Q.   And after you were -- did you go to New Hampshire and

7    appear in court?

8    A.   Yes.

9    Q.   And did you get bail?  Were you let out?

10   A.   Yes.

11   Q.   Did you continue to sell drugs?

12   A.   Yes.

13   Q.   And were you arrested again in early May by agents of the

14   Drug Enforcement Administration?

15   A.   Yes.

16   Q.   Did you agree to cooperate with them?

17   A.   Yes.

18   Q.   And sometime after that were you shown a series of

19   photographs to see if you could identify anyone in connection

20   with the Christmas Eve incident?

21   A.   Yes.

22   Q.   And were you able to identify at that time the photographs

23   of anyone who was the Malden police officer?

24   A.   No.

25            MR. MERRITT:  May I approach, your Honor?

1db11721-5076-4e92-b471-52ca304c4ec2

Page 63

```
1              THE COURT:  Yes.

2              (Discussion off the record.)

3              MR. MERRITT:  May I approach, your Honor?

4              THE COURT:  Yes.

5   BY MR. MERRITT:

6   Q.  Showing you what's marked for identification as

7   Government's Exhibit 22 and 23, do you recognize these series

8   of photographs?

9   A.  Agree.

10  Q.  What do you recognize them from?

11  A.  From the first time I cooperated.

12  Q.  Who showed them to you?

13  A.  DEA.

14  Q.  All right.  And were you asked to see if you could

15  recognize anyone in those series of photographs?

16  A.  Yes.

17  Q.  And were you able to?

18  A.  Yes.

19              MR. MERRITT:  Your Honor, I move in Exhibits 22 and

20  23.

21              THE COURT:  Any objection?

22              MR. DRECHSLER:  Yes.  Can I approach on this,

23  Judge?  I'm a little confused.

24              THE COURT:  Okay.

25              (At sidebar on the record.)
```

1db11721-5076-4e92-b471-52ca304c4ec2

Page 64

1          THE COURT:  May I see those?

2          MR. DRECHSLER:  He just said -- I heard him say

3    yes, that he was able to identify somebody.

4          THE COURT:  Yes.  That's what he said.

5          MR. DRECHSLER:  Okay.  I mean -- I don't know which

6    one he identified.  I'm not sure what -- isn't this supposed to

7    be the array of the police officers?

8          THE COURT:  In other words, he said --

9          MR. DRECHSLER:  In other words, he said he couldn't

10   identify anybody, and now he said he could.

11         THE COURT:  The only thing I heard is he said he

12   could identify.

13         MR. DRECHSLER:  Earlier he said he was shown a

14   group of photographs with regard to an attempt to identify the

15   Malden police officer.  And he said no, he couldn't.  Now he's

16   being asked whether he can identify anybody, and he said yes,

17   he could.

18         THE COURT:  Okay.

19         MR. DRECHSLER:  Well --

20         THE COURT:  He now says he can.

21         MR. MERRITT:  I think he said I couldn't identify

22   the Malden police officer.

23         MR. DRECHSLER:  Right.

24         And then I questioned were you shown other series

25   of photographs could you identify anybody else?

1db11721-5076-4e92-b471-52ca304c4ec2

Page 65

1    THE COURT:  And he said yes.  So that's where he

2    is.

3    MR. ROSSI:  I think he's not trying to identify the

4    police officer, he's trying to identify the other two parties.

5    Correct?

6    MR. MERRITT:  Correct.

7    MR. DRECHSLER:  I misunderstood.

8    (End of discussion at sidebar.)

9    BY MR. MERRITT:

10   Q.  And placing, if I might, your Honor, on this document

11   camera -- do you have -- putting Government Exhibit 23, do you

12   recognize this exhibit, Mr. Ruiz?

13   A.  Yes.

14   Q.  And you selected -- are those your initials on the picture

15   that's marked number 2?

16   A.  Yes.

17   THE COURT:  Just a minute, Mr. Merritt.  This is

18   23?

19   MR. MERRITT:  Yes.

20   THE COURT:  Was there an objection to 22?

21   MR. NATOLA:  No, your Honor.

22   MR. DRECHSLER:  Okay.

23   THE COURT:  22 and 23 are admitted.

24   (Exhibits 22 and 23 received into evidence.)

25   THE COURT:  Go ahead.  I'm sorry.

Page 66

1          MR. MERRITT:  Thank you.

2   BY MR. MERRITT:

3   Q.  And you did put your initials under 2?

4   A.  Yes.

5   Q.  And who was that you were identifying?

6   A.  Jon.

7   Q.  And showing you what's been admitted as Government Exhibit

8   22, you put your initials under picture number 5?

9   A.  Yes.

10  Q.  And who were you identifying in that selection?

11  A.  Gino.

12          MR. MERRITT:  No further questions, your Honor.

13          THE COURT:  Which of you -- Mr. Natola?

14          MR. NATOLA:  Yes, thank you, your Honor.

15          THE COURT:  Okay.

16                  CROSS-EXAMINATION

17  BY MR. NATOLA:

18  Q.  Mr. Ruiz, you don't wear those clothes every day anymore,

19  do you?

20  A.  No.

21  Q.  You wear a prison uniform, right?

22  A.  Yes, orange.

23  Q.  An orange one?

24  A.  Yes.

25  Q.  Because you've been in prison since the early part of 2004;

Page 67

1    is that right?

2    A.  Yes.

3    Q.  And you were brought from prison to testify here today,

4    right?

5    A.  Yes.

6    Q.  Now, let me ask you a question:  There was a time in your

7    cooperation with the government where they put you on a chair

8    and they asked questions to you back and forth like -- as if

9    you were on direct exam and cross-examination, right?

10   A.  Yes.

11   Q.  All right.  How many times did they do that?

12   A.  Four.

13   Q.  And when was the last time they did that?

14   A.  I think it was -- two weeks ago.

15   Q.  Okay.

16   A.  I don't know.

17   Q.  So you've had practice in being questioned by lawyers as if

18   it were in a trial, right?

19   A.  What do you mean questions?

20   Q.  You've had practice in being questioned by lawyers as if it

21   were in a trial, right?

22   A.  Yes.

23   Q.  Okay.  Now, I want to ask you some questions about your

24   direct testimony that you've just given here today.

25                You testified that you got the three kilograms of

Page 68

1    cocaine from one of the members of the organization that was

2    charged in your case.  Do you recall that testimony?

3    A.  Yes.

4    Q.  Who was the individual that you got the cocaine from?

5    A.  Rosales.

6    Q.  What was his first name?

7    A.  Tonio.

8    Q.  I'm sorry?

9    A.  Tonio.

10   Q.  And you've never been required to testify against him, have

11   you?

12   A.  No.

13   Q.  How about anybody else in that case, have you been required

14   to testify against anybody else in that case?

15   A.  No.

16   Q.  Okay.  Now, you testified this morning that it was real

17   cocaine that you got, right?

18   A.  Yes.

19   Q.  But you never tested any of those three kilograms that you

20   had on December 24, 2003, did you?

21   A.  No.

22   Q.  All you had were white bricks that were wrapped in white

23   tape; is that right?

24   A.  Correct.

25   Q.  Now, you testified also that after you got to Minotti's

Page 69

1   house Minotti wanted to see one of the kilograms of cocaine

2   that you brought; is that right?

3   A.   Yes.

4   Q.   And you went out in your car, correct?

5   A.   Mm-hmm.

6   Q.   You activated that secret hiding place in your car; is that

7   right?

8   A.   Yes.

9   Q.   And you grabbed one of the kilograms of cocaine, right?

10   A.   Yes.

11   Q.   I believe your testimony was that you put it in a black

12   shopping bag.  Do you remember that?

13   A.   Yes.

14   Q.   What was the -- what was the black shopping bag made of?

15   A.   Plastic.

16   Q.   Like one of the things you get at the grocery store?

17   A.   Yes.

18   Q.   Okay.  So it was -- it was that thin plastic that they use

19   to put groceries in at the checkout, right?

20   A.   Yeah.

21   Q.   And it was black in color?

22   A.   Yeah.

23   Q.   And when you put the kilo in it, did you wrap the bag

24   around it or did you hold the bag by the handles?

25   A.   Just hold it.

Page 70

1    Q.   Okay.  Just like it was a bag of groceries?

2    A.   I carried it.

3    Q.   Okay.  You never put -- you never put that kilogram in a

4    gym-type bag, did you?

5    A.   No.

6    Q.   And, in fact, you didn't have a gym bag with you in your

7    car that day, did you?

8    A.   No.

9    Q.   And when Mr. Minotti -- moving ahead, just jumping ahead to

10   the hospital on this issue of the bag -- when Mr. Minotti got

11   out of your car with the three kilograms of cocaine in it, he

12   put it in that black plastic shopping bag, right?

13   A.   Yes.

14   Q.   He didn't put it in a gym bag, did he?

15   A.   No.

16   Q.   And he ran off with it into the woods with that black thin

17   plastic shopping bag, right?

