UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA,
                Plaintiff,

V.                              Criminal Action No. 04-10194-RCL

DAVID JORDAN and
ANTHONY BUCCI,                  March 28, 2006
                Defendants.   Boston, Massachusetts
_____


TRANSCRIPT OF TESTIMONY OF CARLOS ALBERT RUIZ DAY 3

JURY TRIAL DAY 7

BEFORE THE HONORABLE REGINALD C. LINDSAY

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

ONE COURTHOUSE WAY

BOSTON, MA  02210


DEBRA M. JOYCE, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA  02210
617-737-4410

1   APPEARANCES:
2   FOR THE GOVERNMENT:
3   JOHN T. McNEIL, ESQ.
    S. THEODORE MERRITT, ESQ.
4   Assistant United States Attorney
    Office of the United States Attorney
5   John J. Moakley U.S. Courthouse
    1 Courthouse Way, Suite 9200
6   Boston, MA  02210
    617-748-3100
7
8   FOR THE DEFENDANT DAVID JORDAN:
9   THOMAS DRECHSLER, ESQ.
    Finneran, Byrne & Drechsler
10  Suite 201
    50 Redfield Street
11  Boston, MA  02122
    617-265-3900
12
    MARIA A. LUISE, ESQ.
13  Balliro & Mondano
    99 Summer Street
14  Suite 1800
    Boston, MA  02110
15  781-737-8442
16
    FOR THE DEFENDANT ANTHONY BUCCI:
17
    MICHAEL F. NATOLA, ESQ.
18  63 Atlantic Avenue
    Suite 2B
19  Boston, MA  02110
    617-367-1199
20
    ANTHONY J. ROSSI, ESQ.
21  ROSSI & BLAISDELL, P.A.
    516 Broadway
22  Everett, MA  02149
    617-387-5502
23
24
25

1                    P R O C E E D I N G S

2              (The following proceedings were held in open court

3      before the Honorable Reginald C. Lindsay, United States

4      District Judge, United States District Court, District of

5      Massachusetts, at the John J. Moakley United States Courthouse,

6      1 Courthouse Way, Boston, Massachusetts, on March 28, 2006.

7              The defendants, David Jordan and Anthony Bucci, are

8      present with counsel.  The Assistant United States Attorneys

9      are present.)

10                    *   *   *   *   *   *   *

11             CARLOS ALBERT RUIZ, having been previously duly

12     sworn by the Clerk, was further examined and testified as

13     follows:

14             THE CLERK:  Mr. Ruiz, once again, I'd just like it

15     remind you that you're still under oath.

16                    CONTINUED CROSS-EXAMINATION

17     BY MR. NATOLA:

18     Q.  Mr. Ruiz, when we left off yesterday, I was asking you

19     questions about the Rule 35 motion.  Do you recall?

20     A.  Yes.

21     Q.  And that Rule 35 motion, just to recap a little bit, you

22     agreed -- or the government, you know, has asked that the judge

23     take no action on that motion until after you testify, right?

24     A.  Yes.

25     Q.  And that's so the government can tell the judge whether

Page 4

1    they're happy with your performance, correct?

2    A.  Yes.

3    Q.  So that your sentence may be reduced?

4    A.  What was that?

5    Q.  So that your sentence may be reduce by Judge Saris?

6    A.  Yes.

7    Q.  Okay.  Now, you testified on Friday that your understanding

8    of your obligation under this plea agreement was to tell the

9    truth.  Do you recall that testimony?

10   A.  Yes.

11   Q.  Now, that's not your only obligation, is it?

12   A.  That's it, tell the truth.

13   Q.  That's it.  That's all you have to do.

14   A.  Yes.

15   Q.  Okay.  Well, let's look at page 5, paragraph 8 of your

16   cooperation -- of your plea agreement, okay?

17           Can you read that from where you are, Mr. Ruiz?

18   A.  Yes.

19   Q.  Okay.  Now --

20           THE COURT:  Is that being shown?

21           THE JURY:  Yes.

22   BY MR. NATOLA:

23   Q.  Paragraph 8 A.  It says, "Terms of Cooperation."  Right?

24   A.  Yes.

25   Q.  It says, "The defendant agrees to cooperate fully with law

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 3   3/28/06

1    enforcement agents and government attorneys."  Correct?

2    A.  Yes.

3    Q.  And that's just a general statement of cooperation, right?

4    That doesn't require you to do anything specific.

5    A.  No.

6    Q.  Okay.  But the next sentence it says, "he" -- meaning

7    you -- "must provide complete and truthful information to all

8    law enforcement personnel."  Correct?

9    A.  Yes.

10   Q.  So it's got to be -- you've got to provide information when

11   you're requested to, right?

12   A.  The truth.

13   Q.  That's right.  Of course it's got to be the truth,

14   Mr. Ruiz.  But you've got to provide information that's

15   truthful, right?

16   A.  Yes.

17   Q.  Okay.  And then you've got to testify for the government

18   when they ask you to testify, correct?

19   A.  Correct.

20   Q.  And so that's another obligation that you have to fulfill

21   for the government under the terms of this agreement, right?

22   A.  Yes.

23   Q.  And of course your testimony has to be truthful, right?

24   A.  Yes.

25   Q.  Otherwise your agreement goes out the window, right?

Page 6

1    A.   Yes.

2    Q.   And you get charged with perjury, right?

3    A.   Yes.

4    Q.   Okay.  But nevertheless, that's a second obligation that

5    you have in addition to telling the truth, right?

6    A.   Yes.

7    Q.   And if you don't do that, no agreement, right, no deal?

8    A.   Yes.

9    Q.   And that's what you're doing here today, right?

10   A.   Yes.

11   Q.   And you've already provided information to the government,

12   correct?

13   A.   Correct.

14   Q.   All right.  Now, the third thing, looking further down

15   here, is in the second paragraph of that paragraph A, it says

16   that you have the right to have counsel present with you when

17   communicating with representatives of the government concerning

18   the criminal conduct with which you've been charged; is that

19   correct?

20   A.   Yes.

21   Q.   And then it goes on to say that you knowingly and

22   voluntarily waive your right to have counsel with you in all

23   debriefings and at all appearances to testify, right?

24   A.   Yes.

25   Q.   So that's another obligation that you have to the

fb15da61-bf01-46a8-88e9-52478032a92d

1   government in addition to telling the truth, right?

2   A.  Yes.

3   Q.  And in addition to all the other obligations that you've

4   got to the government, correct?

5   A.  Yes.

6   Q.  All right.  And, in fact, you don't have an attorney here

7   today, do you?

8   A.  No.

9   Q.  Okay.  So you're fulfilling that requirement today of your

10  agreement, correct?

11  A.  Yes.

12  Q.  All right.  And, finally, on the next page at the top, it

13  says, "To enable the Court to have the benefit of all relevant

14  sentencing information, defendant waives any rights he may have

15  to prompt sentencing and will join in any requests by the U.S.

16  Attorney that sentencing be postponed until defendant's

17  cooperation is complete."

18             Do you see that?

19  A.  Yes.

20  Q.  Okay.  And you've already -- but that's another obligation

21  that you've got to fulfill for the government, to join any

22  requests to postpone your sentencing, correct?

23             But you already were sentenced, right?

24  A.  Yes.

25  Q.  Was your sentence postponed or were you sentenced right

1    after the plea date?

2    A.  After I pled guilty to the charges.

3    Q.  But you agreed in the Rule 35 motion to postpone the

4    hearing on that until your cooperation or your testimony is

5    complete, is that correct?

6    A.  Yes.

7    Q.  So there are things that you have to do for the government

8    in addition just to tell the truth, right?

9    A.  Yes.

10   Q.  All right.  Now, and whether the government -- excuse me,

11   whether the government does the things that it promised to do

12   for you, basically, to recommend the safety valve, to file a

13   Rule 35 motion for you, to file a motion under guideline 5K1

14   for substantial assistance, that depends on whether the United

15   States Attorney's Office is satisfied with your cooperation,

16   right?

17   A.  They already filed the motion for that.

18   Q.  Right.  We already talked about that yesterday, right?

19   A.  Yes.  And I already did a safety valve.

20   Q.  I know that.  So you'd say that the government up to this

21   point has been satisfied with your performance, right?

22   A.  Yes.

23   Q.  And the recommendation that they make to Judge Saris to

24   reduce your sentence is going to depend on how satisfied they

25   are with your performance here at trial, right?

1    A.  All depends on the judge.

2    Q.  It all depends on the judge, but I'm not talking about the

3    judge, I'm talking about the recommendation that you expect the

4    government to make to the judge.

5    A.  Their job was to file the motion.

6    Q.  That's it?

7    A.  Yes.

8    Q.  Not to make any recommendation for you?

9    A.  No, it's up to the judge.

10   Q.  Okay.

11           MR. NATOLA:  Can I have a moment, your Honor,

12   please?

13           THE COURT:  Yes.

14           (Discussion off the record.)

15   BY MR. NATOLA:

16   Q.  So is it your -- are you telling us that it's your

17   expectation that the government is just going to get up there

18   in front of Judge Saris and say, Judge, we filed a Rule 35

19   motion, you act on it?

20   A.  To me it's up to the judge to give me the best sentence.

21   Q.  That's the third time you've said that, Mr. Ruiz.  Now you

22   want to answer my question?

23   A.  Go ahead.

24   Q.  The question is:  Do you expect the government at the

25   hearing on the Rule 35 motion just to say, hey, Judge Saris,

Page 10

1    look, we filed a Rule 35 motion, go ahead and act on it?  Is

2    that what you expect?

3    A.  No.

4    Q.  No.  You expect them to get up there and to recommend a

5    lesser sentence than the 87 months that you've already been

6    awarded, right?

7    A.  Yes.

8    Q.  And how much of a break they recommend for you depends upon

9    how satisfied they are with your performance here in court

10   today, right?

11   A.  Depends on the judge.

12   Q.  So they're not going to make a recommendation at all?

13   A.  The judge has the final answer.

14   Q.  Thank you.  That's the fifth time you've told us.

15             Their recommendation -- you don't expect them to

16   make a recommendation at all, do you?

17   A.  They filed the motion, the judge is the one that gives the

18   answer.

19   Q.  Mr. Ruiz, would you answer my question.

20             MR. NATOLA:  May that be stricken, your Honor,

21   please?

22             THE COURT:  Mr. Natola, he has actually answered

23   the question.  He said yes, he expected the government to make

24   a recommendation.

25             MR. NATOLA:  Okay.

fb15da61-bf01-46a8-88e9-52478032a92d

Page 11

1    BY MR. NATOLA:

2    Q.   Forget about what Judge Saris may do.  We all know,

3    Mr. Ruiz, that it's up to the judge to make the ultimate

4    decision.  Everybody knows that.  I'm talking about what you

5    expect the government to do as a reward for your testimony.  Do

6    you understand what I'm talking about?

7    A.   Which they did, they filed a motion.

8    Q.   I'm not going to play games with you anymore, Mr. Ruiz,

9    forget it.

10             Now, let's see how accurate you are.

11             MR. MERRITT:  Your Honor, can we do away with

12   the --

13             THE COURT:  Mr. Natola, just ask questions.

14             MR. NATOLA:  Yes, your Honor.  Sorry about that.

15             THE COURT:  The thoughts I'm sure are in your head,

16   so just let them stay there.

17             MR. NATOLA:  Thank you, I will.  Sorry.

18   BY MR. NATOLA:

19   Q.   Mr. Ruiz, this is page 6 of your plea agreement that you

20   signed.  In the middle of paragraph B, one, two, three, four,

21   five, six, seven, eight, nine lines down, see the line that

22   says "relevant statutes"?

23   A.   Yes.

24   Q.   You see that, where it says, "The determination whether the

25   government" -- excuse me, "The determination whether the

fb15da61-bf01-46a8-88e9-52478032a92d

Page 12

1   defendant has provided substantial assistance rests solely in

2   the discretion of the U.S. Attorney and is not subject to

3   appeal or review." Do you see that?

4   A.  Yes.

5   Q.  And you understood that when you signed the plea agreement,

6   right?

7   A.  Yeah.

8   Q.  So you know that the determination of whether your

9   cooperation is good enough is completely up to the government

10  to determine, right?

11  A.  Yes.

12  Q.  Because that's what it says in your agreement.

13  A.  Yes.

14  Q.  Okay.  And it says also there that their determination,

15  their decision on whether your cooperation is good enough or

16  not is not subject to appeal or review by anybody.  Is that

17  right?

18  A.  Yes.

19  Q.  Okay.  So the United States Attorney, under the terms of

20  this agreement, okay, and the United States Attorney's Office

21  alone, decides whether your cooperation is good enough for them

22  to file a motion to reduce your sentence, right?

23  A.  To this agreement, yes.

24  Q.  Okay.  And that's what you understood when you entered into

25  this agreement, correct?

fb15da61-bf01-46a8-88e9-52478032a92d

Page 13

1    A.  Yes.

2    Q.  All right.  And we've already discussed it's the U.S.

3    Attorney who will tell Judge Saris if your cooperation is good

4    enough, right?

5    A.  Yes.

6    Q.  Okay.  So if you don't satisfy the United States Attorney's

7    Office with your cooperation, they won't help you get a reduced

8    sentence, will they?

9    A.  Yes.

10   Q.  They will?

11   A.  Yes.

12   Q.  Because they already filed the motion, right?

13   A.  Yes.

14   Q.  Now, turning to page 7 of your agreement, you got something

15   else from the government, didn't you, in addition to a promise

16   to help reduce your sentence?  Did you?

17   A.  What was that?

18   Q.  Did you get something else from the government in addition

19   to their promise to help you reduce your sentence?

20   A.  Not that I know of.

21   Q.  Okay.  Paragraph D, it's right in front of you.  Do you see

22   it?

23   A.  Yes.

24   Q.  "In return for the defendant's full and truthful

25   cooperation, the U.S. Attorney agrees not to use any

fb15da61-bf01-46a8-88e9-52478032a92d

Page 14

1    information provided by the defendant pursuant to this

2    agreement or pursuant to the proffer letter or any information

3    directly or indirectly derived therefrom against defendant in

4    any criminal case except in a prosecution for perjury or

5    obstruction of justice, or for making a false statement after

6    the date of this agreement; or for an act of physical violence

7    against the person of another, or conspiracy to commit any such

8    act of violence."

9            Have I read that correctly?

10   A.  Yes.

11   Q.  So the United States Attorney's Office has granted you

12   immunity, have they not?

13   A.  Yes.

14   Q.  Because that's what it says right there, "letter of

15   immunity," right?

16   A.  Yeah.

17   Q.  And in that agreement of immunity they agree not to use

18   against you any information you give to them with respect to --

19   in any other criminal case against you; is that right?

20   A.  Yes.

21   Q.  All right.  The only exception is if you -- if you lie or

22   if you commit an act of violence against somebody, right?

23   A.  Yes.

24   Q.  Okay.  And they've also, have they not, if you look at --

25   further down, in that paragraph one, two, three, four -- the

fb15da61-bf01-46a8-88e9-52478032a92d

Page 15

1   fifth line up where it starts with the word "that."  Do you see

2   the arrow that's going the wrong way?

3   A.   Yes.

4   Q.   Okay.  "At the time of sentencing, information provided by

5   the defendant pursuant to this agreement should not be used

6   either in determining where within the applicable guideline

7   range to sentence the defendant or in determining whether, or

8   to what extent, a departure from the sentencing guidelines is

9   warranted."

10           Have I read that correctly?

11   A.   Yes.

12   Q.   So anything you tell the government or anything you've told

13   the government, they're not going to use against you, they're

14   not going to tell the judge when it came time to sentence you,

15   right?

16   A.   Yes.

17   Q.   And you've told them about a number of things in this case,

18   right, or in other cases, I should say?

19   A.   Another case.

20   Q.   And they haven't used that against you in recommending a

21   sentence in your presentence report, have they?

22   A.   I told them what I did within the organization.

23   Q.   Okay.  But you're immunized.  In other words, they granted

24   you immunity from using that in determining your sentencing

25   guidelines.  That's what it says there, right?

fb15da61-bf01-46a8-88e9-52478032a92d

Page 16

1    A.  Yes.

2    Q.  Okay.  Now, you haven't been prosecuted for threatening to

3    shoot Jon Minotti, have you?

4    A.  No.

5    Q.  And you haven't been prosecuted for going to Jon Minotti's

6    house with five or six other of your friends and threatening to

7    kill him if he didn't pay you the money for the cocaine or give

8    you back the three kilograms of cocaine, right?

9    A.  At that time I didn't go threaten to kill him, I just

10   threatened him.

11   Q.  You just threatened him?

12   A.  Yeah.

13   Q.  And you know that making threats is a crime, right?

14   A.  Yes.

15   Q.  And you haven't been prosecuted for that crime, have you?

16   A.  No.

17   Q.  And you haven't been able -- you haven't been required --

18   let me take that back.

19           You've made -- you made a lot of money selling

20   drugs, right?

21   A.  A little bit.

22   Q.  Over the course of the years you've made a significant

23   amount of money selling drugs, haven't you?

24   A.  Just to live off of, yeah.

25   Q.  Well, for the three kilogram deal that was supposed go down

1    on December 24, 2003 you were going to make $12,000, weren't

2    you?

3    A.  No.

4    Q.  You weren't?

5    A.  No.

6    Q.  Didn't you testify to that yesterday?

7    A.  Yes, but --

8    Q.  No, no, not yes but, did you testify to that yesterday?

9    A.  Yes.

10   Q.  The government hasn't required you to forfeit any money,

11   have they?

12   A.  I didn't have none.

13   Q.  You didn't have any to forfeit?

14   A.  No.

15   Q.  Okay.

16           MR. NATOLA:  If I could have just one more moment,

17   your Honor, I'm almost finished.

18           THE COURT:  Yes.

19           (Pause.)

20   BY MR. NATOLA:

21   Q.  You wouldn't be testifying here today, would you, if the

22   government didn't offer you this plea agreement, would you?

23   A.  What was that?

24   Q.  You wouldn't be testifying here today if the government

25   didn't offer you the deal that's contained in this plea

Page 18

1    agreement, would you?

2    A.  I would have.

3    Q.  You would have?

4    A.  Yes, for the truth.

5    Q.  Out of generosity; is that right?

6    A.  Yeah, because I wanted --

7    Q.  Wait a minute.  You would have testified in this case

8    without any expectation of a break in the sentence that you got

9    in the case against you, is that what you're telling this jury?

10   A.  I would tell the truth.

11   Q.  Because you're a good citizen, right?

12   A.  Yes.

13   Q.  And good citizens always come into court and testify and

14   tell the truth, right?

15   A.  Yes.

16   Q.  And good citizens don't sell cocaine, do they?

17   A.  No.

18   Q.  No, they don't.  So you're not such a good citizen after

19   all, are you, Mr. Ruiz?

20   A.  No.

21   Q.  And you wouldn't come in here and testify were it not for

22   this plea agreement, would you?

