## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
|  | ) |
|  | ) **CRIMINAL NO.** |
| v. | ) **04 − 10325 − GAO** |
|  | ) |
| **JON MINOTTI** | ) |
|  | ) |

# FILED UNDER SEAL
# DO NOT SCAN

### DEFENDANT JON MINOTTI'S
### SENTENCING MEMORANDUM

The defendant Jon Minotti ("Minotti") submits this memorandum and the accompanying affidavits[1] for use in connection with his sentencing hearing on July 13, 2006.

Minotti anticipates that the government will file motions under U.S.S.G. §5K1.1 and 18 U.S.C. § 3553(e) thus permitting the court to impose a sentence below any otherwise applicable advisory guideline or statutory minimum mandatory. Once the government makes the motions, the degree of departure is in the court's discretion. *See United States v. Mariano*, 983 F.2d 1150, 1155\( 1st Cir. 1993) ("[T]he decision whether to depart after the government has made such a motion, like the related decision as to the extent of any resultant departure, falls squarely within the

---

[1]  (1) Affidavit of Jon Minotti, and (2) Affidavit of Michele Minotti.

district court's domain.").

Assuming that the government files these motions, there are three principal sentencing issues. First, Minotti contends that he is "safety valve" eligible under U.S.S.G. §5C1.2 (a)(2) and that as a result he should receive a two level downward adjustment in offense level pursuant to §2D1.1(b)(1). With this adjustment and the adjustment for acceptance of responsibility, Minotti's offense level would be 25. At Criminal History Category I, the low end of Minotti's advisory guideline range for his drug offenses would be 57 months.

Second, Minotti accepted *Pinkerton* responsibility for police officer Jordan's likely carrying of his service weapon when he approached Bucci and Ruiz on December 24, 2003. His plea, therefore, included a plea to a violation of 18 U.S.C. § 924(c)(1)(A)(i). The government contends that in addition to carrying the weapon, Jordan brandished it. Minotti did not and does not accept *Pinkerton* or other responsibility for this assertion. Minotti disputes both that the weapon was in fact brandished and, even if it was brandished, that it was reasonably foreseeable to him that it would be brandished.

Under 18 U.S.C. 924(c)(1)(A)(i) if a weapon is carried in the course of a drug offense there is a minimum mandatory five year term of imprisonment "in addition" to the penalties provided for the underlying drug offense. Under 18 U.S.C. 924(c)(1)(A)(ii), if the weapon is brandished the "additional" sentence is not less than seven years. It is Minotti's position that only the "additional" five year term applies. It is the government's position that the "additional" seven year term applies. Minotti's plea agreement leaves this issue for the court's determination on a preponderance

of the evidence standard.[2]  Combining the first two issues, it is Minotti's position that his advisory guideline sentencing range, i.e., without substantial assistance motions, begins at 117 months.[3]  It is the government's position that the applicable range begins at 154 months.[4]

The third sentencing issue anticipates the government's motions under U.S.S.G. §5K1.1 and 18 U.S.C. § 3553(e), namely, the appropriate departure for Minotti's substantial assistance.  The government has already filed a Memorandum on Substantial Assistance which describes Minotti's cooperation as "extraordinary."  The government has not yet disclosed its recommended departure.

## MINOTTI IS SAFETY VALVE ELIGIBLE

Under §5C1.2(a)(2) a defendant is ineligible for safety valve consideration if he "possess[ed] a firearm or other dangerous weapon (or induce[d] another participant to do so) in connection with the offense." These standards of safety valve ineligibility are different from the standards for *Pinkerton* § 924(c)(1)(A) liability.  And the government and Probation have conceded that Minotti is not precluded from safety valve eligibility as the result of his *Pinkerton* responsibility for a violation of 18 U.S.C. § 924(c)(1)(A)(i).[5]  Indeed, Francis Muolo, a participant with Minotti in the December 24th 2003 theft of drugs from Carlos Ruiz, was equally *Pinkerton* responsible for any weapon possession or brandishing by Jordan.[6]  He was

---

[2]  See Plea Agreement, page 3.

[3]  Fifty seven months at offense level 25 for the drug offenses and the "additional" five years (60 months) under 18 U.S.C. § 924(c)(1)(A)(i).

[4]  Seventy months at adjusted offense level 27 for the drug offenses and the "additional" seven years(84 months) under 18 U.S.C. § 924(c)(1)(A)(ii).

[5]  See the final PSR at pages 27 and 28.

[6] Government counsel has conceded this fact to counsel for Minotti.

found safety valve eligible when he was sentenced by Judge Lindsay.[7]

The Presentence Report has never included an aggravating role for Minotti as an offense level adjustment under U.S.S.G. §3B1.1. No such adjustment should have been included. The government made no objections to the initial PSR. Minotti, however, objected to the absence of a safety valve adjustment in the initial PSR. [8] Subsequent to Minotti's objection, and in a letter dated May 2, 2006, the government, through AUSA John T. McNeil, argued to Probation that Minotti was not safety valve eligible because he exercised a leadership role by "recruiting" Jordan. This assertion is improper for several reasons, not the least of which is the fact that Mr. McNeil had previously advised Judge Lindsay at the trial of Bucci and Jordan and in the course of Minotti's cross examination on March 30, 2006, that "Mr. Minotti is actually eligible for safety valve. . . . He's eligible for the safety valve." A copy of the relevant transcript pages is attached as Exhibit A.

