UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
)
)
)  CRIMINAL NO.
v. )  04 – 10325 – GAO
)
JON MINOTTI )
)

# FILED UNDER SEAL
# DO NOT SCAN

### AFFIDAVIT OF JON MINOTTI

I, Jon Minotti, under the pains and penalties of perjury, depose and say as follows:

1. I am the defendant in this case and I make this affidavit for use in connection with my sentencing hearing scheduled for July 13, 2006.

2. Since 1991 I worked principally as a plasterer in the construction trade. Plastering involves repetitive physical motion in the hands, arms and shoulders. In the late 90s I began to experience severe pain, principally in my shoulders and my right middle finger which continually locked in and out of joint due to excessive swelling. The pain was most intense while I tried to do plastering work but it continued even after I ceased the actual plastering movement. I sought medical help and was prescribed percocet. I continued to work with the assistance of percocet and other prescribed medications but required higher and higher dosages to relieve the pain and

1

continue to work. As time went on my prescription medication was insufficient and I began to take illegal pain medication, specifically Oxycontin. At some point, I do not know exactly where, I was taking Oxycontin not so much to relieve pain, but because I needed the medication. I became addicted to Oxycontin and I was buying and using Oxycontin in pills of 80 milligram quantities sometimes up to four times a day. I was purchasing them in bulk – 100 pills at a time – at $48.00 a pill. My monthly cost was in the $3,000.00 to $4,000.00 range. Oxycontin took over my life in ways I never thought possible. My principal supplier was Anthony Bucci. In a sense, he took over my life too.

    3. Prior to my Oxycontin addiction, I had been an occasional social user of marijuana and cocaine. I was not, however, involved in the sale of drugs. After my Oxycontin addiction and, I am convinced, because of it I did get involved in drug transactions including marijuana and cocaine transactions. Most of my illegal drug activity was essentially at the direction of Anthony Bucci. He had a way, however, of controlling things from the background. He had other people doing the up-front work and placing themselves, and not him, in harm's way.

    4. In the spring of 2003, Thomas Gorgone introduced me to Carlos Ruiz. Gorgone said he regularly obtained marijuana and cocaine from Ruiz and that Bucci had recently told him that he was having difficulty obtaining marijuana. Gorgone, who was aware that I knew Bucci, suggested Ruiz as a source for Bucci. I relayed that information to Bucci and subsequently, at Bucci's direction, traveled to California to look at product from Ruiz's source. There were two transactions. In each case, the sample displayed was much better than the product delivered. Bucci concluded that he had been ripped off by Ruiz and held me responsible. During this time Bucci

owed my wife substantial amounts from a real estate investment with Bucci that I pressed her to make. He repeatedly threatened to hold back money that was or would be due.

5. Bucci decided to respond to Ruiz by stealing drugs from him. This was something that Bucci told me he had done in the past. Bucci devised a relatively simple plan. A cocaine transaction would be set up with Ruiz. The delivery would be interrupted by an apparent police intervention in mid transaction, that is, before money changed hands. Bucci knew that I was acquainted with Detective David Jordan. He had a painting business on the side and we sometimes worked on the same construction projects. I was also dealing with Jordan and his wife as a real estate agent. Bucci had told me that he knew that Jordan was a "dirty cop" because associates of his had been paying Jordan off. I also knew that Jordan was approachable in this regard because he once told me how easy it would be to steal from dealers known to the police and he suggested a desire to get involved in stealing from dealers.

6. Bucci asked me to approach Jordan and I did. Bucci's plan was for me to set up a transaction with Ruiz for "Gino." Bucci would be "Gino" but, as was typical, Bucci did not want to be identified. Bucci's plan was for me to be the one "out front" and for me to have the drugs in hand just before the police intervention so that I could take off with the drugs as soon as the police appeared. On Bucci's instructions I relayed the plan to Jordan. He was willing but wanted to meet with everyone first.

7. On Bucci's instructions, I had told Ruiz that I had a guy that wanted three kilograms of cocaine, that he was "loaded" and that he had the cash available. On December 23, 2003, Ruiz told me that he had the product and was waiting on my guy. I told him that the "guy" was busy that

3

day but that it would probably take place at about 10:00 a.m. on the 24th. Ruiz was to come to my house first.

8. At about 9:00 a.m. on the morning of December 24th, Bucci, myself and Francis Muolo met with Jordan in the parking lot of the Malden Medical Center. Bucci had enlisted Muolo. He was to pick me up after I ran away with the cocaine. Jordan had suggested the location. When we arrived and introductions were completed, Jordan essentially took over. He knew the area. The back of the parking lot looked over a hill that descended into a wooded area. On the other side of the wooded area was a road hidden from view that would serve as the spot for picking me up with the cocaine if the plan worked. Jordan suggested that Bucci park his car at the end of the lot adjacent to the hill. I was to find a way of getting the drugs into my hands for the transfer to "Gino." Jordan would approach with his car and I was to take off as soon as I saw Jordan's car.