18   A.   Yes.

19   Q.   Okay.  Now, you testified earlier that when you were at

20   Minotti's house, he forgot his telephone, right?

21   A.   Yes.

22   Q.   So you left and then very quickly came back to Minotti's

23   house, right?

24   A.   Yes.

25   Q.   He ran in, got his telephone, yes?

Page 71

1    A.  Yes.

2    Q.  And when he came out, he had the telephone to his ear,

3    correct?

4    A.  Yes.

5    Q.  And he gave the telephone to you, right?

6    A.  Mm-hmm.

7    Q.  And you say that you spoke with Gino and Gino said that

8    everything was all set and that he the money.  Do you remember

9    testifying to that?

10   A.  Yes.

11   Q.  Now --

12   A.  He said he had a friend from New Hampshire.

13   Q.  Okay.

14   A.  So everything was all set.

15   Q.  He said three things.  He said everything was all set?

16   A.  Mm-hmm.

17   Q.  He said he had the money?

18   A.  Yeah.

19   Q.  Right?

20   A.  Yeah.

21   Q.  And now you're saying that he said he had friends from New

22   Hampshire with him, right?

23   A.  Yeah.

24   Q.  You didn't tell the jury that on direct examination, did

25   you?

1db11721-5076-4e92-b471-52ca304c4ec2

Page 72

1    A.   No.

2    Q.   Okay.  Now, do you remember being questioned before the

3    grand jury on June the 8th of 2004 in this building?

4    A.   What was that?

5    Q.   Do you remember appearing before the federal grand jury in

6    this building on June the 8, 2004?

7    A.   Yes.

8    Q.   And you were brought into the grand jury room, right?

9    A.   Yes.

10   Q.   And there were a bunch of people sitting there, correct?

11   A.   Yes.

12   Q.   And there was no judge, was there?

13   A.   No.

14   Q.   There was a prosecutor, right?

15   A.   Yes.

16   Q.   And there was a stenographer, just like that one over

17   there, correct?

18   A.   Yes.

19   Q.   Now, what did you do before you began to testify that day,

20   Mr. Ruiz?

21   A.   What did I do?

22   Q.   Yeah.

23   A.   Tell them the truth, what happened.

24   Q.   You raised your right-hand, didn't you?

25   A.   Yes.

1db11721-5076-4e92-b471-52ca304c4ec2

Page 73

1    Q.  You took an oath?

2    A.  Yes.

3    Q.  You took an oath to tell the truth, right?

4    A.  Yes.

5    Q.  And you swore to tell the truth under the pains and

6    penalties of perjury, right?

7    A.  Correct.

8    Q.  You know what perjury is, don't you?

9    A.  Yes.

10   Q.  What is it?

11   A.  If you lie.

12   Q.  If you lie when you're under oath, right?

13   A.  Yes.

14   Q.  And you know it's a crime, right?

15   A.  Yes.

16   Q.  And it's a federal crime, correct?

17   A.  Yes.

18   Q.  And you could be punished for perjury, right?

19   A.  Yes.

20   Q.  Now, do you recall, sir, having been asked the question,

21   quote, When you were at Jon's house -- meaning Jon Minotti's

22   house -- did you ever speak to Gino?  Did you folks call Gino

23   on the phone?  Do you recall?

24            Do you remember being asked that question?

25   A.  Did I what?

1db11721-5076-4e92-b471-52ca304c4ec2

Page 74

1       MR. MERRITT:  Page?

2       (Discussion off the record.)

3   BY MR. NATOLA:

4   Q.  Mr. Ruiz, do you recall being asked the following

5   question -- now listen carefully -- this is by the prosecutor,

6   Mr. Farley, Assistant U.S. Attorney Farley.  Do you remember

7   him?

8   A.  Yes.

9   Q.  Okay.  He was the original prosecutor in this case, right?

10  A.  Yes.

11  Q.  Mr. McNeil wasn't the original prosecutor, was he?

12  A.  No.

13  Q.  And Mr. Merritt wasn't the original prosecutor either?

14  A.  No.

15  Q.  Okay.  Now, Mr. Farley was asking you the questions before

16  the grand jury that day, right?

17  A.  Yes.

18  Q.  Okay.  Do you remember being asked this question by

19  Mr. Farley:  "When you were at Jon's house, did you ever speak

20  to Gino?"

21          Do you remember being asked that question?

22  A.  I don't remember.

23          MR. NATOLA:  May I approach the witness, your

24  Honor?

25          THE COURT:  Yes.

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 2  3/27/06

1db11721-5076-4e92-b471-52ca304c4ec2

Page 75

BY MR. NATOLA:

Q.  I'm going to ask you to look at this to yourself, read it
to yourself, bottom of page 12 and the Tom of page 13.

        After you're done reading it to yourself, just look
up at me, please.

A.  You mean 24, right?

Q.  Yeah, begin at 24.

        Now, if we'll turn to page 1 -- excuse me, page 3
of this same document, is it accurate for me to say that the
name Carlos Ruiz -- Carlos A. Ruiz is at the top of that?

A.  Yes.

Q.  And it says Carlos A. Ruiz sworn?

A.  Yes.

Q.  So that was you who testified that day?

A.  Yes.

Q.  Do you remember now being asked the question:  "When you
were at Jon's house, did you speak to Gino?"

A.  I told them I didn't recall.

Q.  You didn't recall, did you?

A.  Yes.

Q.  Your answer to the grand jury under oath on June the 8th of
2034 was that you didn't recall speaking with Gino while you
were at Jon's house that morning, correct?

A.  Correct.

Q.  Now, you testified on direct examination that when you saw

Page 76

1   Gino walking across the parking lot of the Malden Hospital that

2   he had scrubs on.  Do you remember that?

3   A.  Yes.

4   Q.  What are scrubs?

5   A.  The working clothes, I guess, from the hospital.

6   Q.  Okay.  They're like those pants and a shirt that like

7   doctors wear sometimes you see on TV?

8   A.  Yeah, yes.

9   Q.  Okay.  And those have -- those look different from other

10  kinds of clothes, right?

11  A.  Yes.

12  Q.  You'd never confuse a set of scrubs with a sweat suit,

13  would you?

14  A.  No.

15  Q.  Because they look different, right?

16  A.  Yes.

17  Q.  And Gino, he wasn't wearing a blue velour sweatshirt that

18  day -- sweat suit that day, was he?

19  A.  No.

20  Q.  No.  He had on hospital scrubs?

21  A.  Yes.

22  Q.  And you say he had a black leather jacket on as well; is

23  that right?

24  A.  Yes.

25  Q.  You testified that as you pulled up into the lot that Jon

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 2  3/27/06

Page 77

1    Minotti told you to park next to the black Mercedes; is that

2    right?

3    A.  Yes.

4    Q.  And you did what Minotti told you to do, right?

5    A.  Yes.

6    Q.  You parked next to the Mercedes, correct?

7    A.  Yes.

8    Q.  You saw Gino walk across the lot and get into his car,

9    right?

10   A.  Mm-hmm, yes.

11   Q.  He didn't say anything to you at that point, did he?

12   A.  Yeah, he told me he was going to go switch Gino's car.

13   Q.  No, no, no, no.  Gino didn't say anything to you when he

14   walked and got into his car, did he?

15   A.  Oh, no.

16   Q.  But Minotti said something to you?

17   A.  Yeah.

18   Q.  So before he got into his car Gino had no conversation with

19   you.

20   A.  No.

21   Q.  He got in the car and he lit a cigarette, correct?

22   A.  Correct.

23   Q.  All right.  And then Minotti started to get out of your

24   car, correct?

25   A.  Yes.

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 2   3/27/06

1db11721-5076-4e92-b471-52ca304c4ec2

Page 78

1  Q.  And just yes or no, you and he had a very brief

2  conversation, right?

3  A.  Me and Jon?

4  Q.  Yeah.

5  A.  Yes.

6  Q.  Okay.  And then he walked toward the front of your car; is

7  that right?

8  A.  Yes.

9  Q.  All right.  And it was at that point that you felt an

10  impact to the rear of your car; is that correct?

11  A.  Yes.

12  Q.  Now, up to that point you never saw Jon Minotti near the

13  window of the vehicle where Gino was sitting, did you?

14  A.  No.

15  Q.  No.  And you never -- because Jon Minotti was in a

16  different spot, right?

17  A.  Yes, he was passenger --

18  Q.  He was on the passenger's side, right?

19  A.  Of the back seat.

20  Q.  And you never saw him say anything to Gino that morning,

21  did you?

22  A.  No.

23  Q.  And you never saw him hand anything to Gino, did you?

24  A.  No.

25  Q.  You never saw him even try to hand anything to Gino, did

1db11721-5076-4e92-b471-52ca304c4ec2

Page 79

1   you?