23   A.  No.

24   Q.  You don't like being in prison, do you?

25   A.  I've been in already for 23 months so --

fb15da61-bf01-46a8-88e9-52478032a92d

1   Q.  I understand that, but you don't like it, do you?

2   A.  No.

3   Q.  Nobody does, right?

4   A.  No.

5   Q.  You'd have to be crazy to like being in prison, wouldn't

6   you?

7   A.  Yes.

8   Q.  You'd do anything to get out of prison as soon as you

9   could, wouldn't you?

10  A.  To see my kids, yes.

11  Q.  Absolutely.

12          MR. NATOLA:  Thank you.  I have no further

13  questions.

14          MR. DRECHSLER:  Can I have just one moment, Judge?

15          THE COURT:  Yes.

16          MR. NATOLA:  Your Honor, can we --

17          MR. DRECHSLER:  I can start, Judge, and he's

18  looking for something for me.

19          THE COURT:  Okay.

20          (Pause.)

21                  CROSS-EXAMINATION

22  BY MR. DRECHSLER:

23  Q.  Mr. Ruiz, during the course of the period of time to which

24  you pled guilty to this cocaine offense you were regularly

25  distributing and selling cocaine; isn't that right?

Page 20

1    A.   Yes.

2    Q.   And you were even doing it before that; isn't at that

3    right?

4    A.   Yes.

5    Q.   You've been doing it for several years; isn't that right?

6             MR. MERRITT:   Your Honor, I object, evidentiary

7    ruling.

8             THE COURT:   I'm sorry?

9             MR. MERRITT:   Under the rules of evidence I object.

10            THE COURT:   Sustained.

11            MR. DRECHSLER:   I'm sorry?

12            THE COURT:   Sustained.

13            MR. DRECHSLER:   May I approach, Judge?

14            THE COURT:   Yes.

15            (At sidebar on the record.)

16            MR. DRECHSLER:   I asked a cooperating witness

17   whether or not he sold cocaine outside of the scope of the

18   indictment to which he's pled guilty.   If in fact he committed

19   uncharged -- and I think his answer was yes -- so to the extent

20   that he committed illegal conduct which is uncharged, I think

21   that goes to the degree of inducement, and I believe I'm

22   entitled to that, Judge.

23            MR. MERRITT:   Well, first of all, he hasn't

24   established any time period he's talking about.   So at a

25   minimum, it would have to be within five years to even be

Page 21

1   prosecutable.  Second, he hasn't even established that this

2   witness has any consciousness of any benefit that he got that

3   the government knew anything about any drug dealing apart from

4   the conspiracy to which he pled.

5          And if the information the government got came from

6   him, they've already established that was immunized.  So this

7   is just a backdoor way of trying to get in inadmissible

8   instances of conduct that does not go to credibility.

9          THE COURT:  I guess we just started with the

10  question --

11         MR. DRECHSLER:  Judge, the fact that they've

12  immunized them is self-evident of another inducement.  In other

13  words, in his debriefing he did indicate and has indicated that

14  he's dealt cocaine and made his living do doing this for

15  several years.  It's right in the debriefing prior to his

16  arrest.  The fact that they've given him immunity, that goes to

17  the degree of inducement.  And I'm trying not to tread on the

18  same ground that Mr. Natola did, but this hasn't been brought

19  out, that outside the scope of the information that he's pled

20  to he committed illegal acts.  He was immunized from them;

21  therefore, the government was willing as an inducement to give

22  him that.  That's something, Judge, I'm entitled to examine him

23  on.

24         MR. MERRITT:  What they seek to do is confuse the

25  jury.  They've already established that he got immunity for his

fb15da61-bf01-46a8-88e9-52478032a92d

Page 22

1  conduct that came from him, and yet, they want to make it

2  appear as if he got a benefit because the government didn't

3  prosecute him for that.  You know, I think that on 403 grounds

4  just confuses the issue.

5          MR. DRECHSLER:  Judge, can I add one thing?  On

6  direct examination the government elicited from this witness

7  that he had several legitimate jobs, drove a bus, worked for a

8  supermarket, stuff like that.  In his proffer he indicated that

9  sold cocaine to earn a living for at least several years prior

10  it his arrest.

11          They opened up the issue.  Absent that it would

12  appear to the jury that this gentleman just started dealing

13  cocaine on the first day of the information and stopped in May

14  of '04.  Of course that's not true.  It's already been elicited

15  that he made a living doing cocaine, and liked to --

16          THE COURT:  I think I need to limit this.  He's got

17  the benefit of this case, and I'm going to limit it to what

18  he's got in this case.

19          I'm sustaining the objection.

20          MR. MERRITT:  Thank you.

21          (End of discussion at sidebar.)

22  BY MR. DRECHSLER:

23  Q.  Well, Mr. Ruiz, beginning in 2003 you certainly were

24  dealing quantities of cocaine in cooperation with Jose Rosales

25  in Peabody, correct?

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 3   3/28/06

Page 23

1   A.   Tonio.

2   Q.   Tonio, yeah?

3   A.   Yes.

4   Q.   You were dealing with him, right?

5   A.   Yes.

6   Q.   You were an agent -- you mentioned yesterday that you were

7   part of that organization; isn't that right?

8   A.   Yes.

9   Q.   Yeah, what organization is that, sir?

10              MR. MERRITT:  Your Honor, again --

11              THE COURT:  Sustained.  Sustained.

12  BY MR. DRECHSLER:

13  Q.   Well, you mentioned were you part of an organization, we

14  agree on that?

15  A.   A group.

16  Q.   You called it an organization.  Those were your words, not

17  mine.

18  A.   That's what the government called it.

19  Q.   No, no, no, sir.  You testified yesterday under oath

20  Mr. Ruiz, didn't you?

21  A.   Yes.

22  Q.   And didn't you say to a question from Mr. Natola that you

23  were part of this organization for several years or something

24  like that?

25  A.   Yes.

Page 24

1  Q.  That wasn't the government's word, that was your word,

2  wasn't?

3  A.  Yes.

4  Q.  Okay.  And I'm asking you how large was this organization

5  that you were part of?

6          MR. MERRITT:  Objection.

7          MR. DRECHSLER:  Sustained.

8  BY MR. DRECHSLER:

9  Q.  Well, were you a manager of the organization?

10         MR. MERRITT:  Objection, your Honor.

11         THE COURT:  Sustained.

12         MR. DRECHSLER:  May I be heard on this, Judge?

13         THE COURT:  I don't think I need to.  I made it

14  clear how we ought to do it, how you ought to do this.

15  BY MR. DRECHSLER:

16  Q.  Well, in any case you also had -- were working with

17  individuals named Mr. Valet, Mr. Minolo --

18         MR. MERRITT:  Objection, your Honor.

19         THE COURT:  Sustained.

20         MR. DRECHSLER:  Your Honor, may I approach?

21         THE COURT:  All right.

22         (At sidebar on the record.)

23         THE COURT:  Yes.

24         MR. DRECHSLER:  I'm reading this portion of it

25  directly out of the offense conduct, which is the subject of

Page 25

1    the plea in this case, the case to which he pled guilty.  Those

2    terms that I'm using are those names and the people that he was

3    working with.  In light of your Honor's ruling, and respecting

4    your Honor's ruling, I am now referring to matters that are set

5    forth in the offense conduct to which he -- this cooperating

6    witness pled guilty pursuant to an agreement with the United

7    States government.

8              THE COURT:  What's the relevance of who it was he

9    dealt drugs with?

10             MR. DRECHSLER:  Well, the breadth and the scope of

11   the organization, Judge, is relevant to the degree of

12   inducement that this witness has received.

13             THE COURT:  The witness has testified yesterday to

14   conduct that includes trafficking in 15 to 50 kilograms of

15   cocaine.  The fact that there were six or seven people involved

16   in it seems not to matter.

17             The objection is sustained.

18             MR. DRECHSLER:  Okay.

19             (End of discussion at sidebar.)

20   BY MR. DRECHSLER:

21   Q.  Now, you mentioned that at some point in time you were

22   arrested in January of 2004, correct?

23   A.  Yes.

24   Q.  And you said that you were arrested by members of the DEA,

25   federal agents; isn't that right?

fb15da61-bf01-46a8-88e9-52478032a92d

Page 26

1  A.  New Hampshire.

2  Q.  I understand.  And you got out on bail, didn't you?

3  A.  Yes.

4  Q.  All right.  And the people that arrested you were federal

5  agents, weren't they?

6  A.  Yes.

7  Q.  In New Hampshire, correct?

8  A.  Yes.

9  Q.  All right.  And then you said you got out on bail sometime

10  in January of '04, correct?

11  A.  Yes.

12  Q.  Okay.  And you didn't get rearrested until when, sir?

13  A.  May 1st.

14  Q.  Okay.  So let me understand something.  You didn't start

15  cooperating until after you were rearrested in May of '04,

16  correct?

17  A.  Yeah, after -- I was still selling drugs after I got

18  arrested.

19  Q.  I'm going to get back to that in a second.  But you were

20  not cooperating with the government between January 8th of 2004

21  and May -- what date, sir, were you arrested?

22  A.  2004, 2003, 2004.

23  Q.  No, sir, when you were arrested --

24  A.  May 1st.

25  Q.  Yes.  Is that the date of your rearrest?

fb15da61-bf01-46a8-88e9-52478032a92d

Page 27

1    A.   Yes.

2    Q.   The date of your first arrest was when, sir?

3    A.   January 7th.

4    Q.   January 7th.  Okay.  So, let me make it crystal clear.

5    Between January 7th and May 1st of 2004 you were not

6    cooperating with the government, were you?

7    A.   No.

8    Q.   Therefore, you were not available to government agents and

9    police officers to speak with them, correct?

10   A.   Correct.

11   Q.   You were represented by a lawyer during that period of

12   time, right?

13   A.   Yes.

14   Q.   And you were remaining silent during that period of time

15   with respect to law enforcement officials, right?

16   A.   Yes.

17   Q.   So if someone suggested that you were available to law

18   enforcement to be debriefed between January 7th and May 1st of

19   2004, that would not be true, would it?

20   A.   What was that?

21   Q.   If someone suggested to this jury that you were available

22   to be interviewed by law enforcement personnel between your

23   first arrest on January 7th of 2004 and your second arrest on

24   May the 1st, 2004, that would be untrue if someone suggested

25   that, wouldn't it?

fb15da61-bf01-46a8-88e9-52478032a92d

Page 28

1   A.  Yes.

2   Q.  Because during that period of time you were represented by

3   a lawyer in New Hampshire, and you weren't talking to any law

4   enforcement people, were you?

5   A.  No.

6   Q.  In fact, during -- between January 7th of 2004 and May 1st

7   of 2004 you were continuing to deal drugs; isn't that right?

8   A.  Yes.

9   Q.  Selling quantities of cocaine; isn't that right?

10  A.  A couple -- not quantities.

11  Q.  Well, you pled guilty to selling between -- according to

12  your plea agreement between 15 and 30 kilograms of cocaine,

13  right?

14  A.  Conspiracy.  I never had drugs on me.

15  Q.  You never had any drugs on you?

16  A.  No, it was a conspiracy.

17  Q.  I see.  So the time on December the 24th of 2003 when you

18  drove up with Mr. Minotti to the parking lot at the Malden

19  Hospital with the cocaine in this hide that you had inside of

20  your car, that was the only time you're telling this jury that

21  you actually had the cocaine in your possession?  You're not

22  telling the jury that, are you?

23  A.  Repeat the question, please.

24  Q.  December 24th of 2003 is the only time that you had cocaine

25  in your possession?

fb15da61-bf01-46a8-88e9-52478032a92d

Page 29

1    A.  No.

2    Q.  Okay.  So you did have quantities of cocaine in your

3    possession between December 24th of 2003 and May 1st of 2004;

4    isn't that true?

5    A.  Yes.

6    Q.  All right.  And December 24th was not the only time, was

7    it?

8    A.  No.

9    Q.  In fact, so often did you carry quantities of cocaine in

10   your car that you had a hide, a little secret compartment with

11   which you transported the cocaine, correct?

12   A.  Yes.

13   Q.  And you had that installed especially in your car for that

14   purpose correct?

15   A.  Yes.

16   Q.  What was it, a Buick?

17   A.  Yes.

18   Q.  You didn't go to the Buick dealer and say, hey, I like this

19   model but do you have one with a hide in the back?  You didn't

20   do that, did you?

21   A.  No.

22   Q.  You went to another drug dealer and you got it installed,

23   didn't you?

24   A.  Not another drug dealer.

25   Q.  Well, you went to someone that deals with installing secret

fb15da61-bf01-46a8-88e9-52478032a92d

Page 30

1    compartments in there, in drug dealers' cars, and you arranged

2    to have this hide installed, right?

3    A.  Yes.

4    Q.  All right.  And this isn't somebody who works at, you know,

5    the regular auto shop at the Buick dealership, is it?

6    A.  No.

7    Q.  No.  It's somebody who installs hides for drug dealers like

8    you, Mr. Ruiz; isn't that right?

9    A.  Yes.

10   Q.  All right.  And just so we have the sequence of events

11   correct, between January of 2004, your first arrest, and May

12   1st of 2005, you weren't -- you were continuing to go about

13   your business dealing cocaine, correct?

14   A.  2004?

15   Q.  Yes, 2004, between January 7th of 2004 and May 1st of 2004

16   you were continuing to occupy yourself on a regular basis

17   selling cocaine, correct?

18   A.  Yes.

19   Q.  And would you say that during that period of time you sold

20   cocaine once a week, twice a week, three times a week?  How

21   often?

22   A.  Twice a week.

23   Q.  Twice a week.  Okay.  And was it in Massachusetts or New

24   Hampshire or elsewhere?

25   A.  Massachusetts.

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 3   3/28/06

fb15da61-bf01-46a8-88e9-52478032a92d

Page 31

1  Q.  Okay.  And were you using the hide in your car to drive and

2  transport the cocaine around, were you?

3  A.  Yes.

4  Q.  And during that period of time out of the goodness of your

5  heart you never drove down to the U.S. Attorney's Office or the

6  DEA or any police department for that matter and walked in and

7  said, hey, you know what, there's crime going on here, I'm

8  going to -- I'd like to come in and tell the truth, all about

9  what's going on.  You never did that --

10                MR. MERRITT:  Your Honor, I'm going to object to

11  this.

12                THE COURT:  Sustained.

13  BY MR. DRECHSLER:

14  Q.  Well, you said in response to a question by Mr. Natola

15  earlier that you would tell the truth regardless of whether or

16  not you had this cooperation agreement with the government;

17  isn't that correct?

18  A.  Yes.

19  Q.  And you told the jury that you would do it even if you

20  didn't have this Rule 35 motion and this sentence hanging over

21  your head?

22  A.  The truth of this crime that happened.

23  Q.  The truth?

24  A.  Not the other --

25  Q.  You're not telling us that between January 7th and May 1st

Page 32

1  that you ever walked into any legal authority's office, whether

2  it be prosecutors or police or drug agents, and told them the

3  truth about what was going on.  You never did that, did you?

4  A.  Within our organization?

5  Q.  No.  Did you talk to law enforcement during that period of

6  time?

7  A.  No.

8  Q.  All right.  And then on May 1, 2005 you got rearrested,

9  correct?

10 A.  Yes.

11 Q.  And the DEA agents confronted you with the evidence they

12 had against you; isn't that right?

13 A.  Yes.

14 Q.  They told you, did they not, that they wanted you to

15 cooperate with regard to your illegal activities and said if

16 you help us, we'll help you.  Isn't that what they said to you?

17 A.  Can you repeat the question?

18 Q.  On May 1st or shortly after May 1st of 2004, when you were

19 rearrested, the federal agents confronted you with your illegal

20 conduct, correct?

21 A.  Yes.

22 Q.  And they told you that if you help us, we'll help you;

23 isn't that right?

24 A.  They asked about what happened with this case.

25 Q.  Did they tell you if you help us, we'll help you?  Yes or

fb15da61-bf01-46a8-88e9-52478032a92d

Page 33

1   no?

2   A.   Yes.

3   Q.   Okay.   And these were federal drug enforcement agents?

4   A.   Yes.

5   Q.   Do you remember which agent it was or agents it was that

6   said this to you, Mr. Ruiz?

7   A.   I don't remember.

8   Q.   And it was only -- and they also, as I showed you -- did

9   they play for you any of the calls that they obtained through

10  the wiretaps and the like?  Did they confront you with any of

11  those calls?

12  A.   Not at that time, no.

13  Q.   They told you they had you, though, didn't they?

14  A.   Yes.

15  Q.   They told you they had lots of calls in which you were

16  dealing -- providing evidence to the government of your illegal

17  drug dealing activities, correct?

18  A.   What was that?

19  Q.   They told you they had lots of calls recorded which would

20  show that you were dealing drugs on a regular basis, correct?

21  A.   Yes.

22  Q.   They told you that they actually had other evidence from

23  witnesses that would incriminate you for your illegal

24  activities, dealing drugs, correct?

25  A.   Yes.

fb15da61-bf01-46a8-88e9-52478032a92d

Page 34

1   Q.  And so, sir, it was then, and only then, that you said here

2   I am ready to talk to you, right?

3   A.  Yes.

4   Q.  May 1, 2004?

5   A.  Yes.

6   Q.  And at that point in time you did not agree to tell the

7   government everything that you knew about your illegal

8   activities; isn't that correct?

9   A.  I didn't tell them anything about the group.

10  Q.  Well, isn't it a fact that they asked you and you declined,

11  you declined to provide cooperation about the Mexican drug

12  operation about which you were involved?

13  A.  Yes --

14  Q.  You declined.  Do you know what "declined" means?

15  A.  No.

16  Q.  Declined -- let me ask you this.  You refused to give up

17  information about the Mexican drug organization with which you

18  were involved; isn't that right?

19  A.  For the safety of my family, yes.

20  Q.  I didn't ask you why, sir, I'll get to that, but you did

21  refuse?

22  A.  Yes, I did refuse.

23  Q.  So at this point in time you, Carlos Ruiz of Peabody,

24  Massachusetts, are deciding what you're going to tell the

25  federal government and what you're not going to tell the

1    federal government; isn't that right?

2    A.  To the safety of my family, yes.

3    Q.  Some things you wanted to tell them and some things you

4    didn't; isn't that right?

5    A.  I told them what happened with this case and --

6    Q.  Sir, some things you told them and some things you didn't,

7    right?

8    A.  Yes.

9    Q.  Okay.  And the person who decided what things you got to

10   tell them and what things you don't have to tell them was you,

11   Carlos Ruiz, right?

12   A.  Yes.

13   Q.  And it didn't ruin your plea agreement with the government,

14   the fact that you declined to provide information about the

15   Mexican drug organization, you still got your deal, right?

16   A.  Yes.

17   Q.  The deal that Mr. Natola asked you all about, right?

18   A.  Yes.

19   Q.  Okay.  And Mr. Natola asked you something about taxes and

20   so on about your drug illegal activities.  Let me ask you

21   something.  With your illegal -- illegally obtained funds that

22   you received as a result of your drug dealing, it's true, is it

23   not, that you purchased things, cars, made payments on your

24   home and your trailer in New Hampshire and the like, correct?