Under U.S.S.G. §5C1.2(a)(4) a defendant is ineligible for safety valve consideration if he was "an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines." Application Note 5 to §5C1.2 defines §5C1.2(a)(4) to mean "a defendant who receives an adjustment for an aggravating role under §3B1.1." (Emphasis added.) In other words, a defendant is only ineligible under §5C1.2(a)(4) if he has in fact received a §3B1.1 aggravating role adjustment. The Probation Office did not impose an aggravating role adjustment. The

---

[7] When Minotti entered his guilty plea in the instant case, Muolo was a co-defendant with Bucci and Jordan in the proceedings before Judge Lindsay. Thereafter, the government agreed to dismiss the § 924(c) charges against Muolo. Nonetheless, under U.S.S.G. §1B1.3 Muolo's *Pinkerton* responsibilities were relevant to his sentencing.
[8] See the final PSR at pages 27-28.

4

government did not object.

The government's belated claim that Minotti played a leadership role appears to be based primarily on the assertion that he "recruited" Jordan. The government's apparent source for that information is Minotti himself. The government's affirmative proffer to Probation that Minotti is not eligible for safety valve consideration is not only inconsistent with its pronouncement in the course of the trial before Judge Lindsay; it is also inconsistent with its obligations under paragraph 7, subsection d., pages 7 and 8, of its plea agreement with Minotti. In the plea agreement the government promised that it would not use information obtained from Minotti, directly or indirectly, except under circumstances not present here.[9]

Finally, Minotti did not in fact "recruit" Jordan in any leadership role and was not in fact a "leader" or "organizer" within the meaning of §3B1.1. As reflected in his accompanying affidavit, ¶¶ 5 and 6, Minotti "recruited" Jordan upon the specific directions of Bucci. Bucci used him; Minotti did not use anyone. In its April 12, 2006 press release following the convictions of Bucci and Jordan, the U.S. Attorney's Office properly identified Bucci as the "instigator and leader of the operation." A copy of the press release is attached as Exhibit B.

### DETECTIVE JORDAN DID NOT BRANDISH A WEAPON

The only evidence that detective Jordan brandished a weapon when he approached Carlos Ruiz on December 24th 2003, is the testimony of Carlos Ruiz. Ruiz's testimony is hardly credible for several reasons. The incident

---

[9] The plea agreement provides in part that "the U.S. Attorney agrees to take the position that at the time of sentencing information provided by Defendant pursuant to this Agreement should not be used wither in determining where within the applicable guideline range to sentence Defendant or in determining whether, or to what extent, a departure form the Sentencing guidelines is warranted."

was under surveillance. At least two federal agents were in the parking lot of the Malden Medical Center on December 24, 2003 for the specific purpose of surveilling an anticipated multi-kilo cocaine transaction between Ruiz and "Gino." They observed no such brandishing. In an Affidavit submitted to Judge Gertner for wiretap authorization on or about March 2, 2004, DEA Agent Kevin O'Neil, stated under oath – [10]

> Specifically, the intercepts and physical surveillance
> revealed: (a) Ruiz drove Minotti to the Malden Medical
> Center, where they met with Bucci in the parking lot; (b)
> Jordan, a detective with the Malden Police Department,
> then pulled his car in behind Ruiz's vehicle to block his
> escape; (c) Jordan approached Ruiz and identified
> himself as a police officer; and (d) Minotti ran off with
> the three kilograms of cocaine before any money was
> exchanged. (Emphasis added)

The physical surveillance revealed that Jordan identified himself as a police officer, not that he brandished a weapon.

Shortly after Ruiz's confrontation with Jordan on December 24, 2003, he described the incident in several telephone conversations without any indication that a weapon was involved.[11] At 11:16 a.m., within a half hour of the incident, Ruiz called his wife, Irene. A copy of a government transcript of the call is attached as Exhibit C. It was introduced in the trial before Judge Lindsay as an excited utterance. Ruiz tells his wife [12] that he

---

[10]  Affidavit Submitted In Support of Application For the Interception of Wire Communications Filed Under Seal. MBD No. 04-10064, ¶ 26, page 18.

[11]  The government has submitted transcripts of two Ruiz conversations that referenced a weapon. One was at approximately 2:00 p.m. on the 24th. The conversation was with Minotti. Ruiz's comments are ambiguous. It is unclear whether he is discussing a second meeting with Jordan or the first meeting. The second transcript is a December 26th conversation with Thomas Gorgone. That reference is cryptic and can be read as referring to Ruiz's second meeting with Jordan on the 24th.

[12]  Irene is not an innocent house wife. The government described her as running the Ruiz drug operation in his absence.

was robbed of three kilos:

> CARLOS:  They robbed the three (3) kilos from me.
>
> IRENE:    No, Charlie.
>
> CARLOS:  Yes.  The asshole who came was a cop. . .. and he, he hit me from the back of the car, and fucking Jon . . . I don't know if Jon knew because I think that he was in it with the other asshole . . .
>
> IRENE:    Uh-huh.
>
> CARLOS:    And Jon went running with the three "cuadros".