9. It was planned as a routine investigation of, at most, suspicious activity. All Jordan had to do was to delay Ruiz long enough for me to take off. At the parking lot during the 9:00 a.m. meeting, Jordan asked me if Ruiz carried a weapon. I made clear to him that he never did. I told him what Ruiz told me. Ruiz had a "hide" in his car. He said he never carried a gun because he was "always" carrying drugs. He did not want to be stopped and found with a weapon because that would cause a careful search of the car. It thus never dawned on me that Jordan would even consider pulling his service weapon. It was not part of any plan and it would be plainly unnecessary. I expected that at most Jordan would simply identify himself as a police officer and inquire as to what was going on.

10. After the 9:00 a.m. meeting at the hospital parking lot I went back home to wait for Ruiz. When he arrived he showed me one kilo. In his

4

presence I called Bucci ("Gino") to advise him that we were on our way. I then got into Ruiz's car for the trip back to the Malden Medical Center. However, I began to have second thoughts. I did not want to do this. I told Ruiz that I had forgotten something at the house and that we had to go back. We were only a block or so from the house. He turned around. I went into the house and called Bucci and tried to back out. I told him that I could not get the cocaine from Ruiz without the money. Bucci said to let him talk to Ruiz and that he would take care of it. I walked out to the driveway and handed the phone to Ruiz. I was standing right next to Ruiz and could hear the conversation. Bucci ("Gino") told Ruiz that he wanted to take the cocaine into his place of employment – the hospital – to test it to make sure it was good before he paid for it. Ruiz agreed. I got back into Ruiz's car. During the trip I climbed into the back seat and Ruiz opened the "hide." I put all three kilos into a bag and then climbed back into the front seat. I now had the cocaine in my possession. When we pulled into the lot, as instructed, I directed Ruiz to park next to "Gino's" car which was adjacent to the hill with the front of "Gino's" car facing away from the hill. Ruiz parked his car facing the hill. "Gino" was not in his car when Ruiz and I arrived, but within a short time he emerged from the hospital, walked to his car and got in. He then lit a cigarette and at that time I got out of Ruiz's car with the bag of cocaine and walked around the front of Ruiz's car to a point between the two cars. I then observed Jordan's car approaching. He was looking right at me. I quickly turned and took off down the hill and through the woods. Muolo picked me up on the other side as planned. I did not observe what happened in the parking lot after I ran. Since I knew that Jordan had seen me take off, there was plainly no need for Jordan to pull his weapon.

11. I am aware that Ruiz has testified that Jordan brandished his weapon when he approached Ruiz and Bucci ("Gino") on the morning of December 24th, 2003. I did not witness the approach, but I am advised that two agents who were at the parking lot for the purpose of surveilling the anticipated cocaine transaction between Ruiz and "Gino" did witness the approach, but never saw Jordan brandishing a weapon.

12. In the period between the December 24th event and my arrest in May of 2004 I had many conversations with Bucci and Jordan about what had transpired. There was never any suggestion that Jordan had pulled his weapon. Immediately after the incident I avoided picking up the several calls that Ruiz made to me. Within an hour or so, however, Ruiz came to my house. He was enraged. He wanted his drugs and he believed that I had stolen them. We spent twenty minutes or so together. He was constantly referring to what took place with Jordan in excited detail, emphatically stating that he did not believe he was a police officer. Ruiz never mentioned a weapon.

13. During this meeting with Ruiz, I told him that I had dumped the bag with the drugs in the woods, but I refused to go with him to look, suggesting that the police were probably watching. Ruiz left apparently for the purpose of looking in the woods for the drugs. When he left, I called Bucci. He told me to call Jordan and I did. At about 2:00 p.m., Ruiz called me. He said the same guy had stopped him again. Ruiz was now even more suspicious that he had been ripped off because he was driving a different car when Jordan approached him. I have listened to a tape of this call and I have seen a transcript. The transcript introduced at the Bucci/Jordan trial includes the following excerpt:

> "If that fucking idiot . . . how the hell he knows I was up there. He didn't even have, this time he didn't have no fucking gun on me or else I would have fucking kicked him. He had his fucking gun on me or else I would have fucking popped him in the nose. That fucking friend of yours."

At the time of this conversation, I do not recall consciously noting the reference to a gun or whether or not Ruiz was saying that Jordan had a gun this second time rather than the first time. In any event this comment is the only comment that Ruiz ever made to me that makes any reference to a weapon that Jordan may have had at any time. I am further advised that Ruiz made at least three other calls immediately after his first confrontation with Jordan and, although in each he described the confrontation, he never mentioned a gun.

14. When federal agents confronted me in May of 2004, I admitted my involvement. The agents wanted me to cooperate by wearing a wire in conversation with Jordan. I was not unwilling, but I asked to see a lawyer first. I was told by Agent Mark Tully that there was no time for that. He said that if I had any hope of staying out of jail, I had to begin to cooperate immediately. He emphasized that they needed to get Jordan on tape, that it was an essential part of the investigation and that that in itself could keep me out of jail. Agent Tully was careful, however, to make clear that he could not make any promises. He said this very important cooperation would be brought to the attention of the prosecutors and that his input and the input of the other agents would be "huge." I agreed to go forward without an attorney. Thus I had already cooperated before any plea agreement was even drafted. I was already committed.

Signed under the pains and penalties of perjury this    day of July 2006.

_____
Jon Minotti

### CERTIFICATE OF SERVICE

I, Michael J. Liston, certify that on July 11, 2006 I served the foregoing by delivering a copy to John T. McNeil, Assistant U.S. Attorney.

_____
Michael J. Liston