2   A.  No.

3   Q.  No.  Because the minute you felt the impact on your car,

4   Jon Minotti beat feet over the rail down the hill, right?

5   A.  Yes.

6   Q.  Now, you said that when this person who had come onto the

7   scene and told you to get out of your car that he frisked you

8   and then he frisked Gino.  Do you recall that testimony?

9   A.  Yes.

10  Q.  Now, you testified that Gino had something on him; is that

11  right?

12  A.  Yes.

13  Q.  And you thought it was money?

14  A.  No, that's what he said.

15  Q.  Gino said it was money?

16  A.  Yes, he said it was for Christmas presents.

17  Q.  But you never saw any money, did you?

18  A.  No.

19  Q.  Now, after you figured out or after you came to the

20  conclusion that you had been ripped off you called Jon Minotti,

21  right?

22  A.  Yes.

23  Q.  And he denied being involved in any kind of rip-off, right?

24  A.  Yes.

25  Q.  But you knew that he was lying to you, right?

Page 80

1   A.   Yeah.

2   Q.   Because you saw him with your own two eyes take off with

3   the drugs, right?

4   A.   Yes.

5   Q.   Okay.  And then since you knew he was lying to you, you

6   called the guy who introduced you to Jon Minotti, right?

7   A.   Yes.

8   Q.   And that was Tommy, correct?

9   A.   Yes.

10  Q.   All right.  And you also called the guy who gave you the

11  three kilos, correct?

12  A.   Yes.

13  Q.   And that was Mr. Rosales?

14  A.   Yes.

15  Q.   You told him that you had been robbed, right?

16  A.   Yes.

17  Q.   And you had this conversation with Tommy; is that right?

18  A.   About what?

19  Q.   About being -- about being ripped off?

20  A.   Being ripped off, yeah.

21  Q.   In fact, you remember that Mr. Merritt played that

22  recording for us of the conversation that you had with Tommy?

23  A.   Yes.

24  Q.   Okay.  I want to go over that with you a little bit.

25              (Discussion off the record.)

Page 81

1    BY MR. NATOLA:

2    Q.  Can you see that on your screen, Mr. Ruiz?

3    A.  Yeah.

4    Q.  Can you read it?  Just look at it.  I don't want you to

5    read it to me, but I'm asking you can you see it, read it?

6    A.  Yes.

7    Q.  This is Exhibit 7 B, transcript number 7 B.

8           Now, you say to Tommy one, two, three, four,

9    five -- five lines down "That mother fucker just robbed me with

10   three Ks, Man."  Is that right?

11   A.  Yeah.

12   Q.  And Tommy says, "What?"

13          And you say, "Yeah."

14          And you go on further, and he asks you:  "You know

15   where Jonny lives?"

16          And he was talking about Jon Minotti, correct?

17   A.  Yes.

18   Q.  And you said to him -- your answer was, "I know where.  I

19   know where he lives."

20          And then, if you turn -- I'm going to turn to the

21   next page.  Can you see that, sir?

22   A.  Yes.

23   Q.  Okay.  And at the very top, Tommy asked you a question:

24   "He left it in the forest?"  And the "he" he's referring to is

25   Jon Minotti, correct?

Page 82

1   A.  Yes.

2   Q.  Because you had told him that you saw Minotti run off into

3   the forest with your cocaine, right?

4   A.  Yup.

5   Q.  All right.  And then you say something, all right.  And the

6   voices overlap.  And Tommy says, "He's full of shit."  Do you

7   see where it says that?  Four lines down.

8   A.  Yeah.

9   Q.  And that's Tommy saying that Minotti is full of shit,

10  right?

11  A.  Yes.

12  Q.  Okay.  And then you say something to Tommy, and his next

13  answer is:  "He didn't leave it in the forest.  He's full of

14  shit."  Right?

15  A.  Yeah.

16  Q.  And, again, he's talking about Minotti, right?

17  A.  Yes.

18  Q.  And this is the guy who introduced you to Minotti, right?

19  A.  Yes.

20  Q.  And this is somebody that you knew who knew Minotti before

21  you knew him, right?

22  A.  Yes.

23  Q.  And he's telling you that Minotti's full of shit, that he's

24  lying to you, right?

25  A.  Yes.

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 2   3/27/06

Page 83

1    Q.  Okay.  And then you said, "He gave it to that -- that

2    fucking kid Gino for fucking probably cheaper."

3            Do you see that line?

4    A.  Yeah.

5    Q.  You see that?

6    A.  Yeah.

7    Q.  You never saw Jon Minotti give anything to Gino, did you?

8    A.  No.

9    Q.  So you were just -- you were just guessing that that had

10   happened, right?

11   A.  Yeah.

12   Q.  Okay.  And right after that Tommy says, "Man, that ain't

13   right, that fucking kid's an asshole."

14            And, again, he's talking about his pal Jon Minotti,

15   right.

16   A.  Yes.

17   Q.  Now, going down one, two, three, four, five -- five up from

18   the bottom, just under where it says, "voices overlap, Tommy."

19   Do you see where that is?

20   A.  Yeah.

21   Q.  And Tommy says -- wait a minute, before that you say "I'm

22   gonna go fucking -- I told you I'm gonna go fucking shoot this

23   kid right now if he doesn't give me this shit."  Is that right?

24   A.  Yes.

25   Q.  You wanted Tommy to get ahold of Jon Minotti and convey

1db11721-5076-4e92-b471-52ca304c4ec2

Page 84

1  that message to him, didn't you?

2  A.  Yes.

3  Q.  Yeah, because you wanted your stuff back, right?

4  A.  Yes.

5  Q.  Or you wanted your money, right?

6  A.  Correct.

7  Q.  Because that's what it's all about in the cocaine

8  distribution business, is money, right?

9  A.  Yes.

10  Q.  Free money, right?

11  A.  Yeah.

12  Q.  And that's the way you made your living, right?

13  A.  Not all the time.

14  Q.  Not all the time.

15      Let me ask you a question.  When you were driving a

16  bus, were you selling cocaine at that time, too?

17      MR. McNEIL:  Objection, your Honor.

18      THE COURT:  Sustained.

19  BY MR. NATOLA:

20  Q.  When you were working for Catholic Charities, were you

21  selling cocaine at that time?

22      MR. MERRITT:  Objection, your Honor.

23      THE COURT:  You may have that.  I guess that's the

24  same question, which you may have.

25  A.  No.

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 2  3/27/06

1db11721-5076-4e92-b471-52ca304c4ec2

Page 85

1  Q.  You weren't?

2  A.  No.

3  Q.  It was only after that?

4  A.  No.

5  Q.  It was before that?

6  A.  Never.

7  Q.  You never sold cocaine?

8  A.  Not when I was working legally.  I never sold drugs when I

9  was working.

10  Q.  But only after you stopped working?

11  A.  No.  When I worked, I didn't sell no drugs.

12  Q.  But after -- when you didn't work, you sold drugs?

13  A.  That was a couple of years after I started selling drugs.

14  Q.  But you did sell drugs, right?

15  A.  I sold drugs, but not when I was working.

16  Q.  I understand that.  But after you stopped working you began

17  selling drugs, right?

18  A.  When I stopped -- when I wasn't employed, when I wasn't

19  employed, I sold drugs.

20  Q.  Okay.

21  A.  When I didn't have no employment.

22  Q.  Yeah.

23  A.  Yes, I did sell drugs.

24  Q.  You sold drugs in high school, too, right?

25  A.  Yes.

Page 86

1    Q.  Okay.  Now, getting back to that right after you said say

2    "I'm going to shoot this kid right now if he doesn't give me my

3    shit."  Tommy says, "That mother fucker, what a piece of shit

4    he is."

5            Now, Tommy's talking again about Jon Minotti,

6    right?

7    A.  Yes.

8    Q.  All right.  Now --

9            (Discussion off the record.)

10           MR. NATOLA:  If I could have just a moment, your

11   Honor, please.

12   BY MR. NATOLA:

13   Q.  Now, you heard the government play a conversation, Exhibit

14   8 A, between you and Jon Minotti on December 24, 2003.  Do you

15   remember that?

16   A.  Yes.

17   Q.  We just heard it here.

18   A.  Yes.

19   Q.  Okay.  And in that conversation Jon Minotti -- turning to

20   page 2, just below the middle, you say, "Either you -- either

21   you contact him today, tell him to give me a fucking call and

22   give me my shit back or give me my money."

23           Have I read that correctly?

24   A.  Yes.

25   Q.  And the "him" you were talking to -- about, rather, the him

1db11721-5076-4e92-b471-52ca304c4ec2

Page 87

1   you were talking about was this guy Gino, correct?

2   A.  Yes.

3   Q.  Okay.  Because Jon Minotti led you to believe that it was

4   Gino who took the cocaine, right?

5   A.  No, because he told me that Gino was going to buy it.

6   Q.  But that's -- but you saw Minotti run off with it, right?

7   A.  Yes.

8   Q.  And you never saw Minotti give Gino the cocaine, right?

9   A.  He ran, because he said he seen a blue light.

10  Q.  Wait a minute.  Answer my question, not the question you

11  want to answer, okay?