25   A.  Yes.

Page 36

1  Q.  All right.  You haven't had to give any of those things up

2  to the government as a result of this prosecution, have you?

3  A.  Yes, I did.

4  Q.  You did?

5  A.  Yeah.  My truck.

6  Q.  Your truck.

7  A.  Yeah.

8  Q.  All right.  But -- you didn't have to give up any of your

9  property, other property, have you?

10  A.  I didn't have no property.

11  Q.  Oh, okay.

12  A.  The trailer wasn't worth it.

13  Q.  The Park Avenue -- excuse me, the Buick with the hide, did

14  you have to give that up or is somebody else driving it now?

15  A.  I sold it.

16  Q.  You sold it with the drug hide in it, did you?

17  A.  Yeah.

18  Q.  To another drug dealer who would have a use for that?

19  A.  No.

20  Q.  Is it an option that you advertised and said, hey, not only

21  do you get this Buick but you get a hide?

22          MR. MERRITT:  Your Honor --

23          MR. DRECHSLER:  I'll move on, Judge.

24          MR. MERRITT:  Entertaining but not really relevant.

25          MR. DRECHSLER:  Well, I'm glad I'm entertaining

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 3   3/28/06

fb15da61-bf01-46a8-88e9-52478032a92d

Page 37

1    somebody, Judge.

2              THE COURT:  Thank you.

3    BY MR. DRECHSLER:

4    Q.  Now, with regard to this agreement that you have with the

5    government, as Mr. Natola pointed out, you understand now,

6    certainly, that the person who decides, the entity that decides

7    whether or not you get the benefit of the bargain by getting a

8    further reduction in your sentence is the United States

9    Attorney's Office?

10   A.  Yes.

11   Q.  Now, you never met me before today, have you, sir?

12   A.  No.

13   Q.  I haven't offered you anything, have I?

14   A.  No.

15   Q.  Mr. Natola hasn't offered you anything, has he?

16   A.  No.

17   Q.  We can't offer you anything.  You know that, don't you?

18   A.  What was that.

19   Q.  We can't offer you anything in return for your testimony?

20   A.  No.

21   Q.  In fact, you know that there are two sides to this

22   controversy.  Do you know the name of this case?  It's United

23   States v. Mr. Bucci and Mr. Jordan.  You know the name of the

24   case, right?

25   A.  Yes.

fb15da61-bf01-46a8-88e9-52478032a92d

Page 38

1  Q.  And you understand there's a controversy that's being tried

2  in front of this jury.  It's a dispute.  You understand that?

3  A.  Yes.

4  Q.  Okay.  The government is alleging that my client and

5  Mr. Bucci did certain things that were illegal, right?

6  A.  Yes.

7  Q.  Okay.  And you know that Mr. Bucci and Mr. Jordan have pled

8  not guilty to that?

9  A.  Yes.

10  Q.  And there's a dispute going on in this courtroom as to who

11  did what, correct?

12  A.  Yes.

13  Q.  And you know you're testifying for the government with

14  regard to -- you're testifying for one side in this legal

15  dispute; isn't that right?

16  A.  Yes.

17  Q.  Okay.  And you're testifying for the side that can give you

18  something and has given you something in return for your

19  testimony, right?

20  A.  Yes.

21  Q.  And you know that Mr. Natola and myself can't give you one

22  single solitary minute thing in exchange for your testimony,

23  right?

24  A.  Yes.

25  Q.  So clearly, with regard to this two-sided controversy that

fb15da61-bf01-46a8-88e9-52478032a92d

Page 39

1    is being presented to this jury --

2              MR. MERRITT:  Your Honor, I'm going to object to

3    the form of these questions.  It's asked and answered also.

4              THE COURT:  Well, let me hear the rest of this

5    question.

6    BY MR. DRECHSLER:

7    Q.  So it's clear, Mr. Ruiz, with regard to this dispute that

8    bring us before the jury, one side to the dispute, the

9    government, has given you something in return for your

10   testimony, and the other side to this dispute hasn't and cannot

11   give you anything in exchange for your testimony, correct?

12   A.  Correct.

13   Q.  All right.  And, Mr. Ruiz, if you were to -- you know that

14   this resentencing is on in front of Judge Saris actually has a

15   date of April the 28th.  You're aware of that, aren't you?

16   A.  Yes.

17   Q.  That's the day when you're going to go in front of Judge

18   Saris and you hope to get a further reduction in your sentence,

19   correct?

20   A.  Yes.

21   Q.  And you expect that the government is going to continue to

22   recommend that you get a further reduction in your sentence,

23   correct?

24   A.  Yes.

25   Q.  And let me ask you something, Mr. Ruiz.  If you were to

fb15da61-bf01-46a8-88e9-52478032a92d

1    come before this jury and tell them something different from

2    what you've told them -- what you've told the government in the

3    past in order to obtain this plea agreement, you wouldn't

4    expect the government to continue to press for a reduction in

5    your sentence, would you?

6    A.  What was that?

7    Q.  If you changed your testimony and said something different

8    from what you've told the government agents in your interviews

9    prior to your testimony yesterday and today, you would not

10   expect the government to continue to press for a reduction in

11   your sentence, would you?

12   A.  My testimony was the truth when I told the government

13   and --

14   Q.  You say it's the truth, Mr. Ruiz.  But I'm asking you if

15   you changed your testimony you would not expect the government

16   to continue to press for a reduction in your sentence, correct?

17   A.  Correct.

18   Q.  And you also know, Mr. Ruiz, that if you changed your

19   testimony and began to change it the other way, made it worse

20   for my client or made it worse for Mr. Bucci, you know that

21   there's not one single, solitary thing that we can do about it,

22   right?

23   A.  What was that?

24   Q.  If you change your testimony and made it worse for the

25   defendants, there isn't anything we can do about it?

Page 41

1          MR. MERRITT:  Objection, your Honor.

2          THE COURT:  Sustained.

3    BY MR. DRECHSLER:

4    Q.  Well -- you also are aware, are you not, that with regard

5    to your plea agreement and the various motions that have been

6    filed to continue your sentencing, they have all been placed

7    under seal by order of the Court, correct?

8    A.  Yes.

9    Q.  So you're aware of the fact that the casual member of the

10   public, anybody who just walked in here in the courthouse and

11   wanted to go into the clerk's office where the papers are

12   kept --

13          MR. MERRITT:  Your Honor, I'm going to object.

14   Q.  -- they couldn't just look this up, could they?

15          THE COURT:  Sustained.

16          MR. DRECHSLER:  May I approach, Judge?

17          THE COURT:  Yes.

18          (At sidebar on the record.)

19          MR. DRECHSLER:  Judge, this witness has had his

20   plea agreement sealed, the various motions to continue sealed,

21   the Rule 35 motion has been sealed.  It is shielded from public

22   view.  It has been provided to us, that's obviously how we know

23   about it.  But I think that I should be allowed to elicit from

24   this witness that an additional inducement he has received in

25   return for his cooperation is the fact that the cooperation --

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 3  3/28/06

Page 42

1  another privilege, if you will -- it's up to the jury as to

2  what they may glean from this, Judge, has been that his

3  cooperation and the details of it have been kept from the

4  public view.

5           THE COURT:  Well, let me just tell you that it

6  is -- first of all, it's a judicial officer that does that.

7           MR. DRECHSLER:  I understand, but it was a motion

8  of the government -- by agreement, I should say.

9           THE COURT:  And the practice is that in cases like

10  this, where cooperation will subject a defendant or a witness

11  to some danger, to seal that information.  So it's not an

12  inducement of the kind that you're talking about, I think

13  you're talking about, when you say it's an inducement, they're

14  keeping it secret.  It's a decision by a judicial officer that

15  sealing the document is likely to protect this person from

16  harm.

17           MR. DRECHSLER:  I don't dispute that, but the

18  government and this witness' lawyer have entered into that

19  agreement.  I know it's up to the judge ultimately, of course,

20  but the fact of the matter is the witness has asked and the

21  government has agreed to seal all these documents, and it

22  certainly is -- I know it's done regularly, but that doesn't

23  mean it's not an inducement.

24           MR. MERRITT:  I'm not sure -- the basis of the

25  objection is that he asked to have it done.  He hasn't

fb15da61-bf01-46a8-88e9-52478032a92d

Page 43

1    established that.  The fact of the matter, it's done for his

2    safety.  It's not something that's disclosed as a promise,

3    reward, or inducement.  If we move him to a different prison

4    for safety purposes, that's not something that's done for a

5    promise reward or inducement.  So I think it's misleading.

6              THE COURT:  I think it's misleading.  Sustained.

7              (End of discussion at sidebar.)

8    BY MR. DRECHSLER:

9    Q.  Mr. Ruiz, in your plea agreement -- and I'm going to

10   actually ask if I can have the exhibit.

11             THE COURT:  I think it's 20.

12             MR. DRECHSLER:  Judge, if I can use the --

13             THE COURT:  Yes.

14             MR. DRECHSLER:  -- projector here.

15   BY MR. DRECHSLER:

16   Q.  Okay.  Now, again, I'm going to show you Exhibit 20.

17   You've already looked at the plea agreement a couple of times

18   this morning, have you not, Mr. Ruiz?

19   A.  Yes.

20   Q.  Now, I'm going to show you on the first page of Exhibit 20

21   there, let's go down to where it says "penalties."

22             Okay.  We can see now that you faced the following

23   minimum or maximum penalties:  A term of incarceration -- that

24   means prison, right -- of not let than ten years, no more than

25   life; a fine of up to $4 million, right?

fb15da61-bf01-46a8-88e9-52478032a92d

Page 44

1   A.  Yes.

2   Q.  And that's for pleading to an information which is attached

3   to the plea agreement, which alleges -- actually, it's not

4   attached to the exhibit, Judge, although the exhibit says that

5   it is attached.

6           But I do have -- you know that you pled to an

7   information, which alleges that you were involved in a

8   conspiracy that involved five kilograms or more of a mixture

9   and substance containing cocaine, right?

10  A.  Yes.

11  Q.  And in your plea agreement here, turning to page two of

12  Exhibit 20, you can see here that -- I'm going to zoom in on

13  this a little bit -- you can see that the government has agreed

14  with you and your attorney to take the position that the base

15  offense level is 34.  You know that's an offense level from the

16  sentencing guidelines, correct?

17  A.  Yes.

18  Q.  And you know that is one of the factors that determines

19  your sentence, correct?

20  A.  Yes.

21  Q.  And it says that the offense charged in the information

22  involved more than 15 kilograms but less than 50 kilograms,

23  right?

24  A.  Yes.

25  Q.  And, yet, you pled guilty to an information which only

fb15da61-bf01-46a8-88e9-52478032a92d

Page 45

1    alleges that you were involved in a conspiracy that involves

2    more than five kilograms, correct?

3    A.  Conspiracy is 50 to 50 kilos.

4    Q.  It says -- the information that you pled to alleges that

5    you were involved in a conspiracy that involved five kilograms

6    or more of cocaine, correct?

7    A.  Yes.

8    Q.  But the plea agreement references that you actually engaged

9    in conduct which involved no less than 15, no more than 50,

10   5-0, kilograms of cocaine, correct?

11   A.  Yes.

12   Q.  All right.  So you know the reason why the information says

13   five kilograms or more is because that is the highest level of

14   which you can be charged regarding a cocaine conspiracy, right?

15   A.  To the guidelines, yeah.

16   Q.  Well, even under the statute.  The sentence for the

17   violation of the statute that you were accused of violating is

18   a mandatory minimum of ten years.  You understand that,

19   correct?

20   A.  Yes.

21   Q.  And you know that that mandatory minimum of ten years

22   applies to anyone who traffics in cocaine in excess of five

23   kilograms, correct?

24   A.  Yes.

25   Q.  And there is no higher level in the statutory framework,

fb15da61-bf01-46a8-88e9-52478032a92d

Page 46

1    correct?

2    A.   Yes.

3    Q.   Okay.  So you know that even though you are facing -- or

4    you were facing a ten-year mandatory minimum for dealing in

5    excess of five kilograms of cocaine, that your minimum conduct,

6    according to the plea agreement, was three times that, correct?

7    A.   What was that?

8    Q.   Well, five times three is 15, right?

9    A.   Yes.

10   Q.   Your plea agreement calls -- indicates that you agree with

11   the government that you dealt in quantities of cocaine in

12   excess of 15 but less than 50, 5-0, kilograms, correct?

13   A.   Yes.

14   Q.   So what you're saying is that you have pled guilty -- you

15   have pled guilty or you have agreed with the government that

16   you transacted in cocaine in quantities that were at least

17   three times the minimum level of five kilograms necessary to

18   get the mandatory ten years in jail, right?

19   A.   Yeah, it was the proof that they had.

20   Q.   Right.  Was that you sold way more than even what the

21   minimum is for a ten-year sentence, right?

22   A.   What was that?

23   Q.   Well, even if you sold just five kilograms of cocaine, you

24   know that you would get ten years -- you'd be looking at ten

25   years mandatory minimum, correct?

Page 47

1   A.  Yes.

2   Q.  And you sold over three times that, didn't you?

3   A.  Yes.

4   Q.  In your career, right?  Right?

5   A.  Yes.

6   Q.  Now -- and you have engaged also, Mr. Ruiz, in illegal

7   conduct regarding other drugs with which you are not charged,

8   correct?

9   A.  Yes.

10  Q.  Okay.  And with regard to the plea agreement, as Mr. Natola

11  and you discussed, certainly you understand each and every one

12  of those terms that are contained therein; is that right?

13  A.  What was that.

14  Q.  You understand all of the terms of your plea agreement, do

15  you not?

16  A.  Yeah.

17  Q.  Read them, went over them with your lawyer, right?

18  A.  Some of them.

19  Q.  Well, didn't you swear at the end --

20  A.  Yeah.

21  Q.   -- that you read the whole plea agreement and went over it

22  with your lawyer?

23  A.  He gave me a little bit of detail with each one.  We didn't

24  go fully through all of them.

25  Q.  You didn't go fully through all of it?  Well, let's go to

Page 48

1    that part in then, sir.

2              Here we go.  It says, "I have read this letter" --

3    that's the plea agreement -- "in its entirety and discussed it

4    with my attorney.  I hereby acknowledge that it fully sets

5    forth my agreement with the United States Attorney's Office for

6    the District of Massachusetts."

7              Did I read that part of it correctly?

8    A.  Yes.

9    Q.  Okay.  And then go down a little bit about the fifth line

10   from the bottom.  You see where it says "We" -- meaning you and

11   your lawyer -- "have had sufficient time to meet and discuss my

12   case.  We have discussed the charges against me, possible

13   defenses I might have, the terms of this plea agreement, and

14   whether I should go to trial."

15             Did I read all that correctly?

16   A.  Yes.

17   Q.  Now, according to this, anyway, you read the entire plea

18   agreement and you discussed it and you understood it, right?

19   A.  Yes.

20   Q.  So you're telling the jury now that when you signed this --

21   and that is your signature down there, Carlos Ruiz, isn't it?

22   A.  Yes.

23   Q.  Your lawyer didn't sign that for you, you signed it

24   yourself, didn't you?

25   A.  Yes.

fb15da61-bf01-46a8-88e9-52478032a92d

Page 49

1   Q.  You're not telling us that you lied to the Court when you

2   certified that you fully read the agreement and understood it

3   in its entirety.  You're not saying that, you are you?

4   A.  I read it, but my lawyer explained it, you know, like by

5   sections.

6   Q.  Well, did you understand it or didn't you?

7   A.  Yeah, I understood it.

8   Q.  Okay.  Did you sign that you understood it?

9   A.  Yes.

10  Q.  Okay.

11          Now, moving along, sir, so December of 2003 -- you

12  said, by the way, that you didn't make a lot of money selling

13  cocaine, right?  In your response to questions by Mr. Natola,

14  right?

15  A.  Yes.

16  Q.  But at one point you were paying as much as $40,000 for a

17  kilo of cocaine, right?

18  A.  I never said that.

19  Q.  You never said that?

20          Well, you do remember --

21  A.  I don't remember.

22  Q.   -- being interviewed by the federal agents; isn't that

23  right?

24  A.  Yes.

25  Q.  And you recall giving them a statement in the presence of

Page 50

1    your attorney, right?

2    A.  Yes, part I don't remember.

3    Q.  So as much time you spent talking with the federal agents

4    you can't even remember everything you said, right?  Is that

5    right?

6    A.  No.

7    Q.  It's not right?  You do remember everything you said or you

8    don't remember everything you said?  Which is it?

9    A.  I don't recall everything, like drugs.

10   Q.  Well, I'm going to ask you, sir, do you recall being

11   interviewed on June the 3rd of 2004 by -- in the presence of

12   your attorney -- Mr. Farley, who was the first Assistant U.S.

13   Attorney on the case, and federal agents, including Agent

14   Tully.  Do you recall being interviewed here at the courthouse

15   by all those people?

16   A.  Yes.

17   Q.  And do you recall telling them that you worked distributing

18   narcotics solely as a source of income prior to your arrest,

19   and you explained to them how the market goes up and down in

20   the drug business?  Do you remember having that discussion with

21   them?

22   A.  Yes.

23   Q.  The market does go up and down in the drug business like

24   the stock market, right?

25   A.  The prices.

fb15da61-bf01-46a8-88e9-52478032a92d

Page 51

1   Q.  Sure.  Did you tell -- do you remember telling the agents

2   that you -- the most you have paid for a kilogram of cocaine

3   was $40,000 in U.S. currency?  That's cash, right?

4   A.  Yes.

5   Q.  Does that refresh your memory?  You did tell them that,

6   didn't you?

7   A.  Yes.

8   Q.  And sometimes the price was as low as 23 or 25 or 28

9   thousand dollars, right?

10  A.  Yes.

11  Q.  But whatever the price was that you paid, and whatever the

12  price was that you sold it for was always in cash, greenbacks,

13  right?

14  A.  Yes.

15  Q.  All right.  No checks being written, were there?

16  A.  No.

17  Q.  The reason you don't write checks is because you don't want

18  people, law enforcement, knowing what you're doing, right?

19  A.  Yes, and this is cash --

20  Q.  Cash business, right?

21  A.  Yeah.

22  Q.  No taxes, no sales tax, nothing, right?

23  A.  No.

24  Q.  Boom?

25  A.  What was that?

fb15da61-bf01-46a8-88e9-52478032a92d

Page 52

1    Q.  Did you just say "boom"?

2    A.  No, I didn't say that.

3    Q.  Now, when you -- in order to pay that kind of money for a

4    kilo of cocaine, whether it's between 23,000 or 40,000, you

5    need operating capital; isn't that right?

6    A.  You need a cuff.

7    Q.  Well, it's a business that you're running, right?  You need

8    to have enough money to pay for the product in order to sell

9    the product, isn't that right?

10   A.  Yes.

11   Q.  And with regard to your first introduction to Jon Minotti,

12   it was through Tommy, Tom Gorgone, right?