This is Ruiz's first description of the incident.  There is no reference to a weapon.

At 1:30 p.m. Ruiz makes a call to his source, Rosales, for the three kilos that were taken that morning.  Rosales had fronted the product.  A copy of the government transcript of the call to Rosales is attached as Exhibit D. Ruiz tells Rosales "the whole story now" – the "whole story" does not include a weapon:

> RUIZ:      Yes, dude.  But . . . I'll tell you the whole story now.  They ripped me off, those stupid idiots but . . . I already spoke with him, I'm here, I just left from his house now.
>
> ROSALES: Oh, shit.
>
> RUIZ:      But . . . we came by to see this guy here at the hospital, the guy we always see . . .
>
> ROSALES: Uh-huh.
>
> RUIZ:      . . . and then I get a fucking police car on my tail and blocks my path . . .
>
> ROSALES: Uh-huh.
>
> RUIZ:      . . . from behind and I couldn't move, dude.

ROSALES: Uh-huh.

RUIZ:        And this idiot (Jon) had the three "cuadros" on
him and he took off running. They screwed me over big time,
dude. So . . . don't worry man, I'll take care of your product.

Again there is no mention of a weapon and this is in a conversation
with the supplier of the drugs that had been taken.

Before the call to Rosales, Ruiz had visited Minotti at his home. As
reflected in Minotti's accompanying Affidavit, ¶ 12, Ruiz had a heated
conversation with him for about twenty minutes. "He was enraged. He
wanted his drugs and he believed that I had stolen them. We spent twenty
minutes or so together. He was constantly referring to what took place with
Jordan in excited detail, emphatically stating that he did not believe he was a
police officer. Ruiz never mentioned a weapon."

At 1:45 p.m. Ruiz had a telephone conversation with "Tommy"
(Thomas Gorgone). Gorgone had introduced Ruiz to Minotti.[13]  Once again
Ruiz describes the incident without any reference to a weapon. A copy of
the government transcript of this conversation is attached as Exhibit E.

CARLOS: I know where, I know where he lives. Look, this
is what happened, Jon and me . . . Jon set something up for
three (3) of them, right?

TOMMY:  Yeap.

CARLOS:   And then I went with Jon to see that kid named
Gino.

TOMMY:  Yeap.

CARLOS:  Bu supposedly a fuckin' detective, uh . . . came
behind me and stopped me and then Jon ran with the shit.  I

---

[13] See Affidavit of Jon Minotti,¶ 4.

8

call . . . I go to Jon's house, I go, "Where's my shit at?" He
goes, "I left it in the fuckin' forest."

Gorgone testified before the Grand Jury on June 29, 2004. He
testified in part as follows:[14]

> QUESTION:  Did Mr. Ruiz ever tell  you that the police
> officer  that  he  was or the  person who he, who purported to
> be a police  officer that he observed on Christmas Eve had
> drawn a gun on  him?
>
> ANSWER:    He never told me anything like that.

At 3:37 p.m. Ruiz talked to the person he believed was "Gino" but
which was Bucci.  "Gino" was present with Ruiz when Jordan approached.
Again Ruiz, in discussing what occurred, says nothing about a weapon.  A
copy of the government transcript of this conversation is attached as Exhibit
F.

> RUIZ:      If, if you were in my place you'd probably think
> the same shit too.  You know.  Because this is bullshit. . . .
> [STUTTERS] . . Out of nowhere this mother fucker or
> whatever wanna-be-cop, comes behind me, <u>he didn't even do</u>
> <u>nothing</u>. He would've,  he would've run after Jon if anything.
> (Emphasis added)
>
> GINO:      Buddy, I . . .I don't  know, I don't know the cop,
> I don't  know.
>
> RUIZ:      No, he would've . . . at least . . . at least he would
> have called for back up.
>
> GINO:      [U/I] . . . like I said, I'm on probation.  I mean . . .
> [U/I], you know what I mean?

---

[14]  Gorgone June 29, 2004 Grand Jury Testimony, page 24.

> RUIZ:     At lest he would've called for back up.   Like I
> told Jon, all I want is my shit tomorrow.   He knows what he
> did it at . . . where he left it at . . . just give me my shit and
> that's it.   And forget . . . and forget about everything.

Ruiz's trial testimony that Jordan pulled a weapon is simply inconsistent with his conduct immediately after. If a weapon had been drawn and put in Ruiz's face, he could hardly fail to mention that rather graphic fact whenever he recounted the story. He constantly mentions that the cop came up behind him and blocked his path. Does it make sense that he continually failed to mention the gun? He did not tell his wife in the course of an excited utterance. He did not tell his supplier whose drugs were taken. He did not tell his friend "Tommy" who introduced him to Minotti. He did not mention it to Minotti. He did not mention it to "Gino." Indeed, he told "Gino" that the officer "didn't even do nothing."