12          Minotti ran off -- you saw Minotti run off with the

13  cocaine, right?

14  A.  Yes, which he was going to give to Gino.

15          MR. NATOLA:  May that be stricken, your Honor?

16          THE COURT:  It may go out.

17  BY MR. NATOLA:

18  Q.  Do you understand the question I just asked you?

19  A.  Repeat it.

20  Q.  You saw Minotti run off into the woods with the cocaine.

21  A.  Yes.

22  Q.  Okay.  And you never saw him give it to Gino, right?

23  A.  Correct.

24  Q.  And you already testified that you knew that Minotti was

25  lying to you, right?

1db11721-5076-4e92-b471-52ca304c4ec2

Page 88

1   A.   Lying about what?

2   Q.   About not having anything to do with ripping you off?

3   A.   Yeah.

4   Q.   Okay.  So what made you think that he was telling you the

5   truth now when he was trying to pin it all on Gino?  You

6   thought he was telling you the truth then?

7              MR. MERRITT:  Your Honor, I object as there's no

8   evidence to that point.

9              MR. NATOLA:  Let me ask it a different way.

10             THE COURT:  Sustained, that question.

11             MR. NATOLA:  Thank you, your Honor.

12             THE COURT:  I mean the objection to that question.

13  BY MR. NATOLA:

14  Q.   So is it fair for me to say you thought that Jon Minotti,

15  who had already lied to you about stealing the cocaine, was

16  telling you the truth when he led you to believe that Gino had

17  it?

18  A.   Yeah, because when we went to the hospital Gino was there.

19  So, you know, I seen him, I seen them, you know, they were good

20  friends.  They were friends.  He introduced me to, you know, to

21  Gino.  So they met up.

22  Q.   And -- but you never saw -- Gino never gave you any money?

23  A.   No.

24  Q.   You never talked to Gino that day?

25  A.   That day, yeah.

1db11721-5076-4e92-b471-52ca304c4ec2

Page 89

1   Q.  At the hospital?

2   A.  Not the hospital, but before, yeah.

3   Q.  We'll get to that in a few minutes.

4           You never talked to him at the hospital, right?

5   A.  No.

6   Q.  He never gave you any money?

7   A.  No.

8   Q.  You never gave him any coke?

9   A.  No.

10  Q.  Okay.  Now, getting to the conversation of December the

11  24th at 3:37 in the afternoon between you and an individual

12  that you say is Gino, you never gave Gino your cell phone

13  number, did you?

14  A.  No.

15  Q.  And yet he called you on your number, correct?

16  A.  Yes.

17  Q.  Okay.  And, in fact, you never called Gino on his phone

18  number, did you?

19  A.  No.

20  Q.  Because you never had Gino's number.

21  A.  No.

22  Q.  Now, you testified about being arrested in Peabody at your

23  house on a New Hampshire charge.  Do you recall that testimony

24  a little while ago?

25  A.  Yes.

Page 90

1   Q.  What was the charge up in New Hampshire?

2   A.  Don't remember.

3   Q.  Was it -- did it have --

4   A.  To do with drugs.

5   Q.  It had to do with drugs?

6   A.  Yes.

7   Q.  And were you arrested -- was it a prosecution out of the

8   state court or the federal court?

9   A.  The federal.

10  Q.  Okay.  And isn't it a fact that as a result of your

11  cooperation in this case here that that New Hampshire case was

12  dropped by the government up there?

13  A.  No.

14  Q.  It wasn't?

15  A.  No.

16  Q.  But the --

17  A.  Not enough evidence.

18  Q.  Wait a minute.

19              MR. NATOLA:  May that be stricken, your Honor?

20              THE COURT:  Yes, it may go out.

21              MR. NATOLA:  Thank you.

22  BY MR. NATOLA:

23  Q.  You were charged up at the federal court in New Hampshire,

24  right?

25  A.  The charges got dropped.

1db11721-5076-4e92-b471-52ca304c4ec2

Page 91

1    Q.  Thank you.  That's my point.  I'll leave it at that.

2              So nothing ever happened to you after having been

3    charged in the federal court in New Hampshire.

4    A.  They were dropped, the charges.

5    Q.  Okay.

6              Now, on December the 24th of 2003 you went to Jon

7    Minotti's house at about 10:00 in the morning; is that right?

8    A.  Yes.

9    Q.  And it was your understanding that the three-kilogram deal

10   was supposed to happen there; is that right?

11   A.  At Jon's house?

12   Q.  Yes.

13   A.  Yes.

14   Q.  And Minotti set the deal up with you, right?

15   A.  Yes.

16   Q.  Okay.  It was -- it was set up in phone calls between you

17   and Minotti, correct?

18   A.  Yes.

19   Q.  And it wasn't set up with phone calls between you and Gino,

20   was it?

21   A.  No.

22   Q.  All right.  Now, I want to ask you -- and I want you to use

23   to the best of your ability -- I want you to describe in inches

24   how high -- first of all, what shape were the kilograms that

25   you brought to Minotti's house?  What shape were they, square,

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 2  3/27/06

1db11721-5076-4e92-b471-52ca304c4ec2

Page 92

1    were they round?

2    A.   Square.

3    Q.   Square?

4    A.   Yes.

5    Q.   And they were compressed, were they not?

6    A.   Yeah, about this thin.

7    Q.   Okay.  So they were packed down tight, right?

8    A.   Yeah.

9    Q.   And they were wrapped in white tape, correct?

10   A.   Yeah.

11   Q.   Okay.  Now, how high were they?  How tall were they?

12   A.   When?  One kilo?

13   Q.   Yeah, one, one?

14   A.   About this size.

15   Q.   So give me your best guess in inches how high top to bottom

16   it was.

17   A.   Six.  I don't know.

18   Q.   Eight inches maybe?

19   A.   Yeah.

20   Q.   Okay.  And how wide was it?

21   A.   Six.

22   Q.   Okay.  So about eight inches high, six inches wide; and

23   about, what, two or three inches thick?

24   A.   Yeah.

25   Q.   Okay.  And there were three of them?

1  A.  Yes.

2  Q.  Will you agree with me, Mr. Ruiz --

3  A.  When I went to his house, I only had one.

4  Q.  No, no, I understand that.  But you had three kilograms

5  altogether, right?

6  A.  Yeah.

7  Q.  All right.  And those are the three kilograms that Jon

8  Minotti ran off with, right?

9  A.  Yes.

10 Q.  And they were all the same size, were they not?

11 A.  Yes.

12 Q.  Eight inches by six inches by two or three inches thick,

13 right?

14 A.  Yes.

15 Q.  You'd agree with me, Mr. Ruiz, that I couldn't stuff those

16 down my pants, could I?

17 A.  Jon had a jacket, so --

18 Q.  I'm not asking you that, Mr. Ruiz.  Can you listen to the

19 question?

20          Given the size of those kilograms of cocaine could

21 I stuff those three kilograms of cocaine down the front of my

22 pants, all of them at the same time?

23 A.  No.

24 Q.  All right.  Now, when you got to Jon's house, to Minotti's

25 house, he told you that you had to go to the Malden Hospital

Page 94

1    instead to do the deal; is that right?

2    A.  Yes.

3    Q.  Or to some hospital, right?

4    A.  Yes.

5    Q.  Did he say the Malden Hospital or did he just say we got to

6    go to the hospital?

7    A.  We got to go to the hospital, that's where Gino works at.

8    Q.  Okay.  Because Gino worked there, right?

9    A.  Yes.

10   Q.  So Minotti told you that the place of the deal was changed,

11   correct?

12   A.  Yes.

13   Q.  All right.  Gino, the person you know as Gino never told

14   you that he worked at the hospital, did he?

15   A.  No.

16   Q.  Now, do you recall meeting on June the 3rd of 2004 with

17   Assistant U.S. Attorney McNeil and several DEA agents?

18   A.  What was that?

19   Q.  June the 3rd of 2004.

20   A.  Mm-hmm.

21                  THE COURT:  Is that a yes?

22                  THE WITNESS:  Yes.

23   BY MR. NATOLA:

24   Q.  Okay.  And that was in this building?

25   A.  Yes.

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 2  3/27/06

1db11721-5076-4e92-b471-52ca304c4ec2

1         MR. NATOLA:  If I could have just a moment, your

2    Honor.

3         THE COURT:  Okay.

4    BY MR. NATOLA:

5    Q.  And you came in here, you went to the U.S. Attorney's

6    Office, right?

7    A.  Yes.

8    Q.  In a small room, right?

9    A.  Yes.

10   Q.  Conference room like, right?

11   A.  Yes.

12   Q.  Sat around the table?

13   A.  Yes.

14   Q.  Mr. McNeil and the agents asked you questions, right?

15   A.  Yes.

16   Q.  Do you recall on that --

17   A.  Not questions, they were telling me what happened, and I

18   told them what happened.