13   A.  I don't know his last name.

14   Q.  His name is Tommy, right?

15   A.  Yes.

16   Q.  And he introduced to Mr. Jon Minotti; isn't that right?

17   A.  Yes.

18   Q.  And the first time that you met Jon Minotti, the

19   government's other cooperating witness, was at a drug

20   transaction, correct?

21   A.  What was that?

22   Q.  It was in the course of a drug transaction, correct?

23   A.  When I met --

24   Q.  Mr. Jon Minotti.

25   A.  Yes.

fb15da61-bf01-46a8-88e9-52478032a92d

Page 53

1    Q.  You sold him an ounce of cocaine?

2    A.  Yes.

3    Q.  For $700, right?

4    A.  Yes.

5    Q.  That's how you met?

6    A.  Yeah.

7    Q.  I mean, you didn't meet at a social occasion or at a local

8    bar or at the ball game; you met for the purpose of selling him

9    drugs, right?

10   A.  Yes.

11   Q.  All right.  And you sold him drugs.  Hi, how you are, my

12   name is Carlos, your name is Jon, here's some drugs, right?

13   And he paid you, right?

14   A.  Yes.

15   Q.  And you exchanged phone numbers with Mr. Minotti at that

16   time, correct?

17   A.  Yes.

18   Q.  And after that time you commenced selling cocaine to

19   Mr. Minotti on a regular basis, correct?

20   A.  Yes.

21   Q.  And with regard to Mr. Minotti, would it be fair to say

22   that prior to December 24th of 2003 you were in a regular

23   communication with him?

24   A.  Yes.

25   Q.  And you indicated, did you not, that on December 24th of

Page 54

1    2004 -- 2003, I'm sorry, your intention or your understanding

2    is that you were going to sell the cocaine to Jon Minotti;

3    isn't that right?

4    A.   Sorry, he was going to sell it to Gino.

5    Q.   Well, you remember testifying before the grand jury in this

6    matter?

7    A.   I took it to Jon, but he was going to give it to Gino.

8             MR. NATOLA:  Your Honor, may that be stricken?

9    It's not responsive to the question.

10            THE COURT:  Just a moment.

11            MR. DRECHSLER:  You recall testifying --

12            THE COURT:  Hold on, Mr. Drechsler, I want to -- I

13   want to just review this.

14            MR. DRECHSLER:  Okay.

15            (Pause.)

16            THE COURT:  No, I think it's responsive.

17   BY MR. DRECHSLER:

18   Q.   So your understanding is you were going to provide the

19   cocaine to Jon Minotti, right?

20   A.   Yes.

21   Q.   All right.  And with regard to your testimony today and

22   yesterday, you were going to charge him, according to your

23   testimony yesterday, was how much per kilogram?

24   A.   Twenty-seven.

25   Q.   Twenty-seven thousand dollars.  All right.  So -- and your

fb15da61-bf01-46a8-88e9-52478032a92d

Page 55

1   $27,000 was the price which you're familiar with as a drug

2   dealer, because, as you know, as you say, as a drug dealer you

3   know how much it is all the time, right?

4   A.  No.

5   Q.  Well, it changes every day?

6   A.  Yes -- not every day.

7   Q.  Well, it changes periodically?

8   A.  Yes.

9   Q.  And $27,000 per kilogram is what you were going to sell it

10  for, right?

11  A.  Yes.

12  Q.  And that's what you testified to under oath yesterday and

13  today, correct?

14  A.  Yes.

15  Q.  And you're as sure about that as you are about everything

16  else that you've testified to in front of this jury yesterday

17  and yesterday and today?

18  A.  I was going to sell it for $27,000.

19  Q.  You were going to sell it for $27?

20  A.  I was going to sell it for $27,000.

21  Q.  Sure as sure as the price of that cocaine as you are that

22  David Jordan pointed a gun at you on December 24, 2003, correct?

23  A.  Which he did.

24  Q.  And you're as sure about that as you are about the price of

25  the cocaine, right?  You're sure about the your testimony?

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 3  3/28/06

fb15da61-bf01-46a8-88e9-52478032a92d

Page 56

1   A.   That the price they were giving to me was $27,000.

2   Q.   That's what you were selling for, right?

3   A.   Yes.

4   Q.   Now, I'm going to show you a copy of the transcript of your

5   testimony before the United States grand jury in this building

6   on June the 8th, 2004 when you were under oath, Mr. Carlos

7   Ruiz; and I'm going to direct your attention to a page that I

8   have unfolded in front of you from that grand jury testimony.

9   You were under oath represented by a lawyer at that time, were

10  you not, sir?

11          MR. MERRITT:  Which page is that?

12          MR. DRECHSLER:  Page 9, I'm sorry.

13  BY MR. DRECHSLER:

14  Q.   Were you represented by a lawyer when you went in there?

15  A.   When I went --

16  Q.   When you went to the grand jury, were you represented by a

17  lawyer?

18  A.   Yes.

19  Q.   Okay.  Would you look at line 12, the question:  "Okay."

20  And this is you testifying -- "And what specifically did you

21  guys talk about in terms of quantity and price that you recall?

22          "A.  It was three kilos.  "He" -- meaning Jon

23  Minotti -- "was going to purchase three kilos at $28,000?"

24          Twenty-eight thousand dollars, correct?

25  A.   Yes.

fb15da61-bf01-46a8-88e9-52478032a92d

Page 57

1   Q.   Okay.  So you're telling the jury now that what you said to

2   the grand jury back on June the 4th was untrue, because it was

3   really $27,000, right?

4   A.   One kilo was 28, but then he said he was going to buy three

5   kilos.

6   Q.   Doesn't it say three kilos at 28,000?

7   A.   That was at one.

8   Q.   Let's read it again?

9            "Okay.  And what specifically did you guys talk

10  about in terms of quantity and price that you recall."

11           Did I read the question correctly, sir?

12  A.   Twelve?

13  Q.   Line 12 and 13.  Did I read the question correctly?

14  A.   Yes.

15  Q.   Okay.  Do you want to read to the jury what your answer was

16  under oath back on June the 4th of 2004, sir?

17  A.   "It was three kilos.  He was going to purchase three

18  kilos at 28,000."

19  Q.   Twenty-eight thousand, right?

20  A.   Yes.

21  Q.   Ah.  And do you recall being before your interview with the

22  drug agents back on June the 3rd of 2004 --

23  A.   Excuse me, sir, in the bottom --

24  Q.   Sir, before the -- you were interviewed by the Drug

25  Enforcement Administration.  It doesn't say 27,000, does it?

fb15da61-bf01-46a8-88e9-52478032a92d

Page 58

1    A.  No, it says going price for a kilo $28,000 on the bottom.

2    Q.  All right.  Well, here's a question:  "Okay.  A kilo."

3              "Q.  Is that a fair going price for a kilo,

4    $28,000?"

5              You said, "Yeah," didn't you?

6    A.  For one kilo.

7    Q.  Well, wait a second.  Two lines above it you said -- these

8    are your words, I'm going to read them for the fourth time,

9    sir -- he was going to purchase three, t-h-r-e-e, kilos,

10   k-i-l-o-s, at 28, two eight comma 0-0-0 thousand dollars.  Does

11   it say that?

12   A.  Yes.

13   Q.  Did you say that?

14   A.  Yes.

15   Q.  Okay.  Now, you recall before June 3rd of 2004 you were

16   interviewed by drug enforcement agents on May the 14th of

17   2004.  Do you recall that?

18   A.  What was that?

19   Q.  You recall being interviewed before June 3rd of 2004 on May

20   13th of 2004.  Do you recall that?

21   A.  Yes.

22   Q.  And do you recall telling the federal drug agents and the

23   prosecutors that you were going to -- you were going to -- you

24   were going to sell the drugs to Mr. Minotti for $25,000.

25   A.  Twenty-seven.

fb15da61-bf01-46a8-88e9-52478032a92d

Page 59

1  Q.  Twenty-five thousand.  I'm asking if you remember telling

2  them on May 14, 2004 that you were going to sell them to

3  Mr. Minotti for $25,000.  Do you recall telling the federal

4  agents that on May 14th of 2004 that the price was 25 per

5  kilo?  Yes or no?

6  A.  I don't remember.

7  Q.  Okay.  I'm going to show you a copy of an interview report,

8  which was provided by the government, from that particular day;

9  and I'm going to direct your attention to paragraph five.

10          MR. DRECHSLER:  May I approach the witness, Judge.

11          THE COURT:  Yes.

12  BY MR. DRECHSLER:

13  Q.  I'm going to direct your attention to paragraph five of

14  this interview report.  You see this is May 14th, temporary

15  federal agent O'Neil, AUSA Farley, okay, and you spoke --

16  that's you, Carlos Ruiz -- you spoke with them at the federal

17  courthouse, right?

18  A.  Yes.

19  Q.  Paragraph five.  You said Mr. Minotti called you on

20  December 23rd and asked if you could get three kilograms of

21  cocaine, right?

22  A.  Mm-hmm.

23  Q.  Okay.  And Ruiz, that's you, told Minotti he could get them

24  for $25,000 apiece and set the deal for the morning of December

25  24th, right?

Page 60

1   A.  Yes.

2   Q.  Ruiz said he got the kilograms fronted to him by Rosales,

3   whom he would have to pay $23,000 for, correct?

4   A.  Yes.

5   Q.  So you were going to get them for 23, according to this,

6   and you were going to sell them for 25; is that right?

7   A.  Yes.

8   Q.  So you were going to make $6,000, according to what you

9   told the federal agents at that time?

10  A.  Yes.

11  Q.  When you went in front of the grand jury, you indicated you

12  were going to sell them for 28 so if you were making six, now

13  you're making 15, right?

14  A.  Yes.

15  Q.  And if you go paid 27,000 you made 12 grand, right?

16  A.  Yes.

17  Q.  So whether you made six grand, 12 grand, 15 grand, it

18  doesn't matter, it's all the same, right?  All the same to

19  Carlos Ruiz, right?

20  A.  Yeah.

21  Q.  Doesn't matter what the truth is, does it?

22  A.  Yes, it does.

23  Q.  All right.  Well -- now --

24  A.  At the time they called --

25  Q.  Excuse me, sir.  I'll ask you a question, you can answer

fb15da61-bf01-46a8-88e9-52478032a92d

Page 61

1    it, that will be great.

2          Now, you said that on the way to the hospital that

3    morning Mr. Minotti's in the front seat initially in the car,

4    right.

5    A.  Yes.

6    Q.  And at some point he climbs into the back seat, right?

7    A.  Yes.

8    Q.  All right.  And, in fact, you talked about yesterday about

9    telling Mr. Minotti that Mr. Bucci was obtaining oxycontin at

10   the hospital, right?

11   A.  In the conversation Jon said something about that.

12   Q.  And you had actually obtained oxycontin from Jon Minotti

13   before, right?

14   A.  Yes.

15   Q.  And you had taken oxycontin as a result of that?

16   A.  Have I taken it?

17   Q.  Yeah.

18   A.  No.

19   Q.  You didn't take it?

20   A.  Try it?  Yes.

21   Q.  Well, did you tell the agents that Mr. Minotti gave you an

22   oxycontin and you took it?  It was the first time you said you

23   took an oxycontin was from Jon Minotti?

24   A.  Yes.

25   Q.  The government's other cooperating witness.

fb15da61-bf01-46a8-88e9-52478032a92d

Page 62

1          MR. MERRITT:  Your Honor, objection.

2          THE COURT:  Yes, Jon Minotti is enough.

3          MR. DRECHSLER:  Okay.  Leave it at that.

4    BY MR. DRECHSLER:

5    Q.  And you said that Mr. Minotti got out of the car and tucked

6    the cocaine that -- first he went in the back seat, you opened

7    the hide, he got the coke out, right?

8    A.  Yes.

9    Q.  And then he got out of the car and you say he hid it under

10   his jacket?

11   A.  Tucked it in.

12   Q.  Tucked it under a gray coat that he had on, right?

13   A.  I don't remember the color, blue, gray, it had like three

14   colors.

15   Q.  Did you -- you do remember anyway that he tucked it into a

16   coat, right?

17   A.  Yes.

18   Q.  All right.  And it was, as we know, Christmas Eve, right?

19   A.  Yes.

20   Q.  And so the wintertime, right?

21   A.  Yes.

22   Q.  All right.  And with regard to this point in time, you say

23   you felt an impact in the rear of your car, correct?

24   A.  Yes.

25   Q.  And then you saw, you say, a person who identified himself

fb15da61-bf01-46a8-88e9-52478032a92d

1  as a police officer, right?

2  A.  He came up and said, "Malden police."

3  Q.  Malden police, right?

4  A.  Yes.

5  Q.  All right.  And fair to say that at this point in time you

6  were upset?

7  A.  I was confused -- I didn't know what was going on.

8  Q.  Well, you were nervous, right?

9  A.  Yes.

10  Q.  And this person identified himself as a Malden police

11  officer, right?

12  A.  Yes.

13  Q.  And he told you to shut off the engine and to get out of

14  your car, right?

15  A.  Yes.

16  Q.  All right.  And you obliged the policeman's orders, right?

17  You should off your engine, didn't you?

18  A.  Yes.

19  Q.  You got out of the car, didn't you?

20  A.  Yes.

21  Q.  All right.  And your first thought was uh-oh, right?

22  A.  No, it was --

23  Q.  So the fact that you were a cocaine dealer, a policeman had

24  just pulled up behind your car, someone identified himself as a

25  policeman --

1    A.  He didn't identify himself at first.

2    Q.  This didn't concern you at all?

3    A.  I was nervous, sure.

4    Q.  And you're telling the jury today that you remember it was

5    a silver revolver that the officer had; is that right?

6    A.  Small handgun.

7    Q.  So you can't say it was a revolver or not, can you?

8    A.  Yeah, revolver.

9    Q.  Revolver.  And you're familiar with guns, you know what the

10   difference is between a revolver and an automatic, don't you?

11   A.  No.

12   Q.  You don't know the difference?

13   A.  Like, when I seen a silver gun, something silver.

14   Q.  But you can't tell us if it's an automatic or a handgun

15   because you don't know the difference?

16   A.  I seen the chambers.

17   Q.  Oh, so you do know the difference between automatic and a

18   handgun?

19   A.  Yes.

20   Q.  And that's because you've seen lots of them?

21   A.  I haven't seen lots of them.

22   Q.  You had one, you had one up in your trailer up in New

23   Hampshire, didn't you?

24   A.  It was a friend's.

25   Q.  A friend's?

fb15da61-bf01-46a8-88e9-52478032a92d

Page 65

1    A.  Yes.

2    Q.  Okay.  I see.  In any case, this gentleman who came up and

3    identified himself as a police officer told you to shut off the

4    engine and get out of the car?

5    A.  Yes.

6    Q.  And then he frisked you, didn't he?  He patted you down?

7    A.  Yes.

8    Q.  And then he went into the car and he searched the car,

9    didn't he?

10   A.  Yes.

11   Q.  And he didn't find any drugs?

12   A.  No.

13   Q.  And he didn't find any drugs because there were no drugs to

14   be found in the car at that point in time, right?

15   A.  No.

16   Q.  Mr. Minotti had taken the drugs out of the car, correct?

17   A.  Yes.

18   Q.  And of course the police officer never opened the hide that

19   you had, because it's a secret place, which most people

20   wouldn't know where to find, right?

21   A.  Yes.

22   Q.  All right.  And he never looked into the hide, did he?

23   A.  No.

24   Q.  He never asked you to open the hide, did he?

25   A.  No.

Page 66

1  Q.  He never said to you I know you've got a secret compartment

2  where you hide drugs, I want you to open up it up for me.  He

3  never said that, did he?

4  A.  No.

5  Q.  He searched the portions of the car that would be

6  accessible to a normal human being and found nothing; isn't

7  that right?

8  A.  Yes.

9  Q.  And he also asked Mr. Bucci -- he frisked Mr. Bucci, patted

10  him down, didn't he?

11  A.  Yes.

12  Q.  All right.  And then you heard him talking on the radio, as

13  we discussed yesterday, and the officer called in and asked for

14  a listing on Carlos Ruiz, a warrant check; isn't that right?

15  A.  Yes.

16  Q.  And you know what a warrant is, right?

17  A.  Yes.

18  Q.  A warrant is a piece of paper that means that the policeman

19  is entitled to arrest you, right?

20  A.  Yes.

21  Q.  All right.  It means you've done something wrong or you're

22  suspected of doing something wrong, correct?

23  A.  Yes.

24  Q.  Or it means you haven't shown up in court; isn't that

25  right?

fb15da61-bf01-46a8-88e9-52478032a92d

Page 67

1    A.   Yes.

2    Q.   Something like that.  Okay.  And the policeman called

3    the -- you heard a call on the radio and asked for a listing or

4    warrant check on you, Carlos Ruiz, right?

5    A.   Yes.

6    Q.   And he got back information with your address, 106

7    Bartholomew Street in the right city, Peabody, Mass.; isn't

8    that right?

9    A.   Yes.

10   Q.   And then he -- by the way, he asked for your permission

11   before he searched the car, didn't he?

12   A.   No.

13   Q.   He didn't ask for your permission?

14   A.   Not that I remember.

15   Q.   Okay.  So he did -- he just did it without your permission?

16   A.   He just went in --

17   Q.   Okay.

18   A.   -- searched around.

19   Q.   He searched around.  And the hide was closed at that point

20   in time, right?

21   A.   Yes.

22   Q.   And he told -- this officer said, well, he said, "Today's

23   your lucky day, merry Christmas, get out of here," right?

24   A.   He said, "You're well-known in Lynn for selling drugs."

25   Q.   He also said, "You're well-known in Lynn dealing drugs,"

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 3   3/28/06

Page 68

1   right?

2   A.  Yes.

3   Q.  And, actually, sir, that was true, wasn't it?  You were

4   well-known in Lynn at the time, right?

5   A.  Yeah.

6   Q.  And you were well-known not for working at Catholic

7   Charities or, you know, being a great baseball player, you were

8   well-known in the city of Lynn for being a drug dealer, right?

9   A.  Yes.

10  Q.  All right.  And then the detective, the police officer

11  asked you about the person that had run off into the woods,

12  right?

13  A.  Yes.

14  Q.  And you made up a lie, didn't you?

15  A.  Made up a name.

16  Q.  You made up -- that's a lie, isn't it?  Is Steven a real

17  name of somebody?

18  A.  No.

19  Q.  Is that was a lie, wasn't it?

20  A.  Yes.

21  Q.  And it didn't take you a whole lot of time, Mr. Carlos

22  Ruiz, to make up that lie, did it?

23  A.  No.

24  Q.  Nobody wrote it down for you, did they?

25  A.  No.

Page 69

1    Q.  Nobody told you what to say if a policeman came, right?

2    A.  No.

3    Q.  You hadn't rehearsed it with anybody, had you?

4    A.  No.

5    Q.  You just thought up a lie, and you thought it up very

6    quickly, didn't you?

7    A.  Yes.

8    Q.  And it flew out of your mouth and you said, "That's Steve

9    and he ran because he had a warrant for his arrest," right?

10   A.  Yes.

11   Q.  And as we discussed a moment ago, you know what a warrant

12   is, right?