## MINOTTI COULD NOT REASONABLY FORESEE THAT JORDAN WOULD BRANDISH A WEAPON

Even if Ruiz's trial testimony is accepted, it was not reasonably foreseeable to Minotti that Jordan would draw his weapon. Just prior to the incident, Minotti told Jordan that Ruiz never carried a weapon himself. Minotti told Jordan what Ruiz had made clear to him. He was always carrying drugs in the "hide" in his car. He did not want to be found with a weapon if stopped by the police because that would bring about a search of his car. Affidavit of Jon Minotti, ¶ 9.

The plan was that Jordan would make a routine look into suspicious behavior solely for the purpose of giving Minotti an opportunity to take off with the drugs. The location was a hospital parking lot in broad daylight. Minotti knew that Jordan saw him leave. Anything dramatic was

unnecessary.   There was simply no reason for Minotti to conclude that the circumstances would ever warrant Jordan to draw his weapon.

## THE APPROPRIATE DEPARTURE FOR MINOTTI'S SUBSTANTIAL ASSISTANCE

The government has filed a Memorandum on Substantial Assistance but has not yet filed the necessary motions nor disclosed what recommendation it might make.  The Memorandum is a fair and accurate description of Minotti's assistance.  It may be summed up in one word the government uses – extraordinary.  Minotti submits that his "extraordinary" cooperation warrants commensurate sentencing consideration.  Minotti, however, does not anticipate a commensurate recommendation from the government because the current office apparently employs a mechanical response that virtually always caps its recommendations for departure at 50 per cent.  Minotti submits that his cooperation warrants substantially more than a 50 per cent reduction in the sentence otherwise applicable.

One of Minotti's co-conspirators was Francis Muolo.  The government has conceded, at least informally, that Muolo's *Pinkerton* responsibility under 18 U.S.C. § 924(c)(1)(A)(i)  and (ii) is equivalent to Minotti's.  Muolo was scheduled to go to trial with Bucci and Jordan, but on the eve of trial he entered a guilty plea, but only to the drug charges.  The government dismissed the § 924(c)(1)(A) charge.  Muolo did not testify.  He was deemed not to be credible.  Indeed, he had double-crossed the government and jeopardized its investigation by disclosures to Minotti.  Muolo's conduct made it absolutely necessary for Minotti to cooperate immediately and get Jordan on the "wire."  Judge Lindsay sentenced Muolo to 57 months.  If he had the *Pinkerton* responsibility that the government wants to attach to Minotti, his guideline sentence with the "additional" §

924(c) penalties would have been 141 months.

Ruiz was not charged in connection with the aborted drug transaction on December 24, 2003. He was sentenced by Judge Saris in connection with another drug conspiracy involving numerous co-conspirators. Ruiz refused to cooperate in that proceeding citing apparently legitimate safety concerns for his family. Ruiz's cooperation was not pro-active and was not complete. Ruiz avoided placing himself and his family in danger from cooperation. Minotti's cooperation was pro-active, complete and it placed himself and his family at risk. In the end, Ruiz's projected sentence, prior to the government's substantial assistance motions, was a minimum mandatory 120 months. The government's final recommended sentence was 52 months. Judge Saris's sentence was 62 months.

Further argument with respect to the appropriate departure will await the government motions and recommendation.

JON MINOTTI

By his attorney,

Michael J. Liston BBO# 301760
2 Park Plaza, Suite 610
Boston, MA 02116
(617) 426-2281

Dated: July 11, 2006

## CERTIFICATE OF SERVICE

I, Michael J. Liston, certify that on July 11, 2006 I served the foregoing by delivering a copy to John T. McNeil, Assistant U.S. Attorney.

Michael J. Liston

A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,
          Plaintiff,

V.                  Criminal Action No. 04-10194-RCL

DAVID JORDAN and
ANTHONY BUCCI,        March 30, 2006
          Defendants.   Boston, Massachusetts

TRANSCRIPT OF TESTIMONY OF JON MINOTTI DAY 3

JURY TRIAL DAY 9

BEFORE THE HONORABLE REGINALD C. LINDSAY

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

ONE COURTHOUSE WAY

BOSTON, MA 02210

Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA 02210
617-737-4410

a492eb12-9e1c-47b2-b7ad-45dd94c5311c

Page 40

1   A.   No.

2   Q.   Let me ask you, something.  As part of your deal, you know,

3   you're not sentenced yet, Mr. Minotti, but you expect to be

4   sentenced on May the 3rd, is that the day?

5   A.   Yes.

6   Q.   Yeah.  And you expect at that point in time, depending on

7   whether or not the government is satisfied with your testimony,

8   you're expecting the government -- hoping that the government

9   will recommend a reduction in your sentence, right?

10  A.   Yes.

11  Q.   And right now you are facing a mandatory 12 years in jail,

12  aren't you?

13  A.   Yes.

14  Q.   You're facing five years for transacting in more than 500

15  kilograms -- or 500 grams of cocaine, correct?

16  A.   Yes.

17  Q.   You're facing an additional five years which has to be run

18  consecutively, in other words, after the first five years, for

19  being involved in an incident in which a gun was used, correct?

20          MR. McNEIL:  Objection, your Honor.  Can we go to

21  sidebar on this?

22          THE COURT:  Okay.

23          (At side bar on the record.)