19   Q.  They told you what happened?

20   A.  No, I told them what happened.

21   Q.  Okay.  You told them what happened?

22   A.  Yes.

23   Q.  Your lawyer was there present with you?

24   A.  Yes.

25   Q.  Okay.  Do you recall telling them that Minotti told you

Page 96

1  that Gino was at the hospital because he was getting a

2  prescription from a doctor who worked at the hospital?

3  A.  What was that?

4  Q.  Do you recall on June the 3rd, 2004 when you met with

5  Mr. McNeil and the DEA agents telling them that Minotti told

6  you that Gino was at the -- you had to go to the hospital

7  because Gino was there getting a prescription from a doctor who

8  worked there?  Do you recall saying that?

9  A.  No.

10  Q.  You don't.

11           MR. NATOLA:  May I approach the witness, please?

12           THE COURT:  Yes.

13           (Discussion off the record.)

14           MR. NATOLA:  I made a mistake, I'd like to correct

15  it for the record.

16           I get my John's mixed up.  It wasn't Mr. McNeil, it

17  was Mr. Farley.

18           THE COURT:  Okay.

19           MR. NATOLA:  Paragraph 10 of that report, please.

20  BY MR. NATOLA:

21  Q.  I ask you just to read this to yourself, the bottom two

22  lines.

23           Does that help you remember what you said to the

24  Assistant U.S. Attorney and the agents on that day about why

25  you were at the Malden Hospital?

Page 97

1    A.   When we were in the car, we had a conversation.

2    Q.   Hold it.  That's not my question.  That's not my question.

3              My question is what you just read --

4    A.   Mm-hmm.

5    Q.   -- does that help you remember what you told the agents in

6    the U.S. Attorney's Office on June the 3rd of 2004 about why

7    you went to the Malden Hospital?

8    A.   No, but that was -- that right there is not why I told

9    them --

10   Q.   Hold on.  Hold on.  Are you saying -- hold on.  You're

11   telling this Court and this jury that you did not tell agents

12   that Minotti told Ruiz that Bucci was getting prescription

13   oxycontin tablets from a doctor who was working at the Malden

14   Medical Center?  You never said that to agents?

15   A.   Yeah, that he used to get it, if I needed some oxycontins,

16   that Bucci would go get it for me.  Gino could.

17   Q.   Let me try this again.

18   A.   I did tell them that.

19   Q.   You did tell the agents that.  That was the reason you went

20   to the hospital that day?

21   A.   No.

22   Q.   No, okay.  We'll leave it at that.  We'll see what the

23   agents have to say about it.

24              MR. MERRITT:  Objection, your Honor.

25              THE COURT:  That may go out.  You're to disregard

1db11721-5076-4e92-b471-52ca304c4ec2

Page 98

1    that.

2            MR. NATOLA:  Bear with me just a minute, your

3    Honor, please.

4            THE COURT:  Okay.

5    BY MR. NATOLA:

6    Q.  Now, these three kilograms of cocaine that you had on

7    Christmas Eve of 2003, they were fronted to you by Mr. Rosales;

8    is that right?

9    A.  Yes.

10   Q.  In other words, they were given to you on credit.  You

11   didn't have to pay him right there, right?

12   A.  No.

13   Q.  And he was charging you $23,000 for each kilogram, right?

14   A.  Yes.

15   Q.  And you were going to sell those that day for $25,000

16   apiece; is that right?

17   A.  Yeah -- no, it was 27.

18   Q.  It was 27 apiece.  Okay.  And so you were looking at making

19   a $4,000 profit on each kilogram; is that right?

20   A.  Yes.

21   Q.  You would have made $12,000 that day if the deal went down

22   as you hoped it would, correct?

23   A.  Yes.

24   Q.  All right.  Now, after -- you spoke -- after you were at

25   the hospital and you had this encounter with the person who you

1db11721-5076-4e92-b471-52ca304c4ec2

Page 99

1    say was a Malden cop, you left the hospital grounds; is that

2    right?

3    A.  Yes.

4    Q.  And you went and almost -- well, very shortly thereafter

5    you had a conversation with Jon Minotti, correct, over the

6    telephone?

7    A.  Yes.

8    Q.  And Minotti during that conversation told you that he had

9    dropped the cocaine in the woods, right?

10   A.  Yes.

11   Q.  Okay.  And relying on that conversation, because he told

12   you that, you got your brother-in-law, Armando Lovos and you

13   went back to the hospital, right?

14   A.  Yes.

15   Q.  And the reason you went back to the hospital was to try to

16   find the cocaine that Minotti said he dropped in the woods,

17   right?

18   A.  Yes.

19   Q.  And you didn't go into the woods, did you?

20   A.  No.

21   Q.  You sent your brother-in-law into the woods?

22   A.  Yes.

23   Q.  And he was in the woods for a pretty good period of time,

24   right?

25   A.  Yes.

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 2   3/27/06

Page 100

1  Q.  And he didn't find any cocaine in the woods, right?

2  A.  No.

3  Q.  So you knew then that --

4  A.  He ran off.  He ran off because he seen -- somebody told

5  him to get out of there.

6  Q.  Your brother-in-law did?

7  A.  He said somebody was at the top of the hill, the cop --

8       MR. DRECHSLER:  I object to him telling us what

9  someone else told him.

10      THE COURT:  Okay.

11  BY MR. NATOLA:

12  Q.  For however long your brother-in-law was in there and for

13  whatever reason he left and how he left I don't care.  He

14  didn't find any cocaine in the woods, did he?

15  A.  No.

16  Q.  So you knew Minotti lied to you on the phone when he said

17  he had dropped the coke in the woods, right?

18  A.  Yes.

19  Q.  Now, you told the agents that interviewed you on June the

20  3rd of 2004 that you believed that you could identify Gino's

21  voice from the recording that they had, right?

22  A.  What was that?

23  Q.  You told the agents on June the 3rd of 2004 when you were

24  interviewed in this building that you believed that you could

25  identify Gino's voice from a recording that they played to you,

1db11721-5076-4e92-b471-52ca304c4ec2

1    right?

2    A.  Yes.

3    Q.  Okay.  But you weren't sure, were you?

4    A.  No.

5    Q.  Okay.  I want to talk to you, sir, about what's been

6    entered into evidence -- I forget what exhibit it is -- but the

7    plea agreement that you entered into with the government.  Do

8    you recall testifying about that earlier?

9    A.  Yes.

10   Q.  Okay.  And you were represented by a lawyer when you --

11   when you signed that plea agreement, correct?

12   A.  Correct.

13   Q.  And you don't have a copy of that in front of you, do you?

14   A.  No.

15   Q.  Okay.

16            THE COURT:  For your information, it's Exhibit 20.

17            MR. NATOLA:  Exhibit 20.  Thank you, your Honor, so

18   the record is clear.

19            MR. McNEIL:  Your Honor, I think he needs the

20   exhibit if he's going to show things.

21            THE COURT:  I'm sorry?

22            MR. McNEIL:  I think he needs the exhibit if he's

23   going to use the document.

24            THE COURT:  Isn't that it?

25            MR. NATOLA:  It's the copy that I was provided

1db11721-5076-4e92-b471-52ca304c4ec2

Page 102

1    with, your Honor.

2              THE COURT:  I'm not sure I follow you, Mr. Merritt.

3              MR. McNEIL:  Well, the exhibit is sitting up at the

4    table, your Honor, not --

5              THE COURT:  Okay.  Sorry.

6    BY MR. NATOLA:

7    Q.  Now, can you see that on your screen, sir?

8    A.  Yes.

9    Q.  It says page 10, correct?

10   A.  Yes.

11   Q.  All right.  And at the very top in bold letters and

12   underline it says, "Acknowledgment of Plea Agreement."  Is that

13   correct?

14   A.  Yes.

15   Q.  All right.  And the very first words in that acknowledgment

16   of plea agreement say, "I have read this letter in its entirety

17   and discussed it with my attorney."

18              Have I read those the right way?

19   A.  Yes.

20   Q.  And, in fact, you did read that letter in its entirety, and

21   you discussed it at length with Mr. Chipman, did you not?

22   A.  Which letter?  This letter right here?

23   Q.  Yes, sir, the plea agreement.

24   A.  Yes.

25   Q.  Okay.  And that's your signature down the bottom, is it

1db11721-5076-4e92-b471-52ca304c4ec2

Page 103

1    not, Carlos Ruiz?

2    A.  Yes, yes.

3    Q.  And the date is 6/8/04; is that right?

4    A.  Yes.

5    Q.  And at about the middle of that paragraph it says, "I

6    understand the crimes to which I have agreed to plead guilty,

7    the maximum penalties for those offenses, and sentencing

8    guideline penalties applicable to them."  Have I read that

9    correctly?

10   A.  Yes.

11   Q.  And you had conversations with Mr. Chipman where he

12   explained those things to you as your attorney, correct?