13   A.  Yes.

14   Q.  And so you said to the policeman Steve, you made up a fake

15   name; and you made up the fact that the person had a warrant,

16   didn't you?

17   A.  Yes.

18   Q.  That was a complete unadulterated lie, right?

19   A.  Yeah.

20   Q.  And you had no -- and you didn't hesitate, you just -- out

21   it flew out of your mouth, right?

22   A.  Because he ran, so that's what I told him.

23   Q.  That's what I'm saying, I'm talking about the lie, not the

24   fact that the person lie, I'm talking about who that person was

25   and why he ran flew out of your mouth with ease, didn't it?

fb15da61-bf01-46a8-88e9-52478032a92d

Page 70

1   A.  Yes.

2   Q.  So you are capable of lying, Mr. Ruiz, aren't you?  Aren't

3   you?

4   A.  Yes.

5   Q.  And nothing happens to you physically when you lie, you

6   don't exhibit anything unusual to the person you're lying to,

7   do you?

8   A.  What do you mean?

9   Q.  Well, you don't break out into a sweat, you don't break out

10  into the shakes, you don't -- there's no physical indication to

11  the person that you're lying to that you're lying, is there?

12  A.  No.

13  Q.  Now, you told the agents, did you not, that after the

14  incident at Malden Hospital you called -- you went to the

15  Johnny's Food Master grocery store and picked up your wife,

16  right?

17  A.  Shaw's.

18  Q.  Shaw's.  It wasn't Johnny's Food Master.  Doesn't matter.

19  You went to the supermarket and picked her up?

20  A.  Yes.

21  Q.  First you called her on the phone; is that right?

22  A.  Yes.

23  Q.  And then you told the agents that you picked up your wife

24  and then you picked up your brother-in-law, Mr. Lovos, Armando

25  Lovos, and you went to Mr. Minotti's house, right?

Page 71

1    A.   Dropped her off, changed cars, and then went to Jon's

2    house.

3    Q.   Now, in one version of events that you gave to the federal

4    agents you said that you went -- you went to Mr. Minotti's

5    house twice that day, once by yourself and a second time with

6    Mr. Lovos; isn't that right?

7    A.   No.

8    Q.   Well --

9    A.   I don't remember.

10   Q.   Your testimony today is that you went, picked up your wife,

11   dropped her off, picked up Armando Lovos and then went to

12   Mr. Minotti's house?

13   A.   Twice.  When I went to show him the kilos, that was one

14   time; and then the second time I was with Lovos.

15   Q.   I'm talking about afternoon the incident at the hospital.

16   Did you go back to Mr. Minotti's house once or twice?

17   A.   After the incident?

18   Q.   Yes.

19   A.   Just once.

20   Q.   Just once with Armando Lovos, right?

21   A.   Yes.

22   Q.   And you're being as truthful about that as you are about

23   everything else; is that right?

24   A.   That's what I told -- what I remember, yeah.

25   Q.   Well, you do recall speaking with federal agents on May the

fb15da61-bf01-46a8-88e9-52478032a92d

Page 72

1    14th of 2004, right, in this courthouse, correct?

2    A.  I don't remember.  Can you show me?

3    Q.  Well, you remember being interviewed by Trooper O'Neil and

4    AUSA Farley, right?

5    A.  What was that?

6    Q.  May 14, 2004, TFA O'Neil and Farley, right?

7    A.  Yes.

8    Q.  And that's you, Carlos Ruiz, right?

9    A.  Yup.

10   Q.  Okay.  Now, on page -- well, paragraph 10 of this part of

11   your proffer that you got under a grant of immunity, you said

12   that you called your wife from a cell phone and told her that

13   you had just been ripped off; and once you were at Minotti's

14   house you pulled into the driveway and met with Minotti in the

15   garage, right?  Isn't that what it says that you said at that

16   time?  Is that what it says, Mr. Ruiz?

17   A.  That was when -- that was when --

18   Q.  Sir, does it say that while driving back to Minotti's

19   house -- this is after the incident -- you called your wife on

20   the cell phone and told her that you had just been ripped off.

21   Once at Minotti's house, Ruiz pulled in the driveway and met

22   with Minotti in the garage, right?

23   A.  Yes.

24   Q.  Okay.  And then in paragraph 11, you said that Ruiz said

25   that he left Minotti's and went to his house in Peabody, got

fb15da61-bf01-46a8-88e9-52478032a92d

Page 73

1    his Toyota 4Runner, called Armando Lovos -- it's misspelled --

2    and went and picked him up at his house and then went back to

3    Minotti's house.  That's the story you told in paragraphs 10

4    and 11 of your statement of May 13, 2004, that's the story you

5    told then; isn't that right?

6    A.  Yes.

7    Q.  So according to what you told the federal agents back on

8    May the 14th of 2004 and the Assistant United States Attorney,

9    Mr. Farley, who was involved in the case at that time, you made

10   two trips to Mr. Minotti's house immediately after the incident

11   at the Malden Hospital, correct?

12   A.  Only once.

13   Q.  Well, according to what you told the agents you went twice,

14   once by yourself without your wife, you said you called her on

15   the cell phone -- you don't mention picking her up -- you went

16   to Minotti's house, and you met with Minotti.  Isn't that what

17   paragraph 10 says?

18   A.  Yes.

19   Q.  And in paragraph 11 it says you went to Minotti's house,

20   went to your house in Peabody, got your Toyota 4Runner --

21   that's the different vehicle that you had?

22   A.  Yes.

23   Q.  And then you called Armando, your brother-in-law,

24   Mr. Lovos, and then you went back to Mr. Minotti's house

25   according to what you told the agents on May the 14th, correct?

Page 74

1    A.  Yes.

2    Q.  Now you're saying that what really happened is you picked

3    up Armando Lovos, you switched your car and then you went to

4    Mr. Minotti's but you only went there once isn't that what you

5    said?

6    A.  Yes.

7    Q.  All right.  Were you telling the truth on May 14th or are

8    you telling the truth now?

9    A.  I'm telling the truth now and --

10   Q.  All right, all right.

11          Now, with regard to Mr. Minotti, when you met with

12   him at his house, however many times you met with him or

13   whichever time it was, you did have a conversation with

14   Mr. Minotti, right?

15   A.  Yes.

16   Q.  And Mr. Minotti told you, did he not, that he hid the

17   cocaine under some leaves in the forest that was near the

18   Malden Hospital, correct?

19   A.  What was that?

20   Q.  Mr. Minotti told you on one of your visits to his house

21   immediately after the incident on December 24th of 2004 --

22   2003, I'm sorry -- Mr. Minotti told you that the drugs, the

23   cocaine, were hidden under some leaves in the forest near the

24   hospital, right?

25   A.  Yeah, that's what he said.

fb15da61-bf01-46a8-88e9-52478032a92d

Page 75

1   Q.  Okay.  And he said that he ran because he saw a blue light,

2   correct?

3   A.  Yes.

4   Q.  All right.  And you asked Mr. Minotti to go with him --

5   with you back to retrieve the three kilograms of cocaine from

6   the forest near the Malden Hospital, correct?

7   A.  Yes.

8   Q.  Now, did -- and Mr. Minotti told you he wouldn't go, right?

9   A.  Yes.

10  Q.  Told you he had company at his house?

11  A.  Yes.

12  Q.  That's why he said he couldn't go, right?

13  A.  Yes.

14  Q.  At another time, on May 14th, you said -- this is on --

15  that's what you say today, but on May 14, 2004, when you were

16  interviewed by federal agents, you said that Mr. Minotti told

17  you that he wouldn't go back there because he thought the place

18  was crawling with police; isn't that right?

19  A.  He said both things.

20  Q.  He said both things.

21  A.  He said the drugs are over there, that was probably a cop,

22  there's going to be cops all over the place.

23  Q.  Well, sir, when you spoke with the police on June the 3rd

24  of 2004 -- excuse me, the federal agents and the Assistant U.S.

25  Attorney at the time in 2004, you told him that -- you told the

Page 76

1    agents at that time that -- this is in paragraph 11, which I'm

2    going to show you -- this is the interview you had at the

3    courthouse here on June 3rd of 2004, okay?  You met with two

4    special agents and Mr. Farley, the former -- the then Assistant

5    U.S. Attorney in this office, and yourself, and on page --

6    paragraph 11 indicated you, Mr. Ruiz, asked Minotti to go with

7    him to retrieve the three kilograms of cocaine from the forest

8    and Minotti told him he couldn't go because he had company at

9    the house.  Right?

10          You didn't say anything at that time about

11   Mr. Minotti saying that the reason he didn't want to go back

12   was because he thought the cops would be there, right?  You

13   didn't say that at that time, did you?

14   A.  No.

15   Q.  On May 14th, when you spoke with the police, and in fact,

16   when you testified in the grand jury, you said he didn't want

17   to go back because the police would be there, right?

18   A.  Yes.

19          MR. MERRITT:  Your Honor, object to whether it's

20   the grand jury or May 14th.

21          MR. DRECHSLER:  I'll clarify.

22          THE COURT:  Please.

23   BY MR. DRECHSLER:

24   Q.  You see your grand jury testimony up there, sir, the

25   transcript?  No, no, the grand jury -- right underneath that

Page 77

1    piece of paper.  There it is.

2              Okay.  Want to turn to page 22?

3              You have page 22?

4    A.  Yes.

5    Q.  Okay.  Now, you see at the top there when you mentioned

6    Armando Lovos?

7    A.  Yes.

8    Q.  And you said you picked him up and went to Jon's house.

9    That's Jon Minotti, right?

10   A.  Yes.

11   Q.  "And you told him, meaning Jon Minotti, where was the drugs

12   at, the cocaine?"  And he said he left over there in the

13   woods.  And then I told him "let's go, let's go get -- let's go

14   grab them because you know where you left it at."  And he,

15   meaning Mr. Minotti, didn't want to come with me, right?

16   A.  Yes.

17   Q.  And then the questioner, whoever -- the Assistant U.S.

18   Attorney said, "did he" -- meaning Mr. Minotti -- "say why?"

19   And you said, "He said because there is police over there."

20   Right?

21   A.  That's what he said.

22   Q.  Okay.  So one time you tell the grand jury that the reason

23   Mr. Minotti gave you for not going back with you to the Malden

24   Hospital to look for the drugs was because the police was

25   there, right?

fb15da61-bf01-46a8-88e9-52478032a92d

Page 78

1    A.  Yes.

2    Q.  And in June the 3rd, when you spoke with the federal

3    agents, you said the reason Mr. Minotti gave you for not going

4    back to the forest to look for the cocaine is because he had

5    company over the house Christmas Eve, right?

6    A.  Yes.

7    Q.  All right.

8            Now, you knew in any case -- and Mr. Lovos went

9    back to the Malden Hospital and you parked in a different

10   section of the lot, right?

11   A.  Yes.

12   Q.  Now, do you recall telling the agents that, in fact, you

13   parked -- didn't park in the lot at all at one point in time,

14   but that you parked at the bottom of the hill behind the lot?

15   A.  Yes.

16   Q.  So one time you told the federal agents you parked at the

17   bottom of the hill behind the lot, another time you told them

18   that you parked at the back of the lot, right?

19   A.  Yeah, there's a -- under the hill there's a lot.

20   Q.  Well --

21   A.  There's a lot going up there --

22   Q.  Hold on, Mr. Ruiz, for one second.

23            I'm going to direct your attention to your

24   statement of May the 12th -- May the 14th of 2004.  If you turn

25   to paragraph 12, please, sir.

fb15da61-bf01-46a8-88e9-52478032a92d

1         Do you have that in front of you?  This is one of

2    the typewritten statements.

3    A.  This one, the grand jury?

4    Q.  No.  I'm going to show you this one here.

5         Okay.  This is the interview -- report of the

6    interview you had with the federal agents and the AUSA on May

7    14 of 2004, okay?  And I'm going to direct your attention to

8    paragraph 12 of that section.  Would you read that to yourself,

9    please, sir?

10        Have you had a chance to read that now?

11   A.  Yes.

12   Q.  Okay.  And you said in that section that you went to the

13   hospital, dropped Mr. Lovos -- I know it's misspelled, it's

14   actually Mr. Lobos, right, your brother-in-law?

15   A.  That's how you say it, Lovos.

16   Q.  Lovos with a "B" or a "V"?

17   A.  With a "V."

18   Q.  Okay.  So the other reference where it's spelled L-o-b-o-s,

19   that's incorrect.  Is it a "V" or "B"?

20   A.  It's a V.

21   Q.  Okay.  So Mr. Lovos, you dropped him off in the parking

22   lot, and you sent him into the woods to look for the black bag,

23   right?

24   A.  Yes.

25   Q.  And, by the way, you sent Mr. Lovos into the woods to look

1  for the black bag which you thought to contain three kilograms

2  of cocaine?

3  A.  It had three kilos.

4  Q.  Well, you didn't go in there yourself, did you, Mr. Ruiz?

5  A.  No.

6  Q.  You wanted your brother-in-law, Mr. Lovos, to go in there,

7  because if the cops were there and they caught him, it would be

8  Mr. Lovos who got locked up, not you; isn't that right?

9  A.  I sent him so I won't get recognized.

10  Q.  Oh.  You didn't send him because you thought if someone's

11  going to get locked up, it's Mr. Lovos, not Mr. Carlos Ruiz.

12  That didn't enter your mind?

13  A.  No.  The Malden cop would probably recognize me again.

14  Q.  Has he got better eyesight than you, Mr. Lovos?

15  A.  No.

16  Q.  And you sent him into the woods to look for the black bag.

17  And you said that you, Ruiz, said that he then drove around and

18  parked at the bottom of the hill behind the hospital lot isn't

19  that what the interview report says?

20  A.  Yes.

21  Q.  Okay.  Now, earlier you told us that you parked in the

22  parking lot; isn't that right?

23  A.  Yeah, there's a parking lot on the bottom.

24  Q.  Okay.  So whoever was taking down the information on that

25  interview made a mistake, is that what you're telling us?

fb15da61-bf01-46a8-88e9-52478032a92d

1  A.  Yeah, because I told them at the bottom of the hill there's

2  a parking lot over there.

3  Q.  All right.

4        Now, you said that you saw -- you didn't see the

5  policeman -- you yourself didn't see the policeman until -- for

6  the second time until he cut your car off with his car and

7  stopped you in the parking lot, right?

8  A.  I seen him at the top.  That's when my brother-in-law came

9  down running, he goes there's a guy up there.

10  Q.  Okay.  So did you see him or did your brother-in-law see

11  him?

12  A.  I seen somebody right there on the top, and then --

13  Q.  But you didn't see who it was?

14  A.  No.

15  Q.  Okay.

16  A.  He said there's a guy right there screaming to get out of

17  there.

18  Q.  Told you to get out of there?

19  A.  Told him to get out of there.

20  Q.  All right.  And then you --

21  A.  I picked him up.

22  Q.  The policeman -- you had an encounter with him, right?

23  A.  Yes.

24  Q.  And he said to you again, you're looking for drugs.  He

25  accused you of looking for drugs, right?

fb15da61-bf01-46a8-88e9-52478032a92d

Page 82

1    A.   Yes.

2    Q.   All right.  And you told the individual, the policeman, a

3    second lie, didn't you?

4    A.   Yes.  I told him I was looking for the wallet.

5    Q.   You were looking for your friend's -- you said that --

6    first of all, you told the police that you were looking for

7    your wallet, right?

8    A.   No, Steve's wallet.

9    Q.   Well, directing your attention to your statement to the

10   federal agents on June the 3rd, 2004, would you turn to

11   paragraph 12 of the June 3rd of 2004 incident or interview

12   report, sir?

13             This one right here.

14             It says, "The individual approached Ruiz and asked

15   Ruiz if he was looking for something as well as made a

16   statement to the effect that you're looking for drugs."  That's

17   the cop you're referring to, right?

18   A.   Yes.

19   Q.   Okay.  "Ruiz told the individual" -- meaning the cop --

20   "that he was looking for his wallet."  Isn't that what the

21   interview report indicates that you said on June the 3rd, 2004?

22   A.   Yeah his wallet, Steve's.

23   Q.   Well, the statement said you -- you said you were looking

24   for his wallet?

25   A.   Yeah, Steve's, his wallet.

fb15da61-bf01-46a8-88e9-52478032a92d

Page 83

1   Q.  So the statement, to the effect that it indicates that you

2   were -- told the police than you were looking for your wallet,

3   it's incorrect again?

4   A.  For Steve's wallet.

5   Q.  His wallet meaning Steve's wallet?

6   A.  He seen him run.

7   Q.  According to your testimony you said that you're looking

8   for the wallet and -- let me ask you something --

9           THE COURT:  Why don't we reserve that until after

10  the morning recess.

11          MR. DRECHSLER:  Certainly.

12          THE COURT:  Please don't discuss the case, keep an

13  open mind.

14          THE CLERK:  All rise.

15          (Recess taken.)

16          MR. DRECHSLER:  May I proceed, Judge?

17          THE COURT:  Yes.

18  BY MR. DRECHSLER:

19  Q.  Mr. Ruiz, we're back at the parking lot, the second time,

20  and you do agree that you spoke with the policeman and he said

21  to you -- accused you of looking for drugs, right?

22  A.  Yes.

23  Q.  And you said that you were looking for a wallet which was

24  dropped by your friend Steve; isn't that right?

25  A.  Yes.

1   Q.  Okay.  Steve being the same name -- false name -- that you

2   told the policeman the first time, right?

3   A.  Yes.

4   Q.  All right.  And so when the policeman confronts you in the

5   hospital parking lot the second time and asks you -- accuses

6   you of looking for drugs, you make up another lie; isn't that

7   right?

8   A.  Yes.

9   Q.  And that lie was about a wallet, right?

10  A.  Yes.

11  Q.  And of course that wasn't true, of course, right?

12  A.  No.

13  Q.  Okay.  So far -- and again, you didn't hesitate in lying to

14  the policeman about the fact that it was a wallet, right?

15  A.  No.

16  Q.  It didn't take you any time to think about what lie to make

17  up, no one wrote it down for you, right?

18  A.  No.

19  Q.  No one told you in advance here's what to say if the

20  policeman comes by.  That's something that you, Carlos Ruiz,

21  made up on your own, correct?

22  A.  Yes.  I'm not going to tell him I'm looking for drugs.

23  Q.  I'm sorry?

24  A.  I didn't want to tell him I was looking for drugs.

25  Q.  I understand.  So you made up a lie.

fb15da61-bf01-46a8-88e9-52478032a92d

Page 85

1   A.   Yes.

2   Q.   And it flew out of your mouth to the policeman the same way

3   the earlier lie about Steve running away and having a warrant

4   flew out of your mouth; isn't that right?

5   A.   Yes.

6   Q.   And -- now, moving along to December 26th of 2003, on both

7   direct and cross-examination you discussed various phone calls

8   you had with Mr. Minotti during the interim; isn't that right?