24          MR. McNEIL:  Two points.  The first is that he

25  needs to ask Mr. Minotti what he thinks he's facing; because

US v. Jordan, Bucci, Testimony of Jon Minotti
Day 3 033006

a492eb12-9e1c-47b2-b7ad-45dd94c5311c

1   Mr. Minotti is actually eligible for safety valve. And what

2   Mr. Drechsler is asking about is an incorrect statement of

3   law. So he doesn't face a mandatory minimum of 12 years, your

4   Honor; that's first of all. So he's asking him questions --

5   he's got to ask Mr. Minotti what he thinks he's facing because

6   as a matter of law Mr. Drechsler is simply wrong.

7          And, secondly, your Honor, I think at some point if

8   there's --

9          THE COURT: Wait a minute. He's not wrong, is he?

10  He's facing that --

11         MR. McNEIL: Not on the safety valve. He's

12  eligible for the safety valve, a mandatory minimum he's not,

13  he's eligible.

14         THE COURT: Okay. Go ahead. What's your next

15  point?

16         MR. McNEIL: The second point is I want to make

17  sure -- I didn't want to object during Mr. Drechsler's opening,

18  but I want to make sure he isn't just using this to sway the

19  jury about how much time his own client is facing. So there

20  may be time it's appropriate for the Court to instruct with

21  respect they're not to consider the sentencing being faced by

22  either of the defendants in this case. I don't think we're at

23  the point --

24         THE COURT: Well, I have an instruction about that,

25  although I noted that Mr. Drechsler in asking that question

B

**The United States Attorney's Office**

# District of Massachusetts

# Press Releases

April 12, 2006

PRESS RELEASE

## MALDEN NARCOTICS DETECTIVE AND ANOTHER CONVICTED IN CONSPIRACY TO STEAL COCAINE

Boston, MA... A senior Malden Police Department narcotics detective and his co-conspirator, a former federal convict, were convicted today by a federal jury in an eight count indictment charging them with conspiring to distribute three kilograms of cocaine and related charges.

United States Attorney Michael J. Sullivan and June W. Stansbury, Special Agent in Charge of the U.S. Drug Enforcement Administration in New England, announced that DAVID JORDAN, age 45, of 123 Spring Street in Stoneham, Massachusetts, and ANTHONY BUCCI, age 43, of 4 Upland Road, Wakefield, Massachusetts, were convicted of conspiracy to distribute and to possess with intent to distribute three kilograms of cocaine; possession with intent to distribute three kilograms of cocaine; and using or carrying a firearm during and in relation to a drug trafficking crime. JORDAN was also convicted of attempted witness tampering and three counts of making false statements to the DEA. BUCCI was also convicted of a second count of possession with intent to distribute cocaine which occurred five months after the conspiracy with JORDAN.

JORDAN and BUCCI, who had been on electronic bracelets at their respective homes during the pre-trial and trial proceedings, were immediately taken into the custody of the United States Marshals Service and held pending sentencing.

During the three week trial, the government presented evidence that in December 2003, JORDAN, BUCCI and two other men, Jon Minotti and Francis "Skeeter" Muolo, conspired to rob a Peabody cocaine dealer of 3 kilograms of cocaine on Christmas Eve morning 2003. The men executed the scheme by luring the drug dealer to the Malden Medical Center parking lot under the guise of a 3 kilogram drug sale, where JORDAN then arrived on the scene and blocked the dealer's vehicle with his own undercover car. While JORDAN identified himself as a police officer, and held a gun to the dealer's head, Minotti took the cocaine and fled into nearby woods. Muolo picked Minotti and the cocaine up on the other side of the woods and spirited them away from the scene. BUCCI, who was the instigator and leader of the operation, subsequently retrieved the cocaine from Minotti and Muolo, sold the cocaine and provided money to his co-conspirators. While JORDAN expected to be paid $30,000 for his role in the robbery, he ultimately received $15,000.

At the time of the robbery, a DEA Task Force was involved in a separate drug investigation and had a wiretap on the drug dealer's telephone. Shortly after the robbery, the DEA began an investigation of JORDAN and his associates. In the days following the robbery, JORDAN repeatedly lied to a DEA agent about what transpired in the Malden Medical Center parking lot, in attempt to cover-up his own involvement and the activities of Minotti, BUCCI and Muolo.

The day before his arrest, in May 2004, JORDAN was recorded by a co-conspirator acting at the direction of DEA. In that recording, Jordan urged his co-conspirator to lie to DEA agents, to tell another co-conspirator to keep his mouth shut, and to not cooperate with federal investigation. For this and other conduct, JORDAN was convicted of attempted witness tampering.

When BUCCI was arrested on May 20, 2004, officers found in his possession 91 grams of cocaine, two electronic scales, more than $6,000 in cash, and multiple cellular telephones. BUCCI was convicted separately for possession with intent to distribute cocaine for this conduct.

"David Jordan sold his badge for a cut of three kilograms of cocaine, and in the process betrayed everything a law enforcement officer stands for. He betrayed his oath to protect the citizens of Malden from drug dealers and armed robbers by becoming one himself – and he misused his authority as an officer to help commit his crimes. His conduct represents an egregious violation of the trust and good will that honorable and hard working police have earned from their community," said U.S. Attorney Sullivan.