13   A.  Yes.

14   Q.  What the minimum sentence was that you were facing,

15   correct?

16   A.  Yes.

17   Q.  And what the maximum sentence was that you were facing,

18   correct?

19   A.  Correct.

20   Q.  And he talked to you about the United States sentencing

21   guidelines, correct?

22   A.  Yes.

23   Q.  And how they might impact in your case, correct?

24   A.  Yeah.

25   Q.  Okay.  And a little bit further down it says, "We have

1db11721-5076-4e92-b471-52ca304c4ec2

1    discussed the charges against me."

2              Now, who's the "we" that it's referring to?

3    A.  The attorney.

4    Q.  You and your attorney?

5    A.  Yes.

6    Q.  You and Mr. Chipman?

7    A.  Yes.

8    Q.  Okay.  And it says, "We have discussed the charges against

9    me, possible defenses I might have, the terms of this plea

10   agreement, and whether I should go to trial."

11             Have I read that correctly?

12   A.  Yes.

13   Q.  So you discussed with Mr. Chipman the terms of this plea

14   agreement, correct?

15   A.  Yes.

16   Q.  You asked him questions about the plea agreement, right?

17   A.  Yes.

18   Q.  You wanted to make sure that this plea agreement was going

19   to get you the best bargain that you could possibly get in your

20   case, right?

21   A.  Yes.

22   Q.  And so it was important for you to understand what the

23   terms of the plea agreement were, correct?

24   A.  Yes.

25   Q.  And because you're not a lawyer, it was important for you

Page 105

1   to have your lawyer explain those terms to you, correct?

2   A.  Yes.

3   Q.  And he did, correct?

4   A.  Yes.

5   Q.  And you were satisfied with the answers he gave you, right?

6   A.  Yes.

7   Q.  Okay.  Now, the last sentence says, "I am entering into

8   this agreement freely, voluntarily, and knowingly because I'm

9   guilty of the offenses to which I'm pleading guilty and I

10  believe this agreement is in my best interest."

11          Is that right?

12  A.  Yes.

13  Q.  Now, when you read the word "knowingly," you understood

14  that to mean that you knew what you were doing when you signed

15  this plea agreement, right?

16  A.  Yes.

17  Q.  And you knew what it meant?

18  A.  Yeah.

19  Q.  Now, underneath that is your signature, and then below your

20  signature is a statement that says, "I certify that Carlos Ruiz

21  has read this agreement and that we have discussed its

22  meaning.  I believe he understands the agreement and is

23  entering into the agreement freely, voluntarily, and

24  knowingly."

25          Have I read that correctly?

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 2  3/27/06

1   A.   Yes.

2   Q.   Okay.   Now, you did read the agreement, correct?

3   A.   Yes.

4   Q.   And you and Mr. Chipman discussed its meaning, correct?

5   A.   Mm-hmm.

6           THE COURT:   Yes?

7           THE WITNESS:   Yes.

8   BY MR. NATOLA:

9   Q.   And you understood the agreement, correct?

10  A.   Yes.

11  Q.   And you entered into it freely, voluntarily, and knowingly,

12  correct?

13  A.   Yes.

14  Q.   Now, one day you got up in front of Judge Saris in this

15  courthouse, right?

16  A.   Yeah.

17  Q.   And you entered a guilty plea, correct?

18  A.   Yes.

19  Q.   And before you entered your guilty plea Judge Saris' clerk

20  put you under oath, right?

21  A.   Yes.

22  Q.   And Judge Saris asked you some questions about this plea

23  agreement, did she not?

24  A.   Yes.

25  Q.   And she asked you if you had read it, correct?

1db11721-5076-4e92-b471-52ca304c4ec2

1    A.  Yes.

2    Q.  If you understood it, correct?

3    A.  Yes.

4    Q.  If you had discussed it with your lawyer, correct?

5    A.  Correct.

6    Q.  And if you had asked him any questions about it, correct?

7    A.  Yes.

8    Q.  And if you were satisfied that you understood the terms and

9    conditions of that plea agreement; is that right?

10   A.  Yes.

11   Q.  And as you sit here today you're satisfied that you

12   understand the terms and conditions of that plea agreement that

13   you signed back on June the 8th of 2004; is that right?

14   A.  Yes.

15   Q.  Okay.  Now, you pleaded guilty, I believe you testified,

16   last week to a charge of conspiring to distribute between 15,

17   14 and 50, 5-0, kilograms of cocaine.  Is that what you pleaded

18   guilty to?

19   A.  Yes.

20   Q.  Okay.  And you know, or you knew before you pleaded guilty,

21   that that crime carried with it a penalty of not less than ten

22   years in prison, right?

23   A.  Yes.

24   Q.  And you knew that that was a mandatory minimum penalty of

25   not less than ten years.

1db11721-5076-4e92-b471-52ca304c4ec2

Page 108

1    A.  Yes.

2    Q.  And you also knew that the maximum that you faced on that

3    charge was up to life in prison, correct?

4    A.  Yes.

5    Q.  And also you were facing the possibility of a fine of up to

6    $4 million, correct?

7    A.  Yes.

8    Q.  All right.  Now, I'm afraid I'm going to need that back,

9    your Honor.  I wasn't quite done with it.

10                    THE COURT:  You mean Exhibit 20?

11                    MR. NATOLA:  Exhibit 20.

12                    THE COURT:  All right.

13   BY MR. NATOLA:

14   Q.  Okay.  Can you read what I just put up on the screen, sir?

15   A.  Yes.

16   Q.  Okay.  And that's page 3 of Exhibit 20, your plea

17   agreement, right?

18   A.  Yes.

19   Q.  Do you see in the middle of the page it has the small

20   letter c with a half parenthesis around it?

21   A.  Yes.

22   Q.  Okay.  The paragraph immediately after that one that starts

23   "The United States Attorney," do you see that paragraph?

24   A.  Yes.

25   Q.  That paragraph states, "The United States Attorney will

1db11721-5076-4e92-b471-52ca304c4ec2

1   recommend applying section 5C1.2 of the sentencing guidelines

2   and 18 USC section 3553(f) if the U.S. probation Office finds

3   that the defendant meets the requirements of section

4   5C1.2(1)-(4) and the U.S. Attorney finds that the defendant has

5   personally satisfied section 5C1.2(5)."

6           Have I read that correctly?

7   A.  Yes.

8   Q.  Now, you and your lawyer, when you went over this

9   agreement, you talked about the safety valve, did you not?

10  A.  Yes.

11  Q.  All right.  And you know that section 5C1.2 of the

12  guidelines and section 3553(f) of title 18 of the United States

13  Code are the safety valve, right?

14  A.  Yes.

15  Q.  Okay.  Now --

16          MR. NATOLA:  Your Honor, may we approach the bench

17  for a moment?

18          THE COURT:  Yes.

19          (At sidebar on the record.)

20          MR. NATOLA:  Thank you, your Honor.  At this time I

21  am moving for the Court to take judicial notice of section

22  5C1.2 of the United States sentencing guidelines and section

23  3553(f) of title 18 United States Code, and to publish those to

24  the jury as judicially noticed.

25          MR. MERRITT:  Your Honor, I guess I object on 403

1   grounds.  It's really a question of what this witness'

2   understanding of it is.  And there's so many complexities that

3   go into the application of the sentencing guidelines and the

4   statutory things, that, again, if they want to ask the

5   government about why, you know, this -- why the safety valve

6   applied, why it didn't, that's fine, but as to Mr. Ruiz, it's

7   his understanding of the safety valve, not, you know, getting

8   into a bunch of legal jargon, which I think is going to fly

9   right over the heads of the jury, confuse the issue.

10          THE COURT:  Well, the witness has testified that he

11  understood the agreement and that he understood the safety

12  valve.  So it seems to me appropriate for me to do that.

13          What is it you want me to do?

14          MR. NATOLA:  I would like you to take judicial

15  notice of both of them and -- I've marked up mine --

16          THE COURT:  How do you want me to do -- I mean, how

17  do you want me to publish it to the jury is what I mean.

18          MR. NATOLA:  That's the problem I'm facing right

19  now, because I marked up my copies and I don't have --

20          MR. DRECHSLER:  I have clean ones.

21          MR. NATOLA:  What I would suggest to the Court is

22  if -- well, the Court doesn't have one of those projectors --

23  you don't have one of those protectors that you can put stuff

24  on the screen, do you?

25          THE COURT:  No, it has to be put up over there.  I

Page 111

1    can read it.

2              MR. NATOLA:  That would be the best way to do it.

3              THE COURT:  The whole statute or the whole --

4              MR. NATOLA:  Well, your Honor, on 5C1.2, your

5    Honor, I've got it outlined as to what is material to this

6    cross-examination.  And, similarly, I've got the similar

7    language in 3553(f) marked out.

8              THE COURT:  Okay.  Let me have what you have.

9              MR. NATOLA:  That's 3553 and that's 5C1.2.

10             THE COURT:  Okay.

11             MR. NATOLA:  Thank you.

12             (End of discussion at sidebar.)