9   A.   Yes.

10  Q.   And certainly you spoke with Mr. Gorgone about threatening

11  Mr. Minotti -- strike that.

12            You spoke with Tommy.

13  A.   Yes.

14  Q.   And you said you were going to go shoot Mr. Minotti; isn't

15  that right?

16  A.   Yes.

17  Q.   All right.  And to Mr. Minotti, himself you threatened him,

18  didn't you?

19  A.   No, I don't -- yeah.

20  Q.   You never threatened him?

21  A.   Yeah, I did.

22  Q.   Oh, okay.  And yesterday when we went through the excerpt

23  of the call of December 24, 2003 at 2:04 p.m. -- do you

24  remember that?

25            For the record, that is Exhibit -- Government's

Page 86

1  Exhibit 8 B -- 8 A was the tape and 8 B was the transcript.  Do

2  you remember that?

3  A.  Yes.

4  Q.  And there were a couple of portions on there in the

5  excerpts that you actually read and that the jury heard in

6  which you threatened Mr. Jon Minotti, right?

7  A.  Yes.

8  Q.  And in point of fact, in some of the portions of that same

9  conversation, which were not played to the jury, you threatened

10 him several more times, isn't that right, in that same

11 conversation, didn't you?

12 A.  Yes.

13 Q.  All right.

14         MR. DRECHSLER:  In fact, if I can direct the

15 witness' attention, Judge --

16         THE COURT:  All right.

17 BY MR. DRECHSLER:

18 Q.  I direct your attention to a transcript of the entire

19 conversation, and there's some -- I want you to look at the

20 section where there are lines coming through.

21         Page 2, if you look at the third entry where it

22 says "Ruiz."

23 A.  Yes.

24 Q.  It says, "Tomorrow morning you're going to contact your

25 friend, I'm going to go tomorrow morning with all my fucking

fb15da61-bf01-46a8-88e9-52478032a92d

Page 87

1    friends and you're going to have fucking problems."

2           That's what you said, right?

3    A.  Yes.

4    Q.  And then farther down the page, you said -- the third entry

5    from the bottom -- Watch tomorrow, I'm going -- I'm going to go

6    tomorrow to your house and to his house tomorrow morning."

7    Right?

8    A.  Yes.

9    Q.  And would you turn to page 4?

10          If you look at the sixth entry from the bottom

11   where it says "Ruiz."  Do you see that, where it begins with

12   "Yeah, but why"?

13   A.  Yeah.

14   Q.  You said, "If I don't have my shit tomorrow, I'm going to

15   go to your house tomorrow morning, and you're going to show

16   me."  Did you say that?

17   A.  Yes.

18   Q.  And then go to page 6.  The sixth entry from the bottom --

19   again, these are from -- these are additional excerpts from the

20   same conversation.

21          You said, "I'm just telling you, this shit better

22   be here by tomorrow."  Right?

23   A.  Yes.

24   Q.  You say that.  And on the top of page 7 did you say to

25   Mr. Minotti, "If he doesn't have any shit tomorrow -- I'm going

Page 88

1    to tell you this right now, Jon, if he don't have my shit

2    tomorrow, I swear to God there's going to be fucking problems,

3    man."  Did you say that?

4    A.  Yes.

5    Q.  And then at the bottom of that same page did you say, "No,

6    but I know -- if I don't get my shit tomorrow, there's going to

7    be fucking problems, I'm telling you this right now."  Did you

8    say that?

9    A.  Yes.

10   Q.  So all in all between the excerpts we heard yesterday and

11   the ones that we just read during that same phone call you

12   threatened Mr. Minotti eight -- what, six, eight times?

13   A.  Yes.

14   Q.  And then on December 26th you actually go to Mr. Minotti's

15   house, do you not?

16   A.  Yes.

17   Q.  And yesterday you said that you told the Stoneham -- you

18   went to Mr. Minotti's house, you had a confrontation with him,

19   you wanted either your drugs or your money back, right?

20   A.  In the driveway?

21   Q.  I'm sorry?

22   A.  In the driveway?

23   Q.  Yeah, outside of his house on the day after Christmas,

24   December 26, 2003.

25   A.  Yes.

fb15da61-bf01-46a8-88e9-52478032a92d

Page 89

1  Q.  You went to Mr. Minotti's house, right?

2  A.  Yes.

3  Q.  And you brought what, four, five friends with you?

4  A.  Five.

5  Q.  And you said the purpose of bringing five, plus yourself is

6  six, is because you wanted to make that threat look very real;

7  isn't that right?

8  A.  Yes.

9  Q.  You wanted to convince him that you brought five thugs with

10  you to collect this debt; isn't that right?

11  A.  Five friends, yes.

12  Q.  Well, they weren't there to be friends with Jon Minotti,

13  were they?

14  A.  No.

15  Q.  You were there -- you brought those five people there to

16  menace Jon Minotti, right?

17  A.  To scare him.

18  Q.  To scare him.  You wanted him to think those five guys plus

19  you were going to do him serious bodily harm; is that right?

20  A.  Yes.

21  Q.  And, in fact, you got out of the car, did the other five

22  guys stay in the car or did they get out?

23  A.  Only two came out.

24  Q.  The two biggest ones, right?

25  A.  Smallest ones.

fb15da61-bf01-46a8-88e9-52478032a92d

1    Q.   Smallest ones.  So there were still three other guys in the

2    car, right?

3    A.   Yes.

4    Q.   And you said that -- you talked with Mr. Minotti and you

5    told him you wanted either your drugs or your money, right?

6    A.   Yes -- no, we were --

7    Q.   And repeated the fact --

8    A.   They didn't talk to him, because he went inside.

9    Q.   Well, he went inside.  And the next thing you know the

10   Stoneham police show up.

11   A.   Yes.  But I never talked to him.  He goes that's DEA.

12   Q.   My question is, did the Stoneham police show up?

13   A.   Yes.

14   Q.   Okay.  And when the Stoneham police showed up, you

15   testified yesterday that you told the Stoneham police that you

16   were there to get your drugs.

17   A.   Yes.

18   Q.   Money for drugs, right?

19   A.   Money for drugs.  He owed me money.

20   Q.   But that's not all you told the Stoneham police, is it?

21   A.   Not that I -- that's what I remember.

22   Q.   Well, first you lied to the Stoneham police, didn't you?

23   A.   No, I told them I was there to get some money.

24   Q.   You told them you were there to get money for drugs, that's

25   the first thing you told them?

fb15da61-bf01-46a8-88e9-52478032a92d

Page 91

1   A.  I came to speak to my friend.

2   Q.  Mr. Ruiz, didn't you first tell the Stoneham police that

3   you were there at one point did you tell the Stoneham police

4   that you were there to wish Mr. Minotti a merry Christmas?  Did

5   you tell them that?

6   A.  To speak to him.

7   Q.  Did you tell them you were there to wish Jon Minotti a

8   merry Christmas?  Yes or no.  Did you tell them that?  Yes or

9   no?

10  A.  Yes.

11  Q.  Okay.  And that was a lie, wasn't it?

12  A.  Yes.

13  Q.  All right.  And then in other version of events didn't you

14  tell the Stoneham place -- didn't you tell the federal agents

15  that you told the Stoneham police that you were there to get

16  paid for some work that you did for Mr. Minotti?

17  A.  Not that I remember.

18  Q.  Not that you remember?  Well, I'm going to show you a copy

19  of the Stoneham police incident report regarding this

20  incident.  And I'm going to ask you to read to yourself a

21  portion of the second paragraph of this police report.  And I'm

22  going to ask you to read in here the first three lines of this

23  paragraph.  Would you read that to yourself, sir?

24          Okay.  So yesterday you told the jury that the

25  first thing you told the Stoneham police was that you were

Page 92

1    there to get money for drugs, right?

2    A.  Yes, but then --

3              MR. MERRITT:  Objection.

4              THE COURT:  Excuse me just a minute.

5              MR. MERRITT:  I object.

6              THE COURT:  Sustained as to that question.

7    BY MR. DRECHSLER:

8    Q.  Well, sir, does this report refresh your memory to the fact

9    that you told the Stoneham police first that you did some work

10   for Mr. Minotti and that you were there to get paid for the

11   work that you had done?

12   A.  Yeah, but then I told them the truth.

13   Q.  Sir, I understand -- yesterday when you testified on direct

14   examination, did you tell the jury about either of the false

15   statements that you gave to the Stoneham police before you told

16   them the truth?

17   A.  What was that -- yeah.

18             THE COURT:  Okay.

19   Q.  Well, yesterday didn't you tell the jurors that you told

20   the Stoneham police right off the bat the truth, that you were

21   there to get money that you were owed for drugs?  Isn't that

22   what you told the jury yesterday --

23   A.  Yes.

24   Q.  You didn't mention to the jury that you first lied to the

25   Stoneham police and told them you were there to wish him a

fb15da61-bf01-46a8-88e9-52478032a92d

Page 93

1    merry Christmas or you were there to -- because you did some

2    work for him and you wanted to get paid for the work you did.

3    You didn't tell us either one of those things yesterday, did

4    you?

5    A.  I didn't remember.

6    Q.  Oh.

7    A.  I didn't recall.  Now that you refresh my memory.

8    Q.  I see.  Now, let me ask you something.  In the police

9    report it indicates that you did some work for Mr. Minotti and

10   wanted to get paid for it, right?

11   A.  Yes.

12   Q.  And you told the federal agents at one point that what you

13   really said was you were there to wish Mr. Minotti a merry

14   Christmas, right?

15   A.  Yes.

16   Q.  Now, so you told two different stories even about the lies

17   that you told the Stoneham police; isn't that right?

18   A.  What was that?

19   Q.  You've told two different lies.  You've testified that

20   you've told at different times two different lies to the

21   Stoneham police?

22   A.  Telling two things.

23   Q.  Sir, if you turn to the statement of the report of your

24   interview with May 14th --

25   A.  Two different reports which was the same thing.

Page 94

1   Q.  Mr. Ruiz, please look at the interview report between you

2   and the federal agents, the report of your interview with the

3   federal agents of May 14, 2004 paragraph 13, please.  Do you

4   see paragraph 13?

5   A.  Yes.

6   Q.  This is of -- and look halfway down the paragraph.  Did you

7   tell the federal agents on May the 14, 2004 that when the

8   Stoneham police officers arrived you told the Stoneham police

9   officer that you were there to wish Minotti a merry Christmas,

10  right?  Do you see that?

11  A.  Yes.

12  Q.  Okay.  And in the Stoneham police report it indicates that

13  you told the Stoneham police that you were there to -- you did

14  some work for Mr. Minotti and you wanted to get paid for the

15  work you did, right?

16  A.  Yes.

17  Q.  Now, both of those two things, the fact that you wanted to

18  wish him a merry Christmas and the fact that you were there to

19  get paid for some work you did, those were both lies?

20  A.  And then I told them the truth.

21  Q.  Sir, were those two things lies, merry Christmas and I

22  wanted to get paid for some work I did?  Were those lies?

23  A.  Yes.

24  Q.  Now, on May 14th you told the agents that you said -- first

25  lied to the Stoneham police and told them you were there to

fb15da61-bf01-46a8-88e9-52478032a92d

1  wish Mr. Minotti a merry Christmas.  That's lie number one,

2  right?

3  A.  Yes.

4  Q.  Okay.  And then in the Stoneham police report it indicates

5  that the lie you told them was a different lie, that you told

6  them you did some work for him and that you were there to get

7  paid.  That's lie number two?

8  A.  Yes.

9  Q.  And we all agree eventually you told the Stoneham police

10  you were there to collect money for drugs?

11  A.  Yeah, I told them the truth.

12  Q.  But you can't even keep straight which lie you told the

13  Stoneham police, can you?

14  A.  I told them both.

15  Q.  Oh, so now you're saying you told the Stoneham police I'm

16  here to wish him a merry Christmas, I'm here to collect money

17  for work I did on the house, and I'm here to collect money for

18  drugs?

19  A.  That was after.

20  Q.  You told --

21  A.  He got there I came to wish him a merry Christmas.  After

22  that he said tell the truth.  I went to go speak to him and he

23  said you were there to collect some money.

24  Q.  So the part -- so what you're saying is that the part in

25  the Stoneham police report where you indicated to the police,

1   according to the report, that you were there to collect money

2   for work that you did for Mr. Minotti, that's not true.  You're

3   saying you never said that?

4   A.  I said that, too.

5   Q.  Okay.  So I'm trying to get it straight here, Mr. Ruiz.  We

6   agree that two things that you've said at two different times

7   were lies, right?

8   A.  Yes.

9   Q.  One version that you gave to the drug federal agents was

10  that you said merry Christmas and the other version you gave to

11  the Stoneham police was that you did some work and wanted to

12  get paid.  And we agree those are both lies, right?

13  A.  Yes.

14  Q.  Okay.  Now, you didn't say both of those things, did you?

15  A.  To them?

16  Q.  Yes.

17  A.  I said one thing.

18  Q.  Okay.  So which of those is a lie?  Which one did you

19  fabricate?  Fabricate the fact that you said it.  In other

20  words, did you fabricate the fact to the federal agents that

21  you were there -- that you told the Stoneham police that you

22  were there to wish Mr. Minotti a merry Christmas, or did you

23  fabricate the fact that you told the Stoneham police that you

24  were there to collect money for work that you did at the

25  house?  Which fabrication is the actual fabrication that you

Page 97

1   told the Stoneham police?

2   A.   None.

3            MR. MERRITT:   Objection to the form of the

4   question.

5            THE COURT:   Sustained.

6   BY MR. DRECHSLER:

7   Q.   So you didn't lie at all to the Stoneham police?

8   A.   I did lie to them but --

9   Q.   You just can't remember which lie you told them?

10  A.   I told them the truth after.

11  Q.   I'm going to get to that.   But you do admit that you lied

12  first and then you told them the truth second?

13  A.   When I got there, I was nervous because I was wondering why

14  the cops were there.

15  Q.   My question is, you can't remember which lie you told them;

16  is that right?   Today as you sit here you cannot remember which

17  lie you told the Stoneham police first, the merry Christmas or

18  I'm here to get paid --

19  A.   I told the police I'm there to pick up some money for the

20  work that I did for him.

21  Q.   Okay.   So that's the lie that you think you remember

22  telling them?

23  A.   That's what I told him.

24  Q.   And the merry Christmas part you never told them?

25  A.   I probably did.

fb15da61-bf01-46a8-88e9-52478032a92d

Page 98

1    Q.  You can't remember the lies, you can only remember the

2    truth; is that right?

3    A.  I remember, you know, that's what the police said.

4    Q.  Okay.  Well, now, with regard to this Mr. -- this person

5    that you say that you saw at Mr. Minotti's house, you said that

6    you saw the same cop there, right?

7    A.  Yes.

8    Q.  Now, at some point you also testified that after this

9    incident, after you began your cooperation, you were shown an

10   array, a group of photographs of people and asked if you could

11   pick out from that group of photographs the policeman that you

12   saw at the Malden Hospital twice on December 24th and that you

13   say you saw on December 26th near Mr. Minotti's house.  Do you

14   remember that?

15   A.  Yes.

16   Q.  And you looked at that group of photographs, right?

17   A.  Yes.

18   Q.  And you were unable to pick out of that group of

19   photographs Mr. David Jordan's picture.

20   A.  Yes.

21   Q.  So you were unable to identify any of those pictures as

22   David Jordan at that time, correct?

23   A.  No.

24   Q.  I'm sorry?

25   A.  No, I didn't.

fb15da61-bf01-46a8-88e9-52478032a92d

1    Q.  You were unable to?

2    A.  Yeah.

3    Q.  All right.  And yesterday in the courtroom you pointed your

4    finger at my client, right?

5    A.  Yes.

6    Q.  All right.  Now, did somebody tell you before you came into

7    the courtroom where detective Jordan would be sitting?

8    A.  No.

9    Q.  Well, you know he's on trial, right?

10   A.  Yes.

11   Q.  You walk in the courtroom, you saw Mr. Natola, he asked you

12   some questions, right?

13   A.  Yeah.

14   Q.  And you -- when you were shown a group of photos you were

15   unable to pick my client out, right?

16   A.  No.

17   Q.  But suddenly when you came in the courtroom here in the

18   United States District Court after two and a half years, you

19   want the jury to think that you just picked -- you just pointed

20   a finger at my client?

21            MR. MERRITT:  Objection your Honor.

22            THE COURT:  Pardon me?

23            MR. MERRITT:  Objection.

24            THE COURT:  Sustained.

25   BY MR. DRECHSLER:

Page 100

1   Q.  The photos were shown to you back in May of 2004 when you

2   were asked to look at the photos to see if you could pick out

3   the cop, right?

4   A.  Yes.

5   Q.  And by the way, Mr. Minotti -- you say Mr. Minotti paid you

6   some money after this, right?

7   A.  Yes.

8   Q.  And as of May 14, 2004, when you were interviewed by the

9   federal agents, you still maintained to them that Mr. Minotti

10  owed you $10,000, right?

11  A.  I said what he owed me.

12  Q.  That he owed you $10,000?

13  A.  He still owed me for the whole drugs.

14  Q.  Well, did you tell the federal agents on May 14th --

15  A.  Besides that --

16  Q.  -- of 2004 --

17  A.  Besides the drug money -- besides the kilos, he owed me

18  other money, too.

19  Q.  Sir, did you tell the federal drug agents on May 14, 2004

20  that Mr. Minotti owed you $28,000 -- $10,000?

21  A.  Yes, besides the kilos that he took, yes, he did owe me

22  other money.

23  Q.  Okay.  And with regard to Mr. Minotti and the reason why he

24  paid you the money that he paid you, it's because you

25  threatened him to get the money back, right?

fb15da61-bf01-46a8-88e9-52478032a92d

1    A.   Yeah.

2    Q.   You threatened him, and that's why he paid you, right?

3    A.   I don't know why he paid, he just paid me.

4    Q.   Well, didn't you testify --

5    A.   To threaten him, yeah, I guess he paid.

6    Q.   You have testified that you threatened him, right?

7    A.   Yes.

8    Q.   Okay.  And you have testified that the reason you thought

9    he was paying you, paying you, let me put it to you that way,

10   is because you threatened him, right?

11   A.   Because he paid -- he owed money.

12   Q.   Have you testified under oath in the grand jury that the

13   reason you felt that Mr. Minotti was paying you was because you

14   threatened him?

15   A.   Yes.

16   Q.   All right.

17            And, by the way, in all of your conversations with

18   Mr. Minotti, he never told you that this incident at the Malden

19   Hospital was a setup, did he?

20   A.   No.

21   Q.   He's always maintained to you, right, Mr. Minotti, in your

22   conversations with him, that he didn't steal any drugs from

23   you, right?

24   A.   Yes.

25   Q.   And, by the way, when you went to the Malden Hospital that

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 3   3/28/06

fb15da61-bf01-46a8-88e9-52478032a92d

1    day, you believed Mr. Jon Minotti when he told you that you

2    were going there to sell the three kilograms of cocaine, right?

3    A.  What was that?

4    Q.  You believed him when he told you you were going there to

5    sell the three kilograms of cocaine.  That's your testimony,

6    you believed Mr. Minotti?