June Stansbury, DEA Special Agent in Charge said, "DEA is committed to taking investigations wherever they lead us – in this case to a criminal drug dealing corrupt police officer. It is regrettable that the lure of drugs and dirty money tempt a very few in the profession, but make no mistake we treat criminals as they should be even if they are in possession of a badge."

BUCCI is scheduled for sentencing on September 18, 2006. JORDAN is scheduled for sentencing on September 19, 2006. The men face the following sentences:

JORDAN:

Count 1 (drug trafficking conspiracy): mandatory minimum sentence of 5 years, and a maximum of 40 years and a $2 million fine;

Count 2 (possession with intent to distribute): mandatory minimum sentence of 5 years, and a maximum of 40 years and a $2 million fine;

Count 3 (use/carrying of firearm in furtherance of a drug trafficking conspiracy): mandatory minimum sentence of 5-7 years on and after any sentence imposed on any other count and a maximum of life, and a $250,000 fine;

Count 4 (attempted witness tampering): a maximum of 10 years and a $250,000 fine;

Count 6 (false statement): a maximum of 5 years and a $250,000 fine;

Count 7 (false statement): a maximum of 5 years and a $250,000 fine;

Count 8 (false statement): a maximum of 5 years and a $250,000 fine;

BUCCI:

Count 1 (drug trafficking conspiracy): mandatory minimum sentence of 10 years, and a maximum of life and a $4 million fine;

Count 2 (possession with intent to distribute): mandatory minimum sentence of 10 years, and a maximum of life and a $4 million fine;

Count 3 (use/carrying of firearm in furtherance of a drug trafficking conspiracy): mandatory minimum sentence of 5-7 years on and after any sentence imposed on any other count and a maximum of life, and a $250,000 fine;

Count 5 (possession with intent to distribute): a maximum of 30 years and a $2 million fine.

The case was investigated by the U.S. Drug Enforcement Administration and the Massachusetts State Police (including the Middlesex County District Attorney's Narcotics Unit), with the assistance of the U.S. Marshals Service, the Bureau of Alcohol, Tobacco, Firearms and Explosives, and the Stoneham, Everett and Revere Police Departments. It is being prosecuted by Assistant U.S. Attorneys John T. McNeil and S. Theodore Merritt in Sullivan's Public Corruption and Special Prosecutions Unit.

Press Contact: Christina DiIorio-Sterling, (617) 748-3356

C

INCOMING:        781-599-9415
SUBSCRIBER:      NOT AVAILABLE

IRENE                          TO          CARLOS RUIZ

CARLOS:  Hello?

IRENE:   Charlie?

CARLOS:  Hey.

IRENE:   I'm ready now.

CARLOS:  You're not going to believe what happened to me.

IRENE:   What happened?

CARLOS:  Those assholes fucked me over.

IRENE:   What happened?

CARLOS:  They robbed the three (3) kilos from me.

IRENE:   No, Charlie.

CARLOS:  Yes. The asshole who came was a cop... and he, he hit me from the back
of the car, and fucking Jon.. I don't know if Jon knew because I think that he was in it
with the other asshole...

IRENE:   Uh-huh.

CARLOS:  And Jon went running with the three "cuadros" (paintings = kilos). He
tells me, ...[MUMBLES]... I'll meet you in a little bit, ...[STUTTERS]... I'm going to
leave the car here... I'm leaving the car here at the house, I'll be there for you in a little bit.

IRENE:   Well, I'm here at the plaza where Shaw's is.

CARLOS:  Shaw's?

IRENE:   Yes. Where there's a Payless Shoes, Fashion Bug...

CARLOS:  Oh, that's fine. I'll be there in a little bit.

IRENE:   That's fine.

CARLOS:  Okay.

**D**

INCOMING:       603-265-0476
SUBSCRIBER:     AGOSTINI, JOEL
                115 ALLEY ST
                LYNN, MA

******CROSS REFERENCE CALL 5086 N-117******

JOSE ROSALES      TO      CARLOS RUIZ

ROSALES AND RUIZ GREET.

ROSALES:    What are you doing?

RUIZ:       You don't know what happened to me, dude.

ROSALES:    You're kidding.

RUIZ:       Yeah buddy, they held me up, with the three fucking "cuadros" [frames -
kilos]

ROSALES:    [LAUGHS] Yeah, sure.

RUIZ:       Seriously man, I swear to God.

ROSALES:    Stop the bullshit, man.

RUIZ:       Yes, dude. But... I'll tell you the whole story now. They ripped me off,
those stupid idiots but... I already spoke with him, I'm here, I just left from his house
now.

ROSALES:    Oh shit.

RUIZ:       But... we came by to see this guy here at the hospital, the guy we always
see...

ROSALES:    Uh huh.

RUIZ:       ...and then I get a fucking police car on my tail and blocks my path...

ROSALES:    Uh huh.

RUIZ:       ...from behind and I couldn't move, dude.

ROSALES:    Uh huh.

RUIZ:       And this idiot (Jon) had the three "cuadros"[frames - kilos] on him and he

took off running. They screwed me over big time, dude. So... don't worry man, I'll take care of your product.

[BACKGROUND: PHONE RINGS]

ROSALES:    Come by dude, so that we can talk.

RUIZ:    No man, I'm telling you shortly, I'm here with this idiot now so that he can take me over there where...