13             THE COURT:  Give me a moment, please, Mr. Natola.

14             (Pause.)

15             THE COURT:  Mr. Natola, if you're ready.

16             MR. NATOLA:  Yes, your Honor.

17             THE COURT:  Ladies and gentlemen, Mr. Natola has

18    asked that I instruct you concerning the provisions of title 18

19    United States Code section 3553(f) and provisions of the United

20    States sentencing guidelines section 5C1.2.

21             Let me tell you, first, that this statute, title 18

22    United States Code section 3553(f) is a statute of the United

23    States.  The guidelines section that he referred to are

24    guidelines established by an agency called the United States

25    Sentencing Commission for judges to follow in imposing

1db11721-5076-4e92-b471-52ca304c4ec2

Page 112

1    sentences in criminal cases.  The guidelines were established

2    pursuant to section 3553 of title 18.

3              So first let me read to you the pertinent provision

4    of section 3553 --

5              MR. NATOLA:  Your Honor, before you do that, I do

6    have a clean copy of that.  Could I put it on the monitor so

7    the jury could follow along with you?

8              THE COURT:  All right.

9              MR. NATOLA:  Thank you.

10             THE COURT:  Before we do that, is this the whole of

11   section (f)?  Is that what --

12             MR. NATOLA:  Yes, your Honor.

13             THE COURT:  The whole of section (f).

14             MR. NATOLA:  Yes.

15             THE COURT:  All right.

16             All right.  Ladies and gentlemen, I'm about to

17   instruct you about these provisions of title 18 United States

18   Code section 3553(f) that section is entitled "Limitation on

19   Applicability of Statutory Minimum in Certain Cases."

20             "Notwithstanding any other provision of law, in the

21   case of an offense under section 401, 404, or 406 of the

22   Controlled Substances Act (21 United States Code 841, 844, 846)

23   or section 1010 or 1013 of the Controlled Substances Import and

24   Export Act (title 21 United States Code 960, 963) the court

25   shall impose a sentence pursuant to guidelines promulgated by

1db11721-5076-4e92-b471-52ca304c4ec2

1    the United States Sentencing Commission under section 994 of

2    title 28 without regard to any statutory minimum sentence, if

3    the court finds at sentencing, after the Government has been

4    afforded the opportunity to make a recommendation that (1) the

5    defendant does not have more than one criminal history point,

6    as determined under the sentencing guidelines; (2) the

7    defendant did not use violence or credible threats of violence

8    or possess a firearm or other dangerous weapon (or induce

9    another participant to do so) in connection with the offense;

10    (3) the offense did not result in death or serious bodily

11    injury to any person; (4) the defendant was not an organizer,

12    leader, manager, or supervisor of others in the offense, as

13    determined under the sentencing guidelines and was not engaged

14    in a continuing criminal enterprise as defined in section 408

15    of the Controlled Substances Act; (5) and not later than the

16    time of the sentencing hearing, the defendant has truthfully

17    provided to the government all information and evidence the

18    defendant has concerning the offense or offenses that were part

19    of the same course of conduct or of a common scheme or plan,

20    but the fact that the defendant has no relevant or useful

21    information to provide or that the Government is already aware

22    of the information shall not preclude a determination by the

23    court that the defendant has complied with this requirement."

24         Turning now to section 5C1.2 of the sentencing

25    guidelines, it bears the same title as the statute, Limitation

Page 114

1  on Applicability of Statutory Minimum Sentences in Certain

2  Cases.

3          "Except as provided in subsection (b), in the case

4  of an offense under 21 United States Code section 841, 844,

5  846, 960, or 963, the court shall impose a sentence in

6  accordance with the applicable guidelines without regard to any

7  statutory minimum sentence, if the court finds that the

8  defendant meets the criteria in 18 United States Code section

9  3553(f)(1)-(5) set forth below:  (1) the defendant does not

10  have more than one criminal history point, as determined under

11  the sentencing guidelines before application of subsection (b)

12  of section 4A1.3 (Departures Based on Inadequacy of Criminal

13  History Category); (2) the defendant did not use violence or

14  credible threats of violence or possess a firearm or other

15  dangerous weapon (or induce another participant to do so) in

16  connection with the offense; (3) the offense did not result in

17  death or serious bodily injury to any person; (4) defendant was

18  not an organizer, leader, manager, or supervisor of others in

19  the offense, as determined under the sentencing guidelines and

20  was not engaged in a continuing criminal enterprise, as defined

21  in title 21 United States Code section 848; and (5) not later

22  than the time of the sentencing hearing, the defendant has

23  truthfully provided to the Government all information and

24  evidence the defendant has concerning the offense or offenses

25  that were part of the same course of conduct or of a common

Page 115

1   scheme or plan, but the fact that the defendant has no relevant

2   or useful other information to provide or that the Government

3   is already aware of the information shall not preclude a

4   determination by the court that the defendant has complied with

5   this requirement."

6           Okay.  Anything further?

7           MR. NATOLA:  Thank you, your Honor, not at this

8   time from the Court.  Thank you.

9   BY MR. NATOLA:

10  Q.  So Mr. Ruiz, you went over those portions of the guidelines

11  and statutes with Mr. Chipman, right?

12  A.  Yes.

13  Q.  And you understood that under both the statute and the

14  guideline that in order for you to be eligible to receive the

15  benefits of the safety valve that the Court had to find that

16  you did not use violence or credible threats of violence or

17  possess a firearm or other dangerous weapon.  You knew that,

18  right?

19  A.  Yes.

20  Q.  And, yet, you've admitted to the Court here today and to

21  the jury that you threatened Jon Minotti to get your cocaine

22  back, correct?

23  A.  Correct.

24  Q.  And you did that on several occasions, didn't you?

25  A.  Yes.

1db11721-5076-4e92-b471-52ca304c4ec2

Page 116

1  Q.  Okay.  And, yet, you were still awarded the benefit of the

2  safety valve when you were sentenced, weren't you?

3  A.  Yes, because that was --

4  Q.  Hold on.  Yes or no?

5  A.  Yes.

6  Q.  Now, you know that the safety valve allows the Court to

7  sentence you below the minimum mandatory sentence, correct?

8  A.  What was that?

9  Q.  You know, because your lawyer has explained it to you, that

10  the safety valve that we've been talking about allows the Court

11  to sentence you below the minimum mandatory sentence that's

12  called for under the statute?

13  A.  Yes.

14  Q.  Okay.  And in your case the minimum mandatory sentence that

15  the statute required was ten years, right?

16  A.  Yes.

17  Q.  And that's 120 months, correct?

18  A.  Correct.

19  Q.  And you were sentenced to 87 months by Judge Saris, were

20  you not?

21  A.  Yes.

22  Q.  And so your sentence, because of the safety valve, was cut

23  37 months below the minimum mandatory sentence; is that right?

24  A.  Yes.

25  Q.  Okay.  And you know about Federal Rule of Criminal

1    Procedure Rule 35, don't you?

2    A.  No.

3    Q.  You don't?

4    A.  Is it the safety valve?

5    Q.  Your lawyer never told you about a Rule 35 motion?

6    A.  Oh, yeah.

7    Q.  And a Rule 35 motion allows the Court to reduce a sentence

8    that's already been imposed, right?

9    A.  Yes.  He has to file a motion.

10    Q.  You have to file a motion, right?

11    A.  Yes.

12    Q.  And that's called a substantial assistance motion, right?

13    A.  Yes.

14    Q.  And that's also dealt with in another part of the

15    guidelines that you talked about with your lawyer, which was

16    section 5K1 of the guidelines, correct?

17    A.  Yes.

18    Q.  All right.  So you know about section 5K1, right?  Right?

19    A.  Yes.

20    Q.  And you know that both Rule 35 and section 5K1 -- Rule 35

21    of the Rules of Criminal Procedure and section 5K1 of the

22    guidelines allows the Court to reduce your sentence if you've

23    been providing substantial assistance to the government; is

24    that right?

25    A.  Yes.

1db11721-5076-4e92-b471-52ca304c4ec2

Page 118

1    Q.  All right.  Now, you know, don't you, that only the

2    government can file a Rule 35 motion to reduce your sentence,

3    right?

4    A.  What was it, the government?

5    Q.  The government has to file the motion, right?

6    A.  Yes.

7    Q.  Okay.  You can't file it, right?

8    A.  No.

9    Q.  All right.  And Rule 35 and section 5K1 of the guidelines

10   allow you to be resentenced; isn't that correct?

11   A.  Yes.

12   Q.  So that you can get a sentence for substantial assistance

13   even below the sentence that the judge originally gave you when

14   you pleaded guilty, right?

15   A.  Yes.

16   Q.  Okay.  Now, and section 5K1 also allows the Court to impose

17   a sentence that's below whatever the guideline range is for

18   your particular crime; is that right?