7    A.  Yes.

8    Q.  Okay.  And you certainly -- Mr. Minotti certainly never

9    told you that you were going up to the Malden Hospital and he

10   was going to steal the cocaine from you.  He never told you

11   that, did he?

12   A.  No.

13   Q.  If he told you that, you wouldn't have gone up there, right?

14   A.  I wouldn't have, I would have not.

15   Q.  You would not have gone up.

16   A.  Right.

17   Q.  So you were convinced by Mr. Jon Minotti that he was

18   telling you the truth when he told you that you were going up

19   there to sell drugs, right?

20   A.  Yeah, after I spoke -- he say it was for Gino.

21   Q.  And you thought you were going up there to sell the drugs?

22   A.  Yes, to Gino.

23   Q.  And you were going up there to make some money, that's what

24   you believed based on what Mr. Minotti told you?

25   A.  Yes.

Page 103

1  Q.  And you had no indication, did you, when you looked at

2  Mr. Minotti and you spoke with him -- again, as I asked you

3  earlier, he didn't break into a sweat, he didn't start shaking,

4  he didn't quiver, there was nothing to indicate to you that

5  Mr. Minotti was lying to you, was there?

6  A.  He was nervous.  You could tell he was a little bit

7  nervous.

8  Q.  Well, but there was nothing -- you still believed him.  You

9  went up there thinking you were going to sell the drugs, right?

10 A.  Yes.

11 Q.  All right.  And when Mr. Minotti several times told you

12 that the drugs were in the woods, both over the phone and in

13 person -- strike that.

14        Mr. Minotti told you several times over the phone

15 and in person that he dropped the drugs in the woods and hid

16 them under some leaves, right?

17 A.  That's what he told me, yes.

18 Q.  Okay.  And you do agree, do you not -- or you told us on

19 direct examination that when -- on the tape of the phone calls

20 when you said you were going to go over and shoot Mr. Minotti,

21 you told the jury today that that wasn't true, that you -- that

22 you didn't really mean to shoot him, you were just threatening

23 to shoot him, right?

24 A.  Yes, scare him.

25 Q.  You told the jury that when you told Mr. Tommy -- Tommy,

Page 104

1    the guy that you were talking to on the phone, that you were

2    going to go shoot Mr. Minotti, that that was a lie, that you

3    didn't mean to shoot Mr. Minotti, you were just saying that,

4    you were lying?

5    A.  I was threatening.

6    Q.  You were lying?

7    A.  No, threatening.

8    Q.  So you did mean to go shoot him?

9    A.  No.

10   Q.  Okay.  Didn't you tell the jury today that when you

11   threatened to shoot Mr. Jon Minotti that that was a lie, that

12   you didn't really mean to shoot him?

13   A.  Yes.

14   Q.  You told the jury that that threat was untrue, it was a

15   lie, right?

16   A.  Yes.

17   Q.  All right.  And you're the same witness who says that you

18   saw David Jordan with a gun in his hand, right?

19   A.  That's what happened.

20   Q.  Ah.

21          MR. DRECHSLER:  If I could have one moment, Judge.

22          THE COURT:  Yes.

23          MR. DRECHSLER:  Before we conclude, can I approach

24   on one matter, your Honor?

25          THE COURT:  Over here?

fb15da61-bf01-46a8-88e9-52478032a92d

1          MR. DRECHSLER:  Yes.

2          (At sidebar on the record.)

3          MR. DRECHSLER:  Your Honor, there is one call

4   between Jon Minotti and Mr. Ruiz, which is call number 561

5   dated December 24, '03 at 2:38 p.m.

6          Now, this is a conversation between Mr. Minotti and

7   Mr. Ruiz, and I -- in light of the Court's earlier ruling that

8   with regard to anything said by Mr. Minotti you've restricted

9   us, there's a conversation between Mr. Minotti, the next

10  witness, and Mr. Ruiz.  Certainly from my point of view I think

11  there are portions of the conversation in which Mr. Minotti

12  threatens Mr. Ruiz.  Now, I don't know -- I don't want to run

13  afoul of the Court's ruling yesterday, where you said we could

14  just get into the conversations -- the parts that Mr. Ruiz said

15  but not Mr. Minotti.  I would like to ask this witness whether

16  or not when Mr. Minotti said what I think can be interpreted as

17  a threat, said things like, you know, you're going to be making

18  a big mistake, a big fucking mistake, things of that nature, he

19  says it several times -- this is on December 24th -- that he

20  felt threatened by Mr. Minotti.  And I'd like to go over this

21  call with him, including the portions where Mr. Minotti says

22  that.  Because it's relevant to Mr. Minotti's plea deal.  And

23  the only witness who can testify as to whether or not he felt

24  threatened by Mr. Minotti at this time or not would be this

25  witness.  And once he's off the stand I can't ask.

fb15da61-bf01-46a8-88e9-52478032a92d

1          So while I fully intend to go into the threats with

2   Mr. Minotti, it seems to me that I should be permitted to go

3   into those portions of this phone call with Mr. Minotti --

4   Mr. Ruiz at this time in order to establish whether or not

5   Mr. Ruiz was threatened or felt threatened at this particular

6   time.

7          MR. MERRITT:  Your Honor, this is, again, just a

8   backdoor way of trying to assassinate the character of

9   Mr. Minotti.  He'll have plenty of opportunity to do that very

10  shortly, we hope.  But this is -- you know, this is not --

11  doesn't go to Mr. Ruiz's credibility at all.  So I don't

12  understand why this witness is being asked about it.

13          THE COURT:  Okay.

14          MR. DRECHSLER:  It doesn't go to Mr. Ruiz's

15  credibility.  I'm not saying it does.  But it goes to the

16  magnitude of the plea deal.  Mr. Minotti, like Mr. Ruiz, got a

17  3553, you know, consideration from the government; and it seems

18  to me that the issue of threats is a live issue with regard to

19  Mr. Minotti's plea agreement as well.  These calls -- this call

20  Mr. Minotti threatens Mr. Ruiz.  And whether the jury is going

21  to judge the threat to be real or convincing or not would

22  depend on this witness' testimony as to whether or not he at

23  the time threatened.  And that's what I want to establish

24  through this witness at this time.

25          THE COURT:  I'm going to exclude this.

1          MR. DRECHSLER:  Can I mark the transcript of this

2   call for identification?

3          THE COURT:  Hasn't it been marked?

4          MR. DRECHSLER:  Not of this call, Judge.  This is a

5   different call that has not been marked.  I'd ask -- this is

6   the transcript of call -- I'm sorry -- this is the transcript

7   of call 561 between Mr. Minotti and Mr. Ruiz provided to me by

8   the government.  I ask that this be marked for identification.

9          THE COURT:  B for identification.

10         MR. DRECHSLER:  Okay.  The other thing, Judge --

11         THE COURT:  Okay.

12         MR. DRECHSLER:  The other thing yesterday --

13         THE COURT:  Is Mr. Natola interested in this?

14         MR. DRECHSLER:  I don't know, Judge.

15         MR. NATOLA:  Sorry about that.

16         THE COURT:  I guess we're not done.

17         MR. DRECHSLER:  Sorry.

18         There was another call yesterday, Judge.  You

19   allowed me today to read in excerpted portions of Government's

20   Exhibit 8 A and B.

21         THE COURT:  What was that?

22         MR. DRECHSLER:  That was government's Exhibit 8 and

23   B, the remaining threats of the phone call, that was never

24   marked for identification.  I just wanted to mark the full

25   transcript of call 8 B for identification, because I don't

fb15da61-bf01-46a8-88e9-52478032a92d

Page 108

1    think that the record has the --

2              THE COURT:  Well, you've asked him about this, so

3    it's part of the record.

4              MR. DRECHSLER:  That part is, but the part that you

5    excluded about the excerpted conversation, we had an argument

6    yesterday and those parts have not been marked for

7    identification; and to complete the record I want to include

8    that.

9              THE COURT:  If you want to get those to me.

10             MR. DRECHSLER:  That would be 8 C, I assume, like

11   the others.  You see what I'm saying?  This one to be a new

12   number for identification.

13             THE COURT:  We'll mark this one B.

14             MR. DRECHSLER:  Not 8.  This is a different call

15   entirely.

16             THE COURT:  Just B for identification.

17             MR. DRECHSLER:  All right.

18             THE COURT:  Just give that to Lisa.

19             MR. DRECHSLER:  With that, Judge, I'm concluded

20   with this witness at this time.

21             THE COURT:  Okay.

22             (End of discussion at sidebar.)

23             (Exhibit B marked for identification.)

24             THE COURT:  Mr. Merritt, do you have any questions?

25                      REDIRECT EXAMINATION

fb15da61-bf01-46a8-88e9-52478032a92d

Page 109

1  BY MR. MERRITT:

2  Q.  Mr. Ruiz, you were just asked towards the tail end of

3  Mr. Drechsler's cross-examination whether you were able to

4  identify any photographs of the Malden police officer that you

5  had those interactions with on the 24th and -- on the 24th?

6  A.  Yes.

7          MR. MERRITT:  May I approach the witness, your

8  Honor?  I've marked this as Government Exhibit 44.

9          THE COURT:  Do you -- counsel know what that is.

10          MR. DRECHSLER:  Can I just look at it?

11          (Discussion off the record.)

12          THE COURT:  Exhibit 40.

13          MR. MERRITT:  44.

14          THE COURT:  44.  Any objection to 44?  All right.

15  No objection.

16          (Exhibit 44 received into evidence.)

17  BY MR. MERRITT:

18  Q.  Let me hand you what's marked as Exhibit 44.  Do you

19  recognize that series of photographs, Mr. Ruiz?

20  A.  Yes.

21  Q.  Were those the ones that were given to you to see if you

22  recognized the Malden police officer?

23  A.  Yes.

24  Q.  All right.  And were you able to select from this series of

25  photographs who that officer was?

fb15da61-bf01-46a8-88e9-52478032a92d

Page 110

1    A.  No.

2    Q.  Now, you were also asked a number of questions about

3    certain things you had said to either the agents or the grand

4    jury before today.  Do you remember being asked yesterday about

5    the conversation you had with Mr. Minotti, where he at one

6    point said that Gino was getting prescription oxycontin from a

7    doctor at the hospital?  Do you remember those questions?

8    A.  Yes.

9    Q.  And do you remember you were shown a report about having

10   said that previously?

11   A.  Yes.

12             MR. MERRITT:  May I approach the witness, your

13   Honor?

14             THE COURT:  Yes.

15             (Discussion off the record.)

16   BY MR. MERRITT:

17   Q.  Showing you that report that's already been identified as

18   June 3rd --

19             MR. DRECHSLER:  Judge, can I retrieve mine from up

20   there, my copy?

21             THE COURT:  Yes.

22   BY MR. MERRITT:

23   Q.  Directing your attention to the part in the report where

24   you told the agents about when that conversation took place, do

25   you recall when it was that you told them that that took place?

1   A.  Yeah, when we were driving towards the parking lot, to the

2   Malden Hospital.

3   Q.  Okay.  So you were already at the Malden Hospital?

4   A.  Yes.

5   Q.  So why did Jon Minotti tell you were you had to go to the

6   hospital?

7               MR. NATOLA:  Objection.

8               THE COURT:  Can you state what your objection is,

9   please?

10              MR. NATOLA:  I'm sorry, your Honor.

11              THE COURT:  State what your objection is.

12              MR. NATOLA:  He can't testify what was in Jon

13  Minotti's mind.

14              MR. MERRITT:  I'll rephrase the question.

15  BY MR. MERRITT:

16  Q.  What did --

17              THE COURT:  I understood that question

18  differently.  I understood the question to be what did he say

19  he was doing.

20  BY MR. MERRITT:

21  Q.  Yes, before you went to the Malden Hospital what reason did

22  Jon Minotti give you for going to the Malden Hospital?

23  A.  To sell the three kilos.

24  Q.  So it was only after when you were at the hospital when he

25  had this conversation about Gino had access to oxycontin; is

fb15da61-bf01-46a8-88e9-52478032a92d

Page 112

1   that right?

2   A.  Yes.

3   Q.  And you were asked several questions today about how much

4   the price of the kilos were going to be.  Do you recall that?

5   A.  Yes.

6   Q.  And you testified, I think, today or yesterday that the

7   eventual price was $27,000?

8   A.  Yes.

9   Q.  And in the exhibits that we played yesterday, Exhibit 1, it

10  was -- first price that was discussed was $28,000; is that

11  right?

12  A.  Yes.

13  Q.  And then in Exhibit 2 the price became $27,000?

14  A.  Yes.

15  Q.  And when you testified at the grand jury, was that in June

16  of 2004?

17  A.  Yes.

18  Q.  Were you going from your memory at that point?  Had you

19  listened to any of the tapes before that?

20  A.  No.

21  Q.  Now, you also were asked quite a bit about your plea

22  agreement.  When you were arrested in May of 2004, did you

23  agree to cooperate at that point?

24  A.  In May?

25  Q.  Yeah, May of 2004.

fb15da61-bf01-46a8-88e9-52478032a92d

Page 113

1   A.  Yes.

2   Q.  And the date of your plea agreement, Exhibit 20, that's in

3   June 8th of 2004?

4   A.  Yes.

5   Q.  When you agreed to cooperate, did you give a statement to

6   the agents in May, which we've heard about?

7   A.  Yes.

8   Q.  And you were asked some questions about -- today, actually,

9   I guess that it was only after you had signed this plea

10  agreement that you decided to give testimony.  Do you remember

11  being asked that on cross-examination?

12  A.  Yes.

13  Q.  After you were caught in May did you want to testify about

14  what happened to you on Christmas Eve?

15  A.  Yes.

16  Q.  That's before you had any plea agreement?

17  A.  Can you repeat the question?

18  Q.  Yeah.  When you were rested in May, did you want to testify

19  about what happened to you on Christmas Eve 2003?

20  A.  Well, yeah.

21  Q.  And why was that?

22  A.  Because I wanted to tell the truth, what happened.

23  Q.  And you got ripped off?

24  A.  Yeah, I got ripped off.

25  Q.  Now, before you told the agents in May of 2004 about what

fb15da61-bf01-46a8-88e9-52478032a92d

Page 114

1    happened on that night, do you remember telling other people on

2    the telephone just in the days or the day of and then the

3    following two days?

4    A.  The people that I talked to?

5    Q.  Yeah.

6    A.  Yeah, I told people.

7    Q.  You told your wife?

8    A.  Yes.

9    Q.  You told Tommy?

10   A.  Yes, and I told the guy who gave me the three kilos,

11   Rosales.

12   Q.  And of course you didn't know your conversations were being

13   recorded at that time; is that right?

14   A.  No, I didn't know.

15   Q.  You were also asked about, I think, the question having to

16   do with the charges that you were first charged in New

17   Hampshire?

18   A.  Yes.

19   Q.  Do you remember that?  And you said those charges were

20   dismissed?

21   A.  Yes.

22   Q.  When you pled guilty to distributing 50 to 150 kilos, did

23   that include the New Hampshire conduct?

24   A.  Yes.

25   Q.  So you pled guilty to the New Hampshire conduct?

fb15da61-bf01-46a8-88e9-52478032a92d

Page 115

1    A.   Yes.

2    Q.   I think you were also asked yesterday about the three kilos

3    of cocaine that you were going to deliver to Gino, and you were

4    asked whether you had tested the cocaine before?

5    A.   Yes.

6    Q.   You didn't test it; is that right?

7    A.   No.

8    Q.   And you got it from your regular supplier?

9    A.   Yes.

10   Q.   Did you ever have any complaints or situation where

11   somebody came back and said, hey, that wasn't real cocaine that

12   you --

13              MR. NATOLA:  Objection.

14              MR. DRECHSLER:  Objection.

15              THE COURT:  Sustained.

16   BY MR. MERRITT:

17   Q.   Now, you were asked some questions today about whether or

18   not the Malden police officer had a gun and pointed a gun at

19   you at the Malden Hospital parking lot.  Do you recall that?

20   A.   Yes.

21   Q.   And you were also asked about whether the Malden police

22   officer was there at Jon Minotti's when you went on the 26th,

23   right?

24   A.   Yes.

25              MR. MERRITT:  May I approach, your Honor?

fb15da61-bf01-46a8-88e9-52478032a92d

Page 116

1          THE COURT:  Yes.

2  BY MR. MERRITT:

3  Q.  Let me hand you what's marked for identification as

4  Government Exhibit 11 A, which is a call Ruiz to Tommy on

5  December 26, 2003.  Have you listened to that call?

6  A.  Yes.

7  Q.  And is that an accurate recording of your conversation with

8  Tommy on December 26th?

9  A.  Yes.

10  Q.  And have you also looked at the transcript that's been

11  marked as 11 B?  Is that an accurate transcript of that call?

12  A.  Yes.

13          MR. MERRITT:  Your Honor, I move in Exhibit 11 A at

14  this time.

15          THE COURT:  Any objection?

16          Any objection?

17          MR. DRECHSLER:  Yes, your Honor.  May I approach on

18  this?

19          THE COURT:  Okay.

20          (At sidebar on the record.)

21          MR. DRECHSLER:  Your Honor, I'm not sure what

22  exception under the hearsay rule this falls in.  This is not an

23  excited utterance.  This is on December 26th, two days after

24  the incident, at 3:37 p.m., and it's a call between Mr. Ruiz

25  and Tommy.  It's not the call -- there is another call that's

1  already in evidence which you allowed in evidence as an excited

2  utterance.  It's two days later.  It's between what the

3  government says is a non-conspirator to another

4  non-conspirator, Tommy, and Mr. Ruiz.

5            It is beyond the scope of cross-examination.  It

6  does not indicate, your Honor -- and even if it did, I don't

7  see anything in here about the gun.  But let me take a close

8  look, but I don't see a specific reference to the gun in this

9  call.  And, therefore, it's beyond the scope.

10           I never cross-examined this witness about a call on

11  December 26th with Tommy.  It's hearsay.  It's an out-of-court

12  statement that's being offered for the truth.  It's not an

13  excited utterance, it's not a -- what is it?

14           MR. MERRITT:  May I say what it is?

15           THE COURT:  It sounds like it's a prior consistent

16  statement.

17           MR. MERRITT:  It's a classic prior consistent

18  statement, your Honor.

19           He says to Tommy, "and you know what's funny, the

20  supposedly cop guy that pulled the gun on me, he was there with

21  him talking to him."

22           So this is not only directly -- I mean, they were

23  attacked about his -- in fact, his last question is about not

24  believing him about that the cop pulled a gun on him.

25           And, second of all, he also has cross-examined his

fb15da61-bf01-46a8-88e9-52478032a92d

Page 118

1    entire credibility about his story.

2           Here the statement made the day it happened without

3    any reason to fabricate, and it's not even somebody's memory of

4    what was said.  We actually have what was said.  So this comes

5    in as a prior consistent statement.

6           MR. DRECHSLER:  If I can respond to that, Judge.

7    We already have a call to Tommy on December 24th, which was

8    right after the incident happened, and you admitted that as an

9    excited utterance in which he claims that the cop pulled a gun.