[VOICES OVERLAP]

ROSALES:    That's fine, dude.

RUIZ:    Hold on dude, wait... I have him here now, hold on.

[PAUSE]

[ROSALES:    [ASIDE: Son of a bitch. They ripped him off with three (3)  kilos.]

[BACKGROUND: UM: What?]

ROSALES:    [ASIDE: They ripped him off with the three (3) kilos.]

RUIZ:    Hello.

ROSALES:    Hello!

ROSALES:    Uh-huh.

RUIZ:    Yeah, dude. ...[MUMBLES]... he told me he dropped it over here... over the fucking grass, and I'm going crazy looking now.

ROSALES:    Oh shit. He already took off with it, dude.

RUIZ:    No. That's the least thing, I'm going to fucking kill that mother fucker.    (laughs)

ROSALES:    That's fine, we'll talk right now.

RUIZ:    I'll call you back right now.

ROSALES:    That's fine.

MONITORED BY M. GUERREIRO & SUMMARIZED BY C. HARO
REVISED BY P. DIAZ

E

*Dixoune*

INCOMING:        978-360-9197
SUBSCRIBER:      NOT AVAILABLE

TOMMY LNU                    TO                    CARLOS RUIZ

CARLOS:    Hello?

TOMMY:    Hey, what's up?

CARLOS:    You know that... one of Jon's friends, Gino...

TOMMY:    I've, I've heard of him but I don't really know him. Why? What's up?

CARLOS:    That motherfucker just robbed me with three (3) "K" (kilos), man.

TOMMY:    What?!

CARLOS:    Yeap.

[VOICES OVERLAP]

TOMMY:    Are you sure?

CARLOS:    I want you to... I want you to find out where the fuck he lives at yo', I'm gonna go kill this motherfucker.

TOMMY:    ...[STUTTERS]... you know where Jonny lives.

CARLOS:    I know where, I know where he lives. Look, this is what happened, Jon... and me... Jon set something up for three (3) of them, right?

TOMMY:    Yeap.

CARLOS:    And then, I went with Jon to see that kid named Gino.

TOMMY:    Yeap.

CARLOS:    But supposedly a fuckin' detective, uh... came behind me and stopped me and then Jon ran with the shit. I call... I go to Jon's house, I go, "Where's my shit at? " He goes, "I left it in the fuckin' forest."

TOMMY:    He left it in the forest?

CARLOS:    Supposedly he left it in the fuckin' forest.

[VOICES OVERLAP]

TOMMY:      He's full of shit.

CARLOS:     All right? And then, ...[STUTTERS]... I went... then, that's fucked up, you know? I thought we were good friends. You know, and then he comes and does this shit to me.

TOMMY:      He didn't leave it in the forest. He's full of shit.

CARLOS:     He gave it to that fuckin' kid Gino for fuckin'... probably cheaper.

TOMMY:      Man, that... that ain't right. That fuckin' kid's an asshole.

CARLOS:     No...

TOMMY:      ...[STUTTERS]... Jonny did it then.

CARLOS:     I'm pretty sure Jon did it... because I wanna, I'm gonna go to Jon's house right now again and tell him where's my shit at... because he's got... I'm gonna

[VOICES OVERLAP]

TOMMY:      [U/I]

CARLOS:     I'm gonna go fuckin'... I told you, I'm gonna go fuckin' shoot this kid right now... if he doesn't give me my shit.

[VOICES OVERLAP]

TOMMY:      That motherfucker! What a piece of shit he is.

CARLOS:     ....[MUMBLES]... you know, that's fucked up. But that's all right, I'm going to go to his house right now. I'm gonna...

[VOICES OVERLAP]

TOMMY:      Go right to his house.

CARLOS:     I'm gonna go to his fuckin' house and I'm gonna tell him what's going on.

TOMMY:      ....[STUTTERS]... He ain't the brightest kid. I mean, you know where the fuckin' kid lives. What's he doing?

CARLOS:     Yeah.

TOMMY:      Tell him to straighten it out.

CARLOS:       Well, let me call you back, I'm gonna fuckin'... I'm gonna fix this fuckin' problem and then I'll give you a call back.

TOMMY:       Alright.

CARLOS:       Alright?

TOMMY:       Alright, bye.

END OF CALL
MONITORED & SUMMARIZED BY M.GUERRIERO
REVISED BY P. DIAZ

**F**

INCOMING:        781-244-3531
SUBSCRIBER:      N/A

GINO (ANTHONY BUCCI)        TO        CARLOS RUIZ

RUIZ:        Hello?

GINO:        Hello, it's Gino.  What's up?

RUIZ:        What's up?

GINO:        Hello, what's going on?

[VOICES OVERLAP]

RUIZ:        [U/I]  Huh?

GINO:        Hello?

RUIZ:        What happened?

GINO:        I don't know buddy, you tell me. You know.

RUIZ:        For me, that was a set-up, Gino. You tried to set me up, man.

GINO:        Come on, pal. You know?

RUIZ:        Nah.

GINO:        If I had anything to do with this though, and you seem pretty intelligent.
Right?  You think as an intelligent person, I would have just walked right away with it,
buddy. I don't know that guy from a hole in the wall.  Okay?

[VOICES OVERLAP]

RUIZ:        Like I told, like I told Jon...

[VOICES OVERLAP]

GINO:        When I went to work today, okay? We went back in, came back out, he
caught me and pulled me over a second time. Okay?  With two cruisers and then they
wanna go through my trunk and everything else. They went back down and made me sit
there for a half hour and they pulled a search warrant on me.  Pulled my shit apart.

RUIZ:        Why when I went over this time, he pulled me over... he pulled me over
again, man, and he didn't even do nothing. He was more scared, than I was scared of

him.

GINO:        Pulled you over a second time?

RUIZ:        Yeah, I went back over there a... a second time.

GINO:        And they didn't go through your car or anything, huh?

RUIZ:        Nope. And like I told Jon, if supposedly, if he has it, I just want my shit tomorrow. You know, I told him that early on, I'll go, "If he has... if you have my shit, you took off with it, well, I want my shit tomorrow. That's all I want."

GINO:        Hey, Jon, Jon says he dropped it somewhere buddy, you know? I believe Jon. It's got to be somewhere.  [U/I]

[VOICES OVERLAP]

RUIZ:        I told him, I'll go...

GINO:        I'm, a straight up guy, you know, I did my time, did everything and you know, [U/I] anybody. Like I said, if I was walking to [U/I] or had anything to do with it, I would've just waited until you gave it to me, walk in the hospital and, and the would've been the end of it. But that ain't me, that ain't my game.

RUIZ:        Yeah, alright ...[STUTTERS]...

[VOICES OVERLAP]

GINO:        You know? You know, [U/I]

[VOICES OVERLAP]

RUIZ:        If you were in my place...

[VOICES OVERLAP]

GINO:        ... this thing straightened out. You know, and handle this like gentlemen, that's all. So...

RUIZ:        If, if you were in my place you'd probably think the same shit too. You know. Because this is bullshit. ...[STUTTERS]... Out of nowhere this mother fucker or whatever wanna-be cop, comes behind me, he didn't even do nothing. He would've, he would've run after Jon if anything.

***** CALL WAITING TONE ******

RUIZ:       Right?

GINO:       Buddy, I... I don't know, I don't know the cop, I don't know..

RUIZ:       No, he would've... at least... a least he would have called for back up.

[VOICES OVERLAP]

********* CALL WAITING SOUND *******

GINO:       [U/I]... like I said, I'm on probation. I mean... [U/I], you know what I
mean?

[VOICES OVERLAP]

RUIZ:       At least he would've called for back up. Like I told Jon, all I want is my
shit tomorrow. He knows what he did it at... where he left it at....just give me my shit and
that's it. And forget... and forget about everything.

[VOICES OVERLAP

GINO:       Wait wait... he said he tossed it somewhere, no problem I'm gonna send a
couple of workers over there once... [BEEP SOUND] ...and a couple of flash lights.
We're gonna search for your shit. Don't worry about it.

RUIZ:       I mean, that 's all I want. I go, I want my shit and that's it. Like I told
him, I want my shit by tomorrow, that's that.

GINO:       No problem dude, that's all we want to so, that's all we wanted.

RUIZ:       You know.

GINO:       ...straight from the start, you know?

RUIZ:       Okay. So let's leave it like that. I'm gonna leave it 'til... I told him, I'm
gonna see him tomorrow morning I just better see my shit there.

GINO:       Hey my man, so believe me, we'll have all people out in it hunting for it
tonight. If Jon says he tossed it somewhere, it's there. He's a straight up guy too. You
know him, he won't screw anybody. You know, this shit about you thinking I had
something to do with this, you know...

RUIZ:       It pisses me off because come on, it's stupid... the guy... the guy...

[VOICES OVERLAP]

GINO:       .... I didn't even have something in my hands yet buddy. So how did I have something to do with it?

RUIZ:       Yeah, but still, it ...[STUTTERS]... it had to be one... something. something don't smell right, you know? And I know if something happens, I'll forget about it, I just want my shit tomorrow and that's that. We'll just leave it like that. I'll pretend like if nothing happened, just give me my shit and that's that. I want my shit tomorrow and that's that.

GINO:       Oh...

RUIZ:       I'll forget about everything

[VOICES OVERLAP]

GINO:       [U/I] everything I can to do that but you know, [U/I] I had something to do with that, you know 'cause whatever, it's all bullshit dude, I know, if he said something...

[VOICES OVERLAP]

RUIZ:       Jon knows what he's doing.... Jon...

GINO:       I don't know why why the fuck he didn't even bother calling back...

RUIZ:       ...[STUTTERS]... Jon has it, Jon has it...

GINO:       [U/I] 'cause I didn't know if he got caught or what's going on. Secondly, I don't really like to talking on the phone like this either. So let us do what we can tonight and I'll have him get back to you and hopefully everything will be all resolved and get a phone call tonight.

RUIZ:       Alright.

GINO:       Alright?

RUIZ:       Yeap.

GINO:       Alright. We'll talk to you then.

[END OF CALL]
MONITORED BY J.DROUIN & SUMMARIZED BY C. HARO
REVISED BY Y.LOPEZ & P. DIAZ