19   A.  What was that?

20   Q.  You know that Rule 5K -- excuse me, section 5K1 of the

21   guidelines allows the court to impose a sentence below the

22   guideline range in addition to being below the mandatory

23   minimum, right?

24   A.  Yeah.

25              THE COURT:  That's yes?

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 2   3/27/06

1db11721-5076-4e92-b471-52ca304c4ec2

1          THE WITNESS:  Yes.

2    BY MR. NATOLA:

3    Q.  Now, the government has already filed in your case a motion

4    under Rule 35, haven't they?

5    A.  Yes.

6    Q.  To reduce your sentence?

7    A.  Yes.

8    Q.  Correct?  Have you seen it before?

9    A.  No.

10   Q.  You haven't.  Okay.

11          MR. NATOLA:  May I approach the witness, your

12   Honor?

13          THE COURT:  Yes.

14   BY MR. NATOLA:

15   Q.  Now, that says United States v. Carlos Ruiz?

16   A.  Yes.

17   Q.  And it it's got your docket number, 04-10174-PBS?

18   A.  Yes.

19   Q.  And it says, "Government's Rule 35 motion," correct?

20   A.  Yes.

21   Q.  And it was filed under seal, right?

22   A.  Yes.

23   Q.  All right.  Do you know when this motion was filed?

24   A.  I don't remember.  I think a couple weeks ago.

25   Q.  A couple weeks ago.  And it says that "The government moves

Page 120

1   to reduce your sentence to reflect the substantial assistance

2   that you have provided and will continue to provide the

3   government in the investigation and prosecution of other

4   persons who have committed federal criminal offenses." Right?

5   A.  That's what it says?

6           MR. NATOLA:  Your Honor, can I put this up on the

7   screen, please?

8           THE COURT:  Is it an exhibit?  It's not an exhibit.

9           MR. NATOLA:  You know what, I'm going to move it

10  into evidence as an exhibit right now, please.

11          THE COURT:  Any objection to it?

12          MR. MERRITT:  My only objection is the witness has

13  already said he's never seen it, so I don't know how --

14          THE COURT:  All right.

15          MR. MERRITT:  But I have no objection.

16          THE COURT:  All right.  I'll take judicial notice

17  of that as well.

18          MR. NATOLA:  Of Rule 35.

19          THE COURT:  Of that motion.

20          MR. NATOLA:  Of the motion.  Of course you can.

21          THE COURT:  All right.  And you may display it.

22          MR. NATOLA:  Thank you.

23          THE COURT:  By that, ladies and gentlemen, all I'm

24  saying is simply for purposes of the document that Mr. Natola

25  is going to show you, when I said I take judicial notice of it

Page 121

1   to tell you that it is a paper filed in this court, and he's

2   now going to display it.

3   BY MR. NATOLA:

4   Q.  Can you see it, Mr. Ruiz?

5   A.  Yes.

6   Q.  And it says there that "The government hereby moves

7   pursuant to Federal Rule of Criminal Procedure 35(b), to reduce

8   defendant's sentence to reflect the substantial assistance the

9   defendant has provided and will continue to provide the

10  government in the investigation and prosecution of other

11  persons who have committed federal offenses."  Correct?

12  A.  Correct.

13  Q.  And the defendant is you, correct?

14  A.  Yes.

15  Q.  And the sentence that the government is moving to reduce is

16  the 87-month sentence that Judge Saris imposed upon you

17  earlier, correct?

18  A.  Correct.

19  Q.  All right.  And the reason for that is to reflect the

20  substantial assistance that you have provided already, correct?

21  A.  Yes.

22  Q.  And that's -- the assistance that you've provided is all

23  the meetings that you've had with the agents and with the

24  Assistant U.S. Attorneys and all the information that you've

25  already given them, right?

1db11721-5076-4e92-b471-52ca304c4ec2

Page 122

1    A.   Yes, the truth, what happened, you know --

2    Q.   Thank you for sharing that with us, Mr. Ruiz.

3              And the assistance that you will continue to

4    provide the government is your testimony here on the witness

5    stand today, right?

6    A.   Yes.

7    Q.   Okay.  And it goes on to say that "Prior to sentencing in

8    this case, the defendant proffered information to the

9    government that provided substantial assistance in the

10   investigation of the December 24, 2003 robbery of three

11   kilograms of cocaine in Malden, Massachusetts."  Correct?

12   A.   Yes.

13   Q.   All right.  It goes on to say:  "In addition, the defendant

14   entered into a cooperation agreement with the government, under

15   which he testified before the grand jury, which in May, 2004,

16   indicted three individuals in connection with the robbery and

17   conspiracy to possess with intent to district cocaine."  Is

18   that correct?

19   A.   Yes.

20   Q.   And that cooperation agreement is Exhibit Number 20, the

21   cooperation agreement that I had on the screen a few minutes

22   ago; is that right?

23   A.   Yes.

24   Q.   Cooperation agreement that you and your lawyer both signed,

25   correct?

1db11721-5076-4e92-b471-52ca304c4ec2

Page 123

1    A.  Correct.

2    Q.  All right.  "And the trial" -- it goes on to reference "see

3    United States v. Bucci, et al."  Have I read that correctly?

4    A.  Yes.

5    Q.  Okay.  "The trial of the aforementioned case" -- that means

6    the trial of the Bucci case," right?

7    A.  Yes.

8    Q.  -- "is scheduled for March 20, 2006.  And it's anticipated

9    that the defendant will be called as a witness at that trial."

10   Correct?

11   A.  Yes.

12   Q.  And, in fact, you have been called as a witness at that

13   trial, haven't you?

14   A.  Yes.

15   Q.  And that's why you're here teed testifying, right?

16   A.  Yes.

17   Q.  Pursuant to that cooperation agreement, correct?

18           And on page 2 it says, "The government requests

19   that the court stay any action on this motion until sometime

20   after the defendant testifies at that trial" -- meaning this

21   trial -- "so that the defendant may complete his cooperation

22   with the government, and so that the government will be in a

23   position to advise the Court of the full scope of the

24   defendant's cooperation at the time this motion is heard."

25   Have I read that correctly?

1db11721-5076-4e92-b471-52ca304c4ec2

Page 124

1    A.   Yes.

2    Q.   So the government is not going -- this motion is not going

3    to be heard by Judge Saris until your testimony in this case is

4    completed, correct?

5    A.   The motion is already filed.

6    Q.   But it's not going to be heard, it's not going to be acted

7    upon by the judge, right, because the government has asked the

8    court to stay any action on the motion, right?

9    A.   Yes.

10   Q.   Okay.  And when Judge Saris hears this motion, you're

11   hoping and you expect that she's going to reduce your 87-month

12   sentence, correct?

13   A.   Yes.

14   Q.   Okay.

15             MR. NATOLA:  Your Honor, this might be a good place

16   to break.

17             THE COURT:  All right.  I'm going to mark this

18   Rule 35 motion as 20 A.  There's no previously marked document

19   20 A, right?

20             MR. McNEIL:  No, your Honor.

21             THE COURT:  We'll mark that 20 A in evidence.

22             (Exhibit 20 A received into evidence.)

23             Ladies and gentlemen, we'll break for the day.

24   We'll resume tomorrow at 9:00.  Keep an open mind, do not

25   discuss the case.

1          THE CLERK:  All rise.

2          (Jury left the courtroom.)

3          (End of excerpted transcript.)

4                    ¡  ¡  ¡  ¡  ¡  ¡  ¡

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           CERTIFICATION

2            I certify that the foregoing is a correct

3       transcript of the record of proceedings in the above¡entitled

4       matter to the best of my skill and ability.

5

6

7

8       _____    _____

9       Debra M. Joyce                      Date

10      Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 2   3/27/06

1db11721-5076-4e92-b471-52ca304c4ec2

1                         EXAMINATION INDEX

2

CARLOS ALBERT RUIZ
3       CONTINUED DIRECT BY MR. McNEIL  . . . . . . .  2-3
        CROSS BY MR. NATOLA . . . . . . . . . . . . 2-66
4

5

6
                           EXHIBIT INDEX
7
                                                    MAR  /  ADM
8   Government
      5 A    Telephone call 12/24/03 11:00          2-19   2-19
9
      6 A    Telephone call to Irene 12/24/03 11:16 a.m.  2-25   2-25
10
      7 A    Call from Tommy to Ruiz 12/24/03 1:45  2-32   2-32
11
      8 A    Excerpts of call between Ruiz and Minotti  2-47   2-47
12           12/24/04 2:04 p.m.

13    9 A    Call "Gino" to Ruiz 12/24/03           2-51   2-51

14    10 A   Call "Gino" to Ruiz 12/24/03           2-51   2-51

15    20 A   Rule 35 motion                         2-124 2-124

16    21 A   Stipulation                            2-16   2-16

17    22     Series of photographs                  2-65   2-65

18    23     Series of photographs                  2-65   2-65

19

20
       21
22

23

24

25

1db11721-5076-4e92-b471-52ca304c4ec2