10          This is a subsequent alleged consistent statement.

11   I don't think it fits the criteria.

12          The government put in -- I think the chain of

13   events here is that the government put in a call in which this

14   witness said to Tommy that the cop had a gun.  Then I

15   cross-examined and impeached the witness.

16          This isn't a prior consistent statement.  It

17   doesn't predate the first statement in which the witness said

18   he had a gun.  It postdates that.  Now, that's like putting in

19   all the subsequent consistent statements that we have of the

20   witness.

21          Prior consistent statement is only admissible to

22   rebut the inference of recent contrivance.  Since we already

23   have a statement that predates this in evidence, then this does

24   not rehabilitate the witness with regard to that.

25          I only cross-examined him because the government

1    put in first the statement that he pointed the gun and put in

2    this prior consistent statement at that point.  This is a

3    subsequent consistent statement.

4              THE COURT:  You may have it.

5              MR. DRECHSLER:  Note my objection.

6              MR. NATOLA:  Note my objection.

7              THE COURT:  Yes.

8              (End of discussion at sidebar.)

9              (Exhibit 11 A received in evidence.)

10             MR. MERRITT:  Your Honor, I'm going to, with the

11   Court's permission, play Exhibit 11 A and ask the jurors to

12   turn to tab 11 in their --

13             (Played CD.)

14   BY MR. MERRITT:

15   Q.  Now, Mr. Ruiz, on the first page of that transcript when

16   you're talking about "I went but the cops sort of escorted me

17   out."  What were you talking about?

18   A.  About the Stoneham police.

19   Q.  So this call was after you had gone to Jon Minotti's house?

20   A.  Yes.

21   Q.  And on the second page, where you say in the middle of the

22   page, "Yeah, you know what -- you know what's funny, too, that

23   supposedly cop guy that pulled the gun on me, he was there with

24   him talking to him."

25             Now, who are you referring to when you said

1    "supposedly cop guy"?

2    A.   The Malden police, the cop from the first incident in the

3    hospital.

4    Q.   All right.  And then when you say he was there with him

5    talking to him, who are you talking about?

6    A.   About the Malden cop.

7    Q.   Is talking with who?

8    A.   With Jon Minotti.

9    Q.   And when you say "the cop guy that pulled the gun out on

10   me," what are you referring to?

11   A.   The Malden -- when I got set up.

12   Q.   In the parking lot?

13   A.   In the parking lot in the hospital.

14              MR. MERRITT:  One minute, your Honor, please.

15              No other questions.

16              THE COURT:  Mr. Natola, do you have something?

17              MR. NATOLA:  I do, your Honor.  Just a moment,

18   please.

19              (Discussion off the record.)

20                      RECROSS-EXAMINATION

21   BY MR. NATOLA:

22   Q.   Mr. Ruiz, you testified just a few minutes ago that you

23   didn't decide to testify in this case until you signed that

24   plea agreement; is that right?

25   A.   We had already spoken before that to the -- when I got

Page 121

1    arrested in May.

2    Q.  Right.  You got arrested in May.  And you decided to

3    cooperate in May, didn't you?

4    A.  Yes.

5    Q.  You did.  And, in fact, you signed another document in May

6    regarding your cooperation, didn't you?

7    A.  In May?

8    Q.  Yes.

9    A.  Can I see it?

10   Q.  Okay.  Turn your attention to the screen, please.

11               Now, while you do that, let me ask you a question.

12   Your first --

13               MR. MERRITT:  Your Honor, is this being shown to

14   the witness or --

15               THE COURT:  It looks like it's being shown

16   everywhere.  Is this document in evidence?

17               MR. NATOLA:  Not yet, your Honor.

18               In that case, let me approach the witness.

19   BY MR. NATOLA:

20   Q.  Before you look at that, is it fair for me to say that the

21   first time you were interviewed by law enforcement personnel

22   with respect to this case was on May 14th of 2004?

23   A.  May 1st?

24   Q.  May 1st.

25   A.  When I got arrested.

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 3   3/28/06

1    Q.  And that was the day you got arrested where, in New

2    Hampshire?

3              THE COURT:  Mr. Ruiz, you're going to have to keep

4    your voice up.  You're facing Mr. Natola and facing away from

5    the microphone.

6    BY MR. NATOLA:

7    Q.  Okay.  Take a look at that document I put in front of you.

8              Do you recognize that document?

9    A.  Yes.

10   Q.  And this document is a letter dated May 11th of 2004; is

11   that correct?

12   A.  Yes.

13   Q.  And it's a letter dated to your lawyer, Alan D. Chipman,

14   Esq., correct?

15   A.  Yes.

16   Q.  And it's a letter concerning Carlos Ruiz, right?

17   A.  Yes.

18   Q.  And the letter on the back -- on the second page is signed

19   by John J. Farley, Assistant U.S. Attorney, correct?

20   A.  Yes.

21   Q.  And it's acknowledged and agreed to by Carlos Ruiz,

22   correct?

23   A.  Yes.

24   Q.  The date on it is -- you signed it in your handwriting,

25   correct?

Page 123

1    A.   Yes.

2    Q.   And you dated it in your handwriting, too, correct?

3    A.   Yes.

4    Q.   5/14/04; is that right?

5    A.   Yes.

6    Q.   And Mr. Chipman was with you when you signed it; is that

7    right?

8    A.   Yes.

9    Q.   And he signed right underneath your signature; is that

10   right?

11   A.   Yes.

12   Q.   And he put the date 5/14/04, right?

13   A.   Yes.

14   Q.   And this is another agreement that you entered into with

15   the government on 5/14 of '04; is that correct?

16   A.   Yes.

17   Q.   Even though the letter is dated May 11, 2004, correct?

18   A.   Yes.

19   Q.   And the letter says that the letter confirms that the --

20        THE COURT:  Wait just a minute.  It's still not in

21   evidence, and you're about to read it.

22        MR. NATOLA:  I'm sorry, your Honor.  In that case,

23   I offer this as the next exhibit.  It's got a number that I put

24   on it, though, so it's not completely pristine.

25        MR. DRECHSLER:  I have a clean one here, Judge.

Page 124

1          THE COURT:  First of all, is there any objection to

2    this?

3          MR. MERRITT:  No, your Honor.

4          THE COURT:  I'm going to make it 20 B.

5          MR. NATOLA:  Thank you.

6          THE COURT:  All right.

7          (Exhibit 20 B received into evidence.)

8          THE COURT:  And the letter is dated --

9          MR. NATOLA:  It's dated May 11th, your Honor, but

10   it's signed and dated May 14th.

11         THE COURT:  And it's from Farley to Chipman?

12         MR. NATOLA:  Yes, your Honor.

13         THE COURT:  Okay.  It's received in evidence.

14         MR. NATOLA:  And may I display it now, your Honor?

15         THE COURT:  Yes.

16         MR. NATOLA:  Thank you.

17   BY MR. NATOLA:

18   Q.  Now, this is a letter, an agreement that you entered into

19   with the government on May the 14th of 2004, right?

20   A.  Yes.

21   Q.  And it says that "The United States Attorney for the

22   District of Massachusetts will consider an accurate and

23   complete proffer from your client, Carlos Ruiz, in connection

24   with drug trafficking in Malden, Massachusetts and elsewhere. "

25   Is that right?

US v. Jordan, Bucci, Testimony of Carlos Ruiz Day 3   3/28/06

fb15da61-bf01-46a8-88e9-52478032a92d

Page 125

1    A.   Yes.

2    Q.   And the terms under which the contemplated proffer will be

3    received are as follows -- and then there are one, two -- well,

4    there's two numbered paragraphs on the first page, correct?

5    A.   Yes.

6    Q.   And in paragraph number one it says that "No statement made

7    or other information provided by Ruiz will be used by the

8    United States Attorney directly against him except for purposes

9    of cross-examination and/or impeachment should he offer in any

10   proceeding statements or information different from statements

11   made or information provided by him during the proffer or in a

12   prosecution of Ruiz based on false statements made or false

13   information provided by Ruiz."

14            Is that accurate, paragraph two?

15   A.   One.

16   Q.   I'm sorry, paragraph one, I'm sorry.

17   A.   Yes.

18   Q.   And so the government is agreeing in this letter to hear

19   from you, that's what proffer means, right?

20   A.   Yes.

21   Q.   To take information from you, correct?

22   A.   Yes.

23   Q.   And they're agreeing not to use that information against

24   you unless they determine that you lied to them, right?

25   A.   Yes.

Page 126

1    Q.  Okay.  And so it was pursuant to this letter -- it was

2    after you signed this letter that you met with the agents on

3    May 14th; is that correct?

4    A.  Yes.

5    Q.  And you gave them information on May the 14th, correct?

6    A.  Yes.

7    Q.  And on June the 3rd?

8    A.  Yes.

9    Q.  And on various other dates before you actually signed the

10   plea agreement that you signed in this case; is that right?

11   A.  What was that?

12   Q.  You made statements to the agents on the strength of this

13   letter before you actually signed the plea agreement, right?

14   A.  Yes.

15   Q.  All right.  And when you made those statements to the

16   agents, you had in mind that you were going to cooperate with

17   the government, right?

18   A.  Yes.

19   Q.  And you had in mind that you might have to testify for the

20   government if they required you to do so, right?

21   A.  Yes.

22   Q.  Okay.  Now, Mr. Ruiz, you testified that just a little

23   while ago in questioning by Mr. Merritt that when you pleaded

24   guilty in the case against you in Massachusetts that the

25   charges in New Hampshire, that the conduct in New Hampshire was

1    included in what you were charged with down in Massachusetts;

2    is that correct?

3    A.   Yes.

4    Q.   Okay.

5    A.   The PSR it says it.

6    Q.   I'm sorry?

7    A.   In the PSR it says -- all the charges add up.

8    Q.   The PSR is the presentence report, right?

9    A.   Yes.

10   Q.   And that references your conduct up in New Hampshire,

11   right?

12   A.   Yes.

13   Q.   And that PSR was made in this -- in your case here in

14   Massachusetts, right?

15   A.   Yes.

16   Q.   Okay.  Now, so you pled guilty in this case in

17   Massachusetts, part of your guilty plea was on conduct that

18   took place in New Hampshire, right?

19   A.   Yes.

20   Q.   Do you remember testifying yesterday that the charges in

21   New Hampshire were dropped by the government because there

22   wasn't enough evidence against you?

23   A.   Yes.

24   Q.   Do you remember testifying to that?

25   A.   I did say that.

Page 128

1    Q.   Okay.  And, yet, you pled guilty in Massachusetts to

2    conduct that the government couldn't prove against you.  Is

3    that what you want this jury to believe?

4    A.   What was that?

5    Q.   Could you please read the question back?

6              (Record read.)

7    A.   Yes, because --

8    Q.   No.  Yes or no?

9              MR. MERRITT:  Your Honor, I'll object to the form

10   of the question.

11             THE COURT:  The form of the last question, yes or

12   no, that was the instruction.

13             MR. MERRITT:  No, the question before that that he

14   asked to have read back.

15             THE COURT:  You may have that.

16   BY MR. NATOLA:

17   Q.   Do you understand the question, sir?

18   A.   Can you repeat it?

19             MR. NATOLA:  Could you repeat it again, please.

20             (Record read.)

21   A.   They can have proved it because there is a witness

22   testifying -- you know, there is a guy up there -- the one I

23   was giving drugs to, he was cooperating, too.

24   Q.   And he was going to testify against you?

25   A.   Yes.

fb15da61-bf01-46a8-88e9-52478032a92d

Page 129

1    Q.  Up in New Hampshire?

2    A.  Yes.

3    Q.  So the government might have been able to prove the case

4    against you in New Hampshire, right?

5    A.  Yeah, I think so.

6    Q.  And so that's why you pleaded guilty to that conduct down

7    here, right?

8    A.  Yes.

9    Q.  And you agreed that the conduct up in New Hampshire could

10   be added to the conduct that you pled guilty to down here in

11   Massachusetts, right?

12   A.  Pled guilty to all the charges, both charges.

13   Q.  Right, both in New Hampshire and in Massachusetts?

14   A.  What I was doing in New Hampshire, I guess.

15   Q.  And you wouldn't plead guilty to something that you didn't

16   do, would you?

17   A.  No.

18   Q.  Okay, fine.

19          Now, you just testified about Exhibit 11 A, the

20   tape that we just heard a few minutes ago.  Do you recall

21   that?  Do you have that transcript in front of you?

22   A.  Yes.

23   Q.  Yeah.  And if you go down -- you were calling Tommy because

24   he introduced you to Minotti, correct?

25   A.  Yes.

fb15da61-bf01-46a8-88e9-52478032a92d

1  Q.  And if you go down to the big paragraph -- it's just before

2  the bottom of the page where it says, "Yeah, so if you can do

3  me a favor."  Do you see that?

4  A.  Yes.

5  Q.  Okay.  And you say to Tommy, "Yeah, so if you can do me a

6  favor because I know he -- I know he did it, I know he set me

7  up."  Right?  You said that to Tommy?

8  A.  Yes.

9  Q.  And when you said those words to Tommy, "I know he did, I

10  know he set me up," you were talking about Jon Minotti,

11  correct?

12  A.  The whole situation.

13  Q.  When you said the words "he did it, he set me up," you were

14  talking about Jon Minotti, right?

15        MR. MERRITT:  Your Honor, it's beyond the scope.

16  He's already testified about that.

17        MR. NATOLA:  I beg your pardon, your Honor.

18        THE COURT:  You may have the question.

19        MR. NATOLA:  Thank you.

20  BY MR. NATOLA:

21  Q.  Mr. Ruiz, the "he" --

22  A.  Yes, the "he" is John.

23  Q.  Thank you.  Thank you.

24        Now, on page 2, you say about -- let's see, one,

25  two, three, four -- five lines down or five quotes down, Tommy

1    says, "Yup.  He called the cops on you?"  Do you see that?

2    A.  Yes.

3    Q.  And, again, you say, "Huh"?  And he said, "He called the

4    cops on you?"  And you say, "Yeah."

5             And the "he" that is being referred to in those

6    quotes, that's also Jon Minotti; is that right?

7    A.  Yes.

8    Q.  Okay.  And --

9             MR. NATOLA:  If I could have just a moment, your

10   Honor.

11            (Pause.)

12   Q.  And on page 2, in the middle of the page, where you say --

13   right that after Tommy says, "What did he tell them?"

14            And you answer, "Tommy" -- and right that after,

15   Tommy says, "He's a real pisser, huh?"  Do you see that?

16   A.  Yes.

17   Q.  And he is referring to Jon Minotti, correct?

18   A.  Yes.

19   Q.  And you answer him, "Yeah."  Is that right?  Right after

20   that?

21   A.  Yeah.

22   Q.  Okay.

23            MR. NATOLA:  I have nothing further, your Honor.

24                      RECROSS-EXAMINATION

25   BY MR. DRECHSLER:

1  Q.  Mr. Ruiz, directing your attention to that call that was

2  just introduced by the government on redirect, you -- this

3  call, you say to Tommy that -- by the way, Tommy, you say you

4  don't know his last name, right?

5  A.  No.

6  Q.  But he's somebody whom you transacted in drugs, right?

7  A.  Yes.

8  Q.  And you do know his last name, you just don't want to say

9  it in court; is that right?

10  A.  I don't.

11  Q.  You know his last name, you just don't want to tell the

12  jury, right?

13  A.  Now that you told me, yeah.

14  Q.  No, but you knew it before, right?

15  A.  Nope.

16  Q.  Okay.  And here you're telling Mr. Tommy -- we'll call him

17  Mr. Tommy -- that you're talking about Minotti and how he

18  called the cops on you, right?

19  A.  Yes.

20  Q.  And you agree that you told him that the police escorted

21  you out in an effort to avoid you further threatening

22  Mr. Minotti to collect a drug debt; isn't that right?

23  A.  Yes.

24  Q.  So what you're doing in this telephone call, Mr. John --

25  Mr. Carlos Ruiz, government witness, is you're attempting to

1    thwart the police, right?

2    A.  What was that?

3    Q.  Well, the police -- let me is say it this way.  The

4    Stoneham police came and told you to get out of there; is that

5    right?

6    A.  Yes.

7    Q.  They told you to stop trying to collect money for drugs,

8    right?

9    A.  Yes.

10   Q.  So you called Tommy because you weren't about to be

11   impeded, to be stopped by the police, you were going to do what

12   you were going to do to collect that money, right?  You didn't

13   care what the police told you; isn't that right?

14   A.  Yes.

15   Q.  And as you said earlier today, you didn't pay cash for the

16   money that you used -- you got the drugs from somebody else to

17   sell to Mr. Minotti, right?

18   A.  Yeah, they cuffed it to me.

19   Q.  They cuffed it to you means you didn't pay for it, right?

20   A.  Yes.

21   Q.  You had to pay the money afterwards?

22   A.  Yes.

23   Q.  Now that the drugs are gone, you owe somebody -- $23,000

24   times three, you owed somebody $69,000, right?

25   A.  Yes.

Page 134

1    Q.  You don't have it, do you?

2    A.  It's what they paid for.

3    Q.  You told these people, Tommy and everybody else, that the

4    cop pulled the gun on you because you wanted to make it look

5    like you were a stand up guy and you got ripped off at gunpoint

6    and that you couldn't fight for the drugs because you got --

7    there was a gun involved.  That's what you told them because

8    you wanted to look like a tough guy, right?

9    A.  No, that's what happened.

10                MR. DRECHSLER:  Mm-hmm.  Thank you.  I have nothing

11   else.

12                THE COURT:  Mr. Ruiz, thank you very much.  You're

13   excused.

14           (End of testimony of Carlos Ruiz.)

15                      ¡  ¡  ¡  ¡  ¡  ¡

16                    CERTIFICATION

17           I certify that the foregoing is a correct

18   transcript of the record of proceedings in the above¡entitled

19   matter to the best of my skill and ability.

20

21

22

23   _____        _____

24   Debra M. Joyce                      Date

25   Official Court Reporter    3-3

fb15da61-bf01-46a8-88e9-52478032a92d

1                    XAMINATION INDEX

2

CARLOS ALBERT RUIZ
3         CONTINUED CROSS BY MR. NATOLA . . . . . . . .  3-3
          CROSS BY MR. DRECHSLER . . . . . . . . . . . 3-19
4         REDIRECT BY MR. MERRITT . . . . . . . . . .3-108
          RECROSS BY MR. NATOLA . . . . . . . . . . .3-120
5         RECROSS BY MR. DRECHSLER . . . . . . . . .3-131

6

7

                     EXHIBIT INDEX
8
                                                MAR  /  ADM
9    Government
     11 A   Call to Tommy from Ruiz 12/26/03      3-119 3-119
10
     20 B   5/11/04 Letter from John Farley to Alan  3-124 3-124
11         Chipman, Esq.

12   44     Photo array                           3-109 3-109

13
     Defendant
14   B      Transcript of call 561 between Minotti and  3-108
            Ruiz
15

16

17

18

19

20

21

22

23

24

25

fb15da61-bf01-46a8-88e9-52478032